MARK J. HATTAM (BAR NO. 173667)
MICHAEL J. HOLMES (BAR NO. 199311)
ALLEN MATKINS LECK GAMBLE
    MALLORY & NATSIS LLP
501 West Broadway, 15th Floor
San Diego, California 92101-3541
Phone: (619) 233-1155
Fax: (619) 233-1158
E-Mail: mhattam@allenmatkins.com
          mholmes@allenmatkins.com

Attorneys for Defendant
PRINCIPAL COMMERCIAL FUNDING, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 16062 SOUTHWEST FREEWAY, LLC and GARY L. GREENBERG, On Behalf of All Others Similarly Situated, and on Behalf of the Class,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PRINCIPAL COMMERCIAL FUNDING, LLC, and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No. 07 CV 1998 DMS (AJB)<br><br>**LODGMENT OF EXHIBITS IN SUPPORT OF PRINCIPAL COMMERCIAL FUNDING, LLC'S MOTION TO DISMISS**<br><br>Date:  January 11, 2008<br>Time:  1:30 p.m.<br><br>Judge:  Dana M. Sabraw<br>Ctrm:  10 |

Defendant Principal Commercial Funding, LLC hereby lodges true and correct copies of the following exhibits in support of its Motion to Dismiss:

EXHIBIT 1:     Secured Promissory Note dated March 7, 2007

EXHIBIT 2:     Deed of Trust dated March 7, 2007

EXHIBIT 3:     Guaranty dated March 7, 2007

Dated: November 27, 2007                    ALLEN MATKINS LECK GAMBLE
                                                                    MALLORY & NATSIS LLP


                                                            By: s/Michael J. Holmes
                                                                 MICHAEL J. HOLMES
                                                                 Attorneys for Defendant
                                                                 PRINCIPAL COMMERCIAL FUNDING,
                                                                 LLC

# EXHIBIT "1"

**SECURED PROMISSORY NOTE**
Loan No. 755698

$2,700,000                                                   MARCH 7 , 2007

1.      FOR VALUE RECEIVED, 16062 SOUTHWEST FREEWAY, LLC, a Texas limited liability
company, as "Borrower" ("Borrower" to be construed as "Borrowers" if the context so requires), hereby
promises to pay to the order of PRINCIPAL COMMERCIAL FUNDING, LLC, a Delaware limited liability
company (together with its successors and assigns, the "Lender"), the principal sum of TWO MILLION
SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS Dollars ($2,700,000) (the "Loan Amount") or
so much thereof as shall from time to time have been advanced, together with interest on the unpaid balance
of said sum from MARCH 7   (the "Closing Date"), at the rate of Six percent (6.00%) per annum.
This Note is secured by, among other things, a "Mortgage" (it being agreed that Mortgage as hereinafter
used shall be construed to mean "mortgage" or "deed of trust" or "trust deed" or "deed to secure debt" or
other similar type of security instrument as the context so requires).

A payment of interest from the Closing Date to and including March 31, 2007 shall be paid on the
Closing Date calculated by multiplying the actual number of days elapsed in the period for which interest is
being calculated by a daily rate based on the foregoing annual interest rate and a 360-day year. Thereafter,
interest shall be computed on the unpaid balance by multiplying the actual number of days elapsed in the
period for which interest is being calculated by a daily rate based on the annual interest rate set forth above
and a 360-day year. Beginning on May 1, 2007, principal and interest shall be due and payable in
installments of SIXTEEN THOUSAND ONE HUNDRED EIGHTY-SEVEN AND 86/100 DOLLARS
($16,187.86), with an installment in a like amount due and payable on the same day of each month
thereafter until said principal and interest are fully paid, except that all remaining principal, interest to and
including the date of payment and other Indebtedness shall be due and payable on April 1, 2017 ("Maturity
Date") or such earlier date resulting from the acceleration of the Indebtedness by Lender. Each installment
shall be credited first upon interest then accrued and the remainder upon principal. All principal and interest
shall be paid in lawful money of the United States of America by automated clearing house transfer through
such bank or financial institution as shall be approved in writing by Lender, shall be made to an account
designated by Lender, and shall be initiated by Lender or shall be made in such other manner as Lender may
direct from time to time. Any other monthly deposits or payments Borrower is required to make to Lender
under the terms of the Loan Documents shall be made by the same payment method and on the same date as
the installments of principal and interest due under this Note.

2.      (A)    (i)       Borrower shall not have the right or privilege to prepay all or any portion of the
unpaid principal balance of this Note until the Open Period. From and after such date, provided
there is no Event of Default, the principal balance of this Note may be prepaid, at par, in whole but
not in part, upon: (a) not less than 30 days prior written notice to Lender specifying the date on
which prepayment is to be made, which prepayment must occur no later than the fifth day of any
such month unless Borrower pays to Lender all interest that would have accrued for the entire
month in which this Note is prepaid absent such prepayment; (b) payment of all accrued and unpaid
interest on the outstanding principal balance of this Note to and including the date on which
prepayment is to be made; and (c) payment of all other Indebtedness then due under the Loan
Documents. Lender shall not be obligated to accept any prepayment of the principal balance of this
Note unless it is accompanied by all sums due in connection therewith.

(ii)     "Securitization Transaction" shall mean: the sale, transfer or assignment of this
Note, the other Loan Documents and the Environmental Indemnity, or the granting of participations
or issuance of mortgage pass-through certificates or other securities evidencing a beneficial interest

:ODMA\PCDOCS\ATL\1128770\1

in a rated or unrated public offering or private placement, each, as designated by Lender, a Securitization Transaction.

      (iii)    In addition to the Loan Prepayment rights set forth hereinabove, after the Lockout Date (which is the earlier of the date which is two (2) years after the date of the Securitization Transaction (as hereinafter defined) or the date which is four (4) years after the date of the first full debt service payment hereunder) but prior to the Open Period, Borrower may prepay the principal balance of this Note, as set forth in the immediately preceding paragraph, provided however, that such prepayment will require the payment of the Make Whole Premium.

3.      Borrower agrees that to the extent of any prepayment permitted herein, or if Lender accelerates the whole or any part of the principal sum evidenced hereby after the occurrence of an Event of Default, Borrower waives any right to prepay said principal sum in whole or in part without premium and agrees to pay, as yield maintenance protection and not as a penalty, the lesser of: (a) the maximum amount which is allowable under Texas law limiting the amount of interest which may be contracted for, charged or received after considering all other amounts constituting or deemed to constitute interest, and (b) the "Make Whole Premium".

The Make Whole Premium shall be lesser of: (a) the maximum amount which is allowed under Texas law limiting the amount of interest which may be contracted for, charged or received after considering all other amounts constituting or deemed to constitute interest and (b) the greater of one percent (1%) of the outstanding principal amount of the Loan or a premium calculated as provided in subparagraphs (1)-(3) below:

      (1)    Determine the "Reinvestment Yield." The Reinvestment Yield will be equal to the yield on a U.S. Treasury Issue with similar remaining time to the Maturity Date as reasonably selected by Lender within one week prior to the date of prepayment and converted to an equivalent monthly compounded nominal yield, or in the event there is no market activity involving the U.S. Treasury Issue at the time of prepayment, the Lender shall choose a comparable Treasury Bond, Note or Bill which the Lender reasonably deems to be similar to the U.S. Treasury Issue's characteristics (i.e., rate, remaining time to maturity, yield).

      (2)    Calculate the "Present Value of the Loan." The Present Value of the Loan is the present value of the payments to be made hereunder (all installment payments and any remaining payment due on the Maturity Date) discounted at the Reinvestment Yield for the number of months remaining from the date of prepayment to the Maturity Date.

      (3)    Subtract the outstanding principal amount of the Note from the Present Value of the Loan as of the date of prepayment. Any resulting positive differential shall be the premium.

Notwithstanding anything in this section to the contrary, during the "Open Period" which is the period beginning on the payment date in the month which is one month prior to the Maturity Date, no Make Whole Premium shall be payable.

In the event any proceeds from a Casualty or Taking are applied to reduce the principal balance hereof, such reduction shall be made without a Make Whole Premium, provided no Event of Default then exists under the Loan Documents.

4.      If any payment of principal, interest, or other Indebtedness is not made when due, damages will be incurred by Lender, including additional expense in handling overdue payments, the amount of which is

::ODMA\PCDOCS\ATLI\128770\1

difficult and impractical to ascertain. Borrower therefore agrees to pay, upon demand, the sum of four cents ($.04) for each one dollar ($1.00) of each said payment which becomes overdue ("Late Charge") as a reasonable estimate of the amount of said damages, subject, however, to the limitations set forth herein.

Notwithstanding anything hereinabove to the contrary, the Late Charge assessed on any amount due on the Maturity Date but not then paid, whether or not by acceleration, shall not be four cents for each one dollar as described above, but shall instead be a sum equal to the interest which would have accrued on the principal balance then outstanding from the date the payment is made to the end of the month in which the Maturity Date occurs. Such Late Charge shall be in addition to interest otherwise accruing under this Note.

5.    If any Event of Default has occurred and is continuing under the Loan Documents, the entire principal balance of the Loan, interest then accrued, and Make Whole Premium, and all other Indebtedness whether or not otherwise then due, shall at the option of Lender, become immediately due and payable without demand or notice, and whether or not Lender has exercised said option, interest shall accrue on the entire principal balance, interest then accrued, Make Whole Premium and any other Indebtedness then due, at a rate equal to the Default Rate until fully paid.

6.    Notwithstanding anything herein or in any of the other Loan Documents to the contrary, no provision contained herein or therein which purports to obligate Borrower to pay any amount of interest or any fees, costs or expenses which are in excess of the maximum permitted by applicable law, shall be effective to the extent it calls for the payment of any interest or other amount in excess of such maximum. All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of the maturity hereof or otherwise, shall the interest contracted for, charged or received by Lender exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum lawful amount, the interest payable to Lender shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Lender shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall, at the option of Lender, be refunded to Borrower or be applied to the reduction of the principal hereof, without a Make Whole Premium and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal hereof such excess shall be refunded to Borrower. All interest paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of the principal (including the period of any renewal or extension hereof) so that the interest herein for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Borrower and Lender.

7.    Borrower and any endorsers or guarantors waive presentment, protest and demand, notice of protest, demand and dishonor and nonpayment, notice of default, notice of intent to accelerate maturity, and notice of acceleration of maturity and diligence in collection, and agree the Maturity Date of this Note or any installment may be extended without affecting any liability hereunder, and further promise to pay all reasonable costs and expenses, including but not limited to, reasonable attorney's fees incurred by Lender in connection with any Event of Default or in any proceeding to interpret and/or enforce any provision of the Loan Documents.  No release of Borrower from liability hereunder shall release any other maker, endorser or guarantor hereof.

8.    This Note is secured by the Loan Documents creating among other things legal and valid encumbrances on and an assignment of all of Borrower's interest in any Leases of the Premises as described in the Mortgage.  Capitalized terms used herein and not otherwise defined shall have those meanings given to them in the Loan Documents.  In no event shall such documents be construed inconsistently with the terms of this Note, and in the event of any discrepancy between any such documents and this Note, the

::ODMA\PCDOCS\ATL\1128770\1

3

terms hereof shall govern. The proceeds of this Note are to be used for business, commercial, investment or other similar purposes, and no portion thereof will be used for any personal, family or household use. This Note shall be governed by and construed in accordance with the laws of the state where the Premises is located, without regard to its conflict of law principles.

9.    "Recourse Obligations" shall mean the type of recourse and liability of Borrower under the Loan Documents as set out below:

    Notwithstanding any provision to the contrary in this Note or the Loan Documents and except as otherwise provided for in this paragraph below, the liability of Borrower under the Loan Documents shall be limited to the interest of Borrower in the Premises and the Rents. In the event of foreclosure of the liens evidenced by the Loan Documents, no judgment for any deficiency upon the Indebtedness evidenced by the Loan Documents shall be sought or obtained by Lender against Borrower. Nothing herein shall in any manner limit or impair (i) the lien or enforcement of the Loan Documents pursuant to the terms thereof or (ii) the obligations of any indemnitor or guarantor, if any.

    Notwithstanding any provision hereinabove to the contrary, Borrower shall be personally liable to Lender for:

    (a)    any loss or damage to Lender arising from: (i) the failure to pay any of the taxes, assessments or similar charges specified in the Mortgage, or (ii) Borrower's failure to maintain insurance in compliance with the provisions of the Loan Documents, or (iii) Borrower's failure to apply insurance proceeds or condemnation awards in compliance with the provisions of the Loan Documents;

    (b)    any event or circumstance for which Borrower indemnifies Lender under the Environmental Indemnity;

    (c)    material physical waste of the Premises, or any willful act or omission which materially damages or materially reduces the value of the Premises;

    (d)    any Rents (as defined in the Loan Documents) which Borrower receives after an Event of Default under the Loan Documents which are not applied to (A) payment of principal, interest and other charges due under the Loan Documents or (B) payment of ordinary and/or necessary operating expenses of the Premises;

    (e)    any security deposits or other refundable deposits or prepaid rents (together with any interest required by law) not turned over to Lender upon conveyance of the Premises to Lender pursuant to foreclosure or power of sale or by a deed acceptable to Lender;

    (f)    any sums expended by Lender in fulfilling the obligations of Borrower as lessor under any Lease of the Premises prior to a sale of the Premises pursuant to a foreclosure or power of sale, a Permitted Transfer or upon conveyance of the Premises to Lender in lieu of foreclosure, or expended by Lender after any of the above-listed events for obligations of Borrower which arose prior to any such event;

    (g)    misapplication or misappropriation of tax reserve accounts, tenant improvement reserve accounts, security deposits, prepaid rents or other similar sums paid to or held by Borrower or any other entity or person in connection with the operation of the Premises;

(h)     any loss or damage to Lender arising from any fraud or willful misrepresentation by or on behalf of Borrower, Interest Owner or any guarantor regarding the Premises, the making or delivery of any of the Loan Documents or in any materials or information provided by or on behalf of Borrower, Interest Owner or guarantor, if any, in connection with the Loan; and

(i)     any loss or damage to Lender arising from the loss of Lender's perfection or priority of its security interest in personal property or fixtures covered under any UCC financing statement due to Borrower's failure to notify Lender as provided for in the Mortgage.

Notwithstanding anything contained in the language above as it relates solely to taxes, assessments and insurance premiums, to the extent Lender is impounding for taxes, assessments and insurance premiums in accordance with the Loan Documents and Borrower has fully complied with all terms and conditions of the Loan Documents relating to impounding for the same, then Borrower shall not be personally liable for Lender's failure to apply any of said impound amounts held by Lender in accordance with the Loan Documents.

Notwithstanding anything to the contrary in the Loan Documents, the limitation on liability contained in the first paragraph of this section SHALL BECOME NULL AND VOID and shall be of no further force and effect in the event:

(x)     of any Transfer other than a Permitted Transfer; and

(y)     the Premises shall become an asset in a bankruptcy or insolvency proceeding or a petition or answer voluntarily filed by Borrower seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy laws of the United States or under any other applicable federal, state or other statute or law;

Borrower shall be completely relieved of all liability under the Loan Documents, except for an event or circumstance for which Borrower indemnifies Lender under the Environmental Indemnity and except for any fraud or willful misrepresentation by or on behalf of Borrower, Interest Owner or any guarantor regarding the Premises, the making or delivery of any of the Loan Documents or in any materials or information provided by or on behalf of Borrower, Interest Owner or any guarantor in connection with the Loan, upon payment in full of the Indebtedness evidenced by the Loan Documents.

10.     If more than one person or entity constitutes Borrower, all obligations and agreements of the persons or entities constituting Borrower are joint and several.

11.     This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. All of the rights, privileges and obligations hereunder shall inure to the benefit of the heirs, successors and assigns of Lender and shall bind the heirs and permitted successors and assigns of Borrower.

12.     If any provision of this Note shall, for any reason, be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, but this Note shall be construed as if such invalid or unenforceable provision had never been contained herein.

13.     This Note may be executed in counterparts, each of which shall be deemed an original; and such counterparts when taken together shall constitute but one agreement.

::ODMA\PCDOCS\ATL\1128770\1

5

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed and delivered as of the date first set forth above.

16062 SOUTHWEST FREEWAY, LLC, a Texas limited liability company

By: _Gary L Greenberg_

Name: __GARY L GREENBERG__

Title: __MANAGER__

ALLONGE TO SECURED PROMISSORY NOTE DATED _March 7_____, 2007
IN THE ORIGINAL PRINCIPAL AMOUNT OF $2,700,000.00
Loan No. 755698

Pay to the order of PRINCIPAL COMMERCIAL FUNDING II, LLC, a Delaware limited
liability company, having an address of 801 Grand Avenue, Des Moines, IA 50392 without
recourse, representation or warranty.

PRINCIPAL COMMERCIAL FUNDING, LLC,
a Delaware limited liability company

By:    PRINCIPAL REAL ESTATE INVESTORS, LLC,
       a Delaware limited liability company, its authorized
       signatory

       By    _Mari E Larson_
             Name:   Mari E. Larson
             Title:  Senior Closing Consultant

       By    _Sandra K Lanz_
             Name:   Sandra K. Lanz
             Title:  Director
                     Closing

ALLONGE TO SECURED PROMISSORY NOTE DATED _____March_____, 2007
IN THE ORIGINAL PRINCIPAL AMOUNT OF $2,700,000.00
Loan No. 755698

Pay to the order of _____, _____,
having an address of _____
without recourse, representation or warranty.

PRINCIPAL COMMERCIAL FUNDING II, LLC,
a Delaware limited liability company

By:   PRINCIPAL REAL ESTATE INVESTORS, LLC,
      a Delaware limited liability company, its manager



By   _____
     Name:   Diane Duvall
     Title:   Senior Financial Accounting Analyst

By   _____
     Name:   Patricia A. Bailey
     Title:   Chief Financial Officer
             Director of Finance

# EXHIBIT "2"

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY
REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS
INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR
SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Record and return to:

Powell Goldstein LLP
2200 Ross Avenue
Suite 3200
Dallas, TX 75201
ATTN: Melissa Cobb

WE CERTIFY THE FOREGOING INSTRUMENT IS
A TRUE AND CORRECT COPY OF THE ORIGINAL
WHICH HAS BEEN PROPERLY EXECUTED.

REPUBLIC TITLE OF TEXAS, INC.

BY: _____

## DEED OF TRUST, FIXTURE FILING, SECURITY AGREEMENT
### AND ASSIGNMENT OF LEASES AND RENTS
Loan No. 755698

THIS DEED OF TRUST (as the same may from time to time hereafter be modified,
supplemented or amended, this "Deed of Trust"), made as of MARCH 7 , 2007 by 16062
SOUTHWEST FREEWAY, LLC, a Texas limited liability company, having a principal place of business
and post office address at 934 Muirlands Dr., La Jolla, California 92037, "Borrower" ("Borrower" to be
construed as "Borrowers" if the context so requires) to Brenda S. Tyler of 801 Grand Avenue, Des
Moines, Iowa ("Trustee"), as Trustee for the benefit of Principal Commercial Funding, LLC, a Delaware
limited liability company, having its principal place of business and post office address c/o Principal
Global Investors, LLC at 801 Grand Avenue, Des Moines, Iowa 50392-1450, "Lender".

WITNESSETH:

Borrower is justly indebted to Lender for money borrowed (the "Loan") in the original principal
sum of TWO MILLION SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($2,700,000) (the
"Loan Amount") evidenced by Borrower's secured promissory note in the Loan Amount of even date
herewith, (as may be modified, amended, supplemented, extended or consolidated in writing and any
note(s) issued in exchange therefore or replacement thereof) (the "Note"), payable to Lender, together
with all accrued and unpaid interest thereon, interest accrued at the Default Rate (if any), Late Charges (if
any), the Make Whole Premium (if any), all loans and future advances made by Lender to Borrower, and
all other obligations and liabilities due or to become due to Lender pursuant to any and all other
instruments or documents evidencing, relating to or securing the Loan (the "Loan Documents") and the
Environmental Indemnity (collectively the "Indebtedness") until the Indebtedness has been paid, but in
any event, the unpaid balance (if any) remaining due on the Note shall be due and payable on April 1,
2017 (the "Maturity Date") or such earlier date resulting from the acceleration of the Indebtedness by
Lender. Capitalized terms used herein and not otherwise defined shall have those meanings given to them
in the other Loan Documents.

NOW, THEREFORE, to secure the payment of the Indebtedness in accordance with the terms
and conditions of the Loan Documents, and all extensions, modifications, and renewals thereof and the
performance of the covenants and agreements contained therein, and also to secure the payment of any
and all other Indebtedness, direct or contingent, that may now or hereafter become owing from Borrower
to Lender in connection with the Loan Documents, and in consideration of the Loan Amount in hand
paid, receipt of which is hereby acknowledged, Borrower does by these presents grant, bargain, sell,

::ODMA\PCDOCS\ATL\1128769\1

assign and convey unto Trustee, its successors and assigns forever, that certain real estate located in the county of Fort Bend, state of Texas, more particularly described in Exhibit A attached hereto and made a part hereof (the "Land"), which Land, together with the following described property, rights and interests, is collectively referred to herein as the "Premises".

A.    All of Borrower's rights, title and interest as Lessor in and to all leases and all other tenancies, rental arrangements, subleases, and guarantees of the performance or obligations of any tenants thereunder affecting the Premises, or any part thereof, now existing or which may be executed at any time in the future during the life of this Deed of Trust, and all amendments, extensions and renewals of said leases, subleases, and guarantees and any of them, all of which are hereinafter called the "Leases" and all rents or other income or payments, regardless of type or source of payment (including but not limited to common area maintenance charges, lease termination payments, purchase option payments, refunds of any type, prepayment of rents, settlements of litigation or settlements of past due rents) which may now or hereafter be or become due or owing under the Leases, and any of them, or on account of the use of the Premises, all of which are hereinafter called the "Rents", which are pledged and assigned absolutely and directly (and not merely collaterally). It is intended hereby to establish a present and complete transfer of all the Leases and all rights of the lessor thereunder and all the Rents unto Lender, with the right, but without the obligation, to collect all of said Rents, which may become due during the life of this Deed of Trust;

B.    All and singular the tenements, hereditaments, easements, appurtenances, passages, waters, water courses, riparian rights, and other water rights, whether or not adjudicated, whether tributary or nontributary and whether evidenced by deed, water stock, permit or otherwise, sewer rights, rights in trade names and any name under which the Improvements are now or hereafter operated, licenses, permits and contracts, and all other rights of any kind or character in any way now or hereafter appertaining to the Land and Improvements, including but not limited to, homestead and any other claim at law or in equity as well as any after-acquired title, franchise or license and the reversion and reversions and remainder and remainders thereof;

C.    Any and all buildings and improvements of every kind and description now or hereafter erected or placed on the said Land and all materials intended for construction, reconstruction, alteration and repairs of such buildings and improvements now or hereafter erected thereon, all of which materials shall be deemed to be included within the Premises immediately upon the delivery thereof to the Premises, and all improvements and fixtures now or hereafter owned by Borrower and attached to or contained in and used in connection with the Premises and appurtenances thereto; and all items of furniture, furnishings, equipment and personal property owned by Borrower used or useful in the operation of the Premises; and all renewals or replacements of all of the aforesaid property owned by Borrower or articles in substitution therefore, whether or not the same are or shall be attached to said buildings or improvements in any manner (collectively, the "Improvements"); it being mutually agreed, intended and declared that all the aforesaid property owned by Borrower and placed by it on the Land or used in connection with the operation or maintenance of the Premises shall, so far as permitted by law, be deemed to form a part and parcel of the Land and for the purpose of this Deed of Trust to be Land and covered by this Deed of Trust, and as to any of the property aforesaid which does not form a part and parcel of the Land or does not constitute a "fixture" (as such term is defined in the Uniform Commercial Code ("UCC")) this Deed of Trust and the other Loan Documents (the terms of which grant a security interest in personal property or real property, the proceeds of which may become personal property) are each hereby deemed to be, as well, a security agreement under the UCC for the purpose of creating a security interest in all items, including, but not limited to, all property and rights which Borrower may grant, assign, bargain, sell, transfer, set over, deliver, or otherwise convey to Lender, as secured party, under the terms of this Deed of Trust or any of the other Loan Documents, including any and all proceeds thereof (as used herein, Borrower shall mean "Debtor" under the UCC and Lender shall mean "Secured Party" under the UCC),

::ODMA\PCDOCS\ATL\1128769\1

2

and this instrument shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included in the Premises. Borrower hereby grants a security interest in and to any of the Premises governed by the UCC to Lender and authorizes Lender to execute such documents necessary to perfect Lender's security interest and Borrower authorizes Lender at any time until the Indebtedness is paid in full, to prepare and file, at Borrower's expense, any and all UCC financing statements, amendments, assignments, terminations and the like, necessary to create and/or maintain a prior security interest in such property all without Borrower's execution of the same. Furthermore, upon a default under the Loan Documents, Lender will, in addition to all other remedies provided for in the Loan Documents, have the remedies provided for under the UCC in effect in the state in which the Premises is located;

D.      All right, title and interest of Borrower, now or hereafter acquired, in and to any and all strips and gores of land adjacent to and used in connection with the Premises and all right, title and interest of Borrower, now owned or hereafter acquired, in, to, over and under the ways, streets, sidewalks and alleys adjoining the Premises;

E.      All funds now or hereafter held by Lender under any property reserves agreement (including any proceeds derived from any letter of credit) or escrow security agreement or under any of the terms hereof or of the Loan Documents;

F.      All of Borrower's payment intangibles, letter of credit rights, interest rate cap agreements, tenant in common agreement rights, and any other contract rights of Borrower related in any manner to the ownership, operation, or management of the Premises, as well as any and all supporting obligations, and all proceeds, renewals, replacements and substitutions thereof; and

G.      All funds, accounts and proceeds of any of the foregoing whether or not such funds, accounts or proceeds thereof are held by Lender under the terms of any of the Loan Documents, including, but not limited to bankruptcy claims of Borrower against any tenant at the Premises, and any proceeds thereof; proceeds of any Rents, insurance proceeds from all insurance policies required to be maintained by Borrower under the Loan Documents, and all awards, decrees, proceeds, settlements or claims for damage now or hereafter made to or for the benefit of Borrower by reason of any damage to, destruction of or taking of the Premises or any part thereof, whether the same shall be made by reason of the exercise of the right of eminent domain or by condemnation or otherwise (a "Taking").

TO HAVE AND TO HOLD the same unto Trustee, Trustee's successors and assigns, upon the trusts, covenants and agreements herein expressed.

CERTAIN DEFINITIONS

"Affiliate(s)" means any person or Entity directly or indirectly controlling, controlled by, or under common control with Borrower or any person or Entity owning a material interest in Borrower, either directly or indirectly.

"Default Rate" means a rate equal to the lesser of (i) four percent (4%) per annum above the then applicable interest rate payable under the Note or (ii) the maximum rate allowed by applicable law.

"Entity" means a (a) corporation, (b) limited or general partnership, (c) limited liability company, or (d) trust.

"Interest Owner(s)" means any person or entity owning an interest (directly or indirectly) in Borrower.

::ODMA\PCDOCS\ATL\1128769\1

3

"Make Whole Premium" has the meaning set forth in the Note.

"Material Adverse Effect" means a material adverse effect upon (i) the business or the financial position or results of operation of Borrower, (ii) the ability of Borrower to perform, or of Lender to enforce, any of the Loan Documents or Environmental Indemnity or (iii) the value of the Premises.

"Notice" means each notice, consent, request, report or other communication under this Deed of Trust or any other Loan Document which any party hereto may desire or be required to give to the other shall be deemed to be an adequate and sufficient notice if given in writing and service is made by either (i) registered or certified mail, postage prepaid, in which case notice shall be deemed to have been received three (3) business days following deposit to U.S. Mail; or (ii) a nationally recognized overnight air courier, next day delivery, prepaid, in which case such notice shall be deemed to have been received one (1) business day following delivery to such nationally recognized overnight air courier; provided that service of a notice required by Tex. Property Code §51.002 shall be considered complete when the requirements of that statute are met. All Notices shall be addressed to Borrower at its address given on the first page hereof, or to Lender at c/o Principal Global Investors, LLC, 801 Grand Avenue, Des Moines, Iowa 50392-1450, Attn: Commercial Mortgage Servicing, with reference to the applicable loan number, or to such other place as either party may by written notice to the other hereafter designate as a place for service of notice. Borrower shall not be permitted to designate more than one place for service of Notice concurrently.

"Permitted Encumbrances" means all title exceptions set forth in the Title Insurance Policy.

"Permitted Transfer" shall mean those transfers permitted in Article IV of this Deed of Trust or as otherwise expressly permitted by Lender.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, or any other Entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Rating Agency(ies)" shall mean each statistical rating agency that has assigned a rating to any participation interest, certificate or security issued in connection with a Securitization Transaction.

"Required Entity Status" shall mean the type of entity status the Borrower is required to maintain throughout the term of the Loan, which for this Loan shall be: Single-Purpose Entity.

"Single-Purpose Entity" when applicable, means a corporation, limited partnership, limited liability company, or business trust which, at all times until the Indebtedness is paid in full (i) will be organized solely for the purpose of owning the Premises, (ii) will not engage in any business unrelated to the ownership of the Premises, (iii) will not have any assets other than the Premises and those assets related to the Premises, and will hold the Premises and such assets in its own name, (iv) will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation or merger, and, except as otherwise expressly permitted by the Loan Documents, will not engage in, seek or consent to any asset sale, transfer of partnership, membership, shareholder, beneficial interests, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation, operating agreement, trust agreement, or trust certificate (as applicable) without first obtaining approval of the Lender, (v) without the unanimous consent of all of the partners, directors, members, beneficial owners and trustees, as applicable, will not with respect to itself or any other Entity in which it has a direct or indirect legal or beneficial ownership interest (a) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating

::ODMA\PCDOCS\ATL\1128769\1

4

to the relief from debts or the protection of debtors generally; (b) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, custodian or any similar official for itself or for such Entity or all or any portion of such Entity's properties; (c) make any assignment for the benefit of itself or for such Entity's creditors; or (d) take any action that might cause itself or such Entity to become insolvent, (vi) will maintain its accounts, books and records as well as Entity organizational documents separate from any other person or Entity, (vii) will not commingle its funds or assets with those of any other person or Entity, (viii) will conduct its business in its own name, (ix) will pay its own liabilities out of its own funds and assets, (x) will have no indebtedness other than the Indebtedness and commercially reasonable unsecured trade payables in the ordinary course of business relating to the ownership and operation of the Premises which are paid within sixty (60) days of the date incurred, (xi) will not assume or guarantee or become obligated for the debts of any other person or Entity or hold out its credit as being available to satisfy the obligations of any other person or Entity, except for the Indebtedness, (xii) will not acquire obligations or securities of its partners, members, trustees, beneficial owners or shareholders, (xiii) will not pledge its assets for the benefit of any other person or Entity, (xiv) will hold itself out and identify itself as a separate and distinct Entity under its own name and not as a division or part of any other person or Entity, (xv) will not make loans to any person or Entity, and (xvi) will not identify its partners, members, shareholders, trustees, beneficiaries or any Affiliates of any of them as a division or part of it and will maintain an arms length relationship with its Affiliates.

"Security Deposits" means all security deposits held or to be held with respect to the Premises, pursuant to the applicable Leases.

"Title Insurance Policy" means a loan policy of title insurance for the Premises issued to Lender in an amount (not less than the Loan Amount) acceptable to Lender and insuring the first priority lien in favor of Lender created by the Deed of Trust.

## I.  REPRESENTATIONS, WARRANTIES AND COVENANTS

In order to induce Lender to make the Loan to Borrower and in consideration of Lender's reliance thereon, Borrower hereby represents, warrants and covenants, as follows:

1.1     Representations, Warranties and Covenants Relating to Borrower.

    (A)     Organization.

        (i)     Borrower is and, will continue to (a) be duly organized and validly existing in good standing under the laws of the state of its formation, (b) if applicable, be duly qualified to transact business in each jurisdiction in which the nature of its business, the Premises or any of the other Collateral makes such qualification necessary and, (c) have the requisite Entity power to execute, deliver and perform its obligations under the Loan Documents and Environmental Indemnity.

        (ii)     Borrower is and will continue to maintain the Required Entity Status.

    (B)     Authorization.  The execution, delivery and performance of the Loan Documents and Environmental Indemnity and the borrowing evidenced by the Note (i) are within the applicable powers of the Borrower and each other party to the Loan Documents and Environmental Indemnity (other than Lender); (ii) have been authorized by all requisite action; and (iii) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time or both) a default under any governing instrument of Borrower or any other party to the Loan Documents or the Environmental Indemnity (other than Lender), or any

::ODMA\PCDOCS\ATL\1128769\1

5

indenture, agreement or other instrument to which Borrower or any other party to the Loan Documents and Environmental Indemnity (other than Lender) is a party or by which each such party or any of their respective assets or the Premises is or may be bound or affected.

(C)   <u>Enforceability</u>.  The Loan Documents and Environmental Indemnity constitute the legal, valid and binding obligations of Borrower and the other parties to the Loan Documents and Environmental Indemnity (other than Lender), enforceable against each such party in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(D)   <u>Financial Condition</u>.  (i) Borrower is solvent and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to the Borrower or any Interest Owner has been initiated, (ii) Borrower has not entered into this Loan transaction with the intent to hinder, delay or defraud any creditor, and (iii) Borrower has received reasonably equivalent value for the making of the Loan.

(E)   <u>Litigation</u>.  There are no pending actions, suits or proceedings at law or in equity by or before any governmental authority, arbitrator or other authority or, to the knowledge of Borrower, threatened against Borrower or any Interest Owner(s) or the Premises that would have a Material Adverse Effect.

(F)   <u>Not Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, together with applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form (the "<u>Code</u>").

(G)   <u>ERISA</u>.  As of the date hereof and until the Indebtedness is paid in full: (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), which is subject to Title I of ERISA, (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA, (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans, (v) Borrower has made and will continue to make all required contributions to all employee benefit plans, if any, established for or on behalf of Borrower or to which Borrower is required to contribute, and (vi) Borrower has not and will not permit any liability under Sections 4201, 4243, 4062 or 4069 of Title IV of ERISA or taxes or penalties relating to any employee benefit plan or multi-employer plan to become delinquent or assessed, respectively, which would have a Material Adverse Effect.

(H)   <u>No Defaults</u>.  No default or Event of Default exists under or with respect to any Loan Document.

1.2    <u>OFAC</u>.  Borrower further represents and warrants that as of the date hereof and until the Indebtedness is paid in full:

(A)   Borrower and each Interest Owner is not and will not be (i) identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign

::ODMA\PCDOCS\ATL\1128769\1

6

Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), (ii) a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States;

(B)     none of the funds or other assets of Borrower constitute or will constitute property of, or are or will be beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined);

(C)     no Embargoed Person has or will have any interest of any nature whatsoever in Borrower (whether directly or indirectly);

(D)     none of the funds of Borrower have been or will be derived from any unlawful activity with the result that the investment in Borrower is prohibited by law or that the Loan Documents and Environmental Indemnity are in or will be in violation of law;

(E)     Borrower has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times. The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower is prohibited by law or Borrower is in violation of law;

(F)     Borrower has complied and will continue to comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect; and

(G)     Borrower has not and will not use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to Lender under the Loan Documents.

1.3     Representations, Warranties and Covenants Relating to The Premises.

(A)     Title Issues.

(i)     Borrower owns good, indefeasible, marketable and insurable fee simple title to the Premises, free and clear of all liens, other than the Permitted Encumbrances, and Borrower shall not permit any liens (other than the Permitted Encumbrances, any title matters or exceptions approved in writing by Lender subsequent to the date hereof, taxes which are not yet due or delinquent, or any lien that is contested by Borrower in accordance with and subject to this Deed of Trust) to attach to the Premises. Borrower has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey good title to the Premises. There are not now, and there will not be any outstanding options or agreements to purchase or rights of first refusal affecting the Premises, except those tenant purchase rights, if any, as previously approved by Lender in writing. Borrower further represents that it shall

forever warrant and defend the title to the Premises against all claims and demands of all persons whomsoever and will on demand execute any additional instrument which may be required to give Lender a valid first lien on all of the Premises.

(ii)    No Taking has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Premises or for the relocation of roadways providing access to the Premises.

(iii)    All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full. Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants' property) used in connection with the operation of the Premises, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created by the Loan Documents.

(iv)    The Premises is and will be assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is or will be assessed and taxed together with the Premises or any portion thereof.

(v)    This Deed of Trust creates a valid and enforceable first mortgage lien on the Premises as security for the repayment of the Indebtedness, subject only to the Permitted Encumbrances, any title matters or exceptions approved in writing by Lender subsequent to the date hereof, and taxes which are not yet due or delinquent. Each Loan Document securing the Loan establishes and creates a valid, effective, and enforceable lien on and a security interest in, or claim to, the rights and property described therein. All personal property and fixtures covered by each such Loan Document are subject to a UCC financing statement filed and/or recorded, as appropriate, for such recordation or filing in all places necessary to perfect a valid first priority lien with respect to the rights and property that are the subject of each such Loan Document to the extent governed by the UCC.

(B)    Status of the Premises.

(i)    No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or the Federal Emergency Management Agency or any successor thereto as an area having special flood or seismic hazards, or, if now or hereafter located within any such area, Borrower has obtained and will maintain applicable flood hazard and/or earthquake insurance.

(ii)    Borrower has obtained and will maintain all necessary certificates, licenses, permits and other approvals, governmental and otherwise, necessary for the operation of the Premises and the conduct of its business.

(iii)    None of the Improvements lie or will lie outside of the boundaries of the Land or the applicable building restriction lines to the extent that such would have a Material Adverse Effect, and no improvements on adjoining properties now or will materially encroach upon the Land.

::ODMA\PCDOCS\ATL\1128769\1

8

(iv)    The Premises is served by all utilities required for the current or contemplated use thereof.

(v)    All public roads and streets necessary for service of and access to the Premises for the current or contemplated use thereof have been completed and are physically and legally open for use by the public.

(vi)    The Premises is free from (a) damage caused by fire or other Casualty, and (b) material structural defects.

(vii)    All building systems contained in the Premises are in good working order in all material respects, subject to ordinary wear and tear.

(C)    <u>Status of the Leases and Rents.</u>

(i)    <u>No Prior Assignment.</u>   As of the date hereof, (i) Lender is the assignee of Borrower's interest under the Leases, and (ii) there are no other assignments of any of the Lessor's interest in the Leases or any of the Rents due or to become due and payable thereunder.

(ii)    <u>Security Deposits.</u>  As of the date hereof, Borrower is in possession of the Security Deposits all of which are held in compliance with all applicable Legal Requirements.

(iii)    <u>Leases.</u>  (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are the valid, binding and enforceable obligations of Borrower and the applicable tenant or lessee thereunder; (c) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified rent roll delivered to and approved by Lender; (d) none of the Rents have been collected for more than one (1) month in advance; (e) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (f) there exists no offset or defense to the payment of any portion of the Rents; (g) no Lease contains an option to purchase, right of first refusal to purchase, expansion right, or any other similar provision except as previously disclosed in writing to Lender; (h) no Person has any possessory interest in, or right to occupy the Premises, except under and pursuant to a Lease; (i) all leasing broker fees and commissions payable by Borrower with respect to the Lease(s) have been paid in full, in cash or other form of immediately available funds; and (j) as of the Closing Date, Borrower has delivered to Lender copies of all Leases of all or any portion of the Premises.

Borrower will immediately notify Lender in writing if any of the representations, warranties or covenants are no longer true or have been breached or if Borrower has a reasonable basis to believe that they may no longer be true or have been breached.  In addition, Borrower will, at the request of Lender, provide such information as may be requested by Lender to determine Borrower's compliance with the terms hereof.

Borrower agrees that (a) all of the representations and warranties of Borrower set forth herein, and in the other Loan Documents and Environmental Indemnity delivered as of the date hereof are made as of the date hereof (except as expressly otherwise provided) and (b) all representations, warranties and covenants made by Borrower shall survive the delivery of the Note and continue for so long as any

Indebtedness remains owing, *provided, however*, that the representations and warranties set forth in the Environmental Indemnity shall survive in accordance with and subject to the Environmental Indemnity and shall not be subject to the limitation of liability provisions set forth herein or in the Note.

## II. AFFIRMATIVE COVENANTS

BORROWER COVENANTS AND AGREES AS FOLLOWS:

Borrower shall:

2.1    pay each item of Indebtedness secured by this Deed of Trust when due according to the terms of the Loan Documents;

2.2    pay a Late Charge on any payment of principal, interest, Make Whole Premium or Indebtedness which is not paid on or before the due date thereof to cover the expense involved in handling such late payment;

2.3    pay on or before the due date thereof any indebtedness permitted to be incurred by Borrower pursuant to the Loan Documents and any other claims which could become a lien on the Premises (unless otherwise specifically permitted in this Deed of Trust, and upon request of Lender exhibit satisfactory evidence of the discharge thereof;

2.4    manage, operate and maintain the Premises and keep the Premises, including but not limited to, the Improvements, in good condition and repair and free from mechanics' liens or other liens or claims for liens, provided however, that Borrower may in good faith, with reasonable diligence and upon written Notice to Lender within twenty (20) days after Borrower has knowledge of such lien or claim, contest the validity or amount of any such lien or claim and defer payment and discharge thereof during the pendency of such contest in the manner provided by law, provided that (i) such contest may be made without the payment thereof; (ii) such contest shall prevent the sale or forfeiture of the Premises or any part thereof, or any interest therein, to satisfy such lien or claim; (iii) Borrower shall have obtained a bond over such lien or claim from a bonding company acceptable to Lender which has the effect of removing such lien or collection of the claim or lien so contested or Borrower provides a cash deposit or letter of credit in an amount acceptable to Lender; and (iv) Borrower shall pay all costs and expenses incidental to such contest; and further provided, that in the event of a final, non-appealable ruling or adjudication adverse to Borrower, Borrower shall promptly pay such claim or lien, shall indemnify and hold Lender and the Premises harmless from any loss for damage arising from such contest and shall take whatever action necessary to prevent sale, forfeiture or any other loss or damage to the Premises or to the Lender;

2.5    comply, and cause each lessee or other user of the Premises to comply, with all requirements of law and ordinance, and all rules and regulations, now or hereafter enacted, by authorities having jurisdiction of the Premises and the use thereof, including but not limited to all covenants, conditions and restrictions of record pertaining to the Premises, the Improvements, and the use thereof (collectively, "Legal Requirements");

2.6    subject to the provisions of this Deed of Trust, promptly repair, restore or rebuild any Improvements, now or hereafter a part of the Premises which may become damaged or be destroyed by any cause whatsoever, so that upon completion of the repair, restoration and rebuilding of such Improvements, there will be no liens of any nature arising out of the

::ODMA\PCDOCS\ATL\1128769\1

10

construction and the Premises will be of substantially the same character and quality as it was prior to the damage or destruction; and

2.7   if other than a natural person, do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges under the laws of the state of its formation and, if other than its state of formation, the state where the Premises is located. Borrower shall notify Lender at least thirty (30) days prior to (i) any relocation of Borrower's principal place of business to a different state or any change in Borrower's state of formation, and/or (ii) if Borrower is an individual, any relocation of Borrower's principal residence.

## III.  RESTRICTIVE COVENANTS

Borrower shall not:

3.1   construct any building, structure or any addition which adds area to any building on the Premises, without the prior written consent of Lender not to be unreasonably withheld, unless such construction is required by applicable Legal Requirements;

3.2   make any alteration (in excess of $50,000.00 per alteration) or addition (other than normal repair and maintenance) to (i) the roof or any structural component of any Improvements on the Premises, or (ii) the building operating systems, including but not limited to, the mechanical, electrical, heating, cooling, or ventilation systems (other than replacement with equal or better quality and capacity), without the prior written consent of Lender not to be unreasonably withheld; unless such additions or alterations are required by applicable Legal Requirements;

3.3   remove or demolish any material Improvements, or any portion thereof, which at any time constitutes a part of the Premises without the prior written consent of Lender;

Notwithstanding anything hereinabove to the contrary, Borrower may construct, remove or demolish tenant improvements within the then existing building(s) or other structures to the extent such work is required solely under the terms of any Leases approved by Lender provided (i) no Event of Default exists under the Loan Documents; (ii) the work is completed on a timely basis, in a good, workmanlike, lien-free manner and in accordance with all Legal Requirements, and (iii) such work does not negatively affect the structural integrity of the Improvements or the value of the Premises;

3.4   cause or permit any change to be made in the general use of the Premises without Lender's prior written consent;

3.5   initiate any or acquiesce to a zoning reclassification or material change in zoning without Lender's prior written consent. Borrower shall use all reasonable efforts to contest any such zoning reclassification or change not otherwise consented to by Lender in writing; or

3.6   make or permit any use of the Premises that could with the passage of time result in the creation of any right of use, or any claim of adverse possession or easement on, to or against any part of the Premises in favor of any person or entity or the public.

## IV.  DUE ON SALE OR ENCUMBRANCE/TRANSFERS

4.1   Except with the prior written consent of Lender or except as expressly permitted in accordance with the following provisions, Borrower or Interest Owner shall not, and shall not permit,

::ODMA\PCDOCS\ATL\1128769\1

11

acquiesce to or allow any of the following to occur: (i) a sale, conveyance, assignment, transfer, encumbrance (other than the lien hereof), alienation, pledge or other disposition (whether directly or indirectly, voluntary or involuntary, or by operation of law) of all or any portion of the Premises or an interest in the Premises or direct or indirect ownership interests in the Borrower; (ii) the reconstitution or conversion of Borrower and/or Interest Owner from one entity to another type of entity; (iii) the issuance or other creation of ownership interests in the Borrower and/or Interest Owner; (iv) a merger, consolidation, reorganization or any other business combination with respect to Borrower and/or Interest Owner; (v) a conversion to or operation of all or any portion of the Premises as a cooperative or condominium form of ownership; or (vi) if the Borrower is a trust, or if a trust owns a direct ownership interest in Borrower, the addition, deletion or substitution of a trustee of such trust.  For the purposes of this provision, any of the events described above shall be defined as a "Transfer".

4.2    If any such Transfer occurs without the prior written consent of Lender (other than Transfers where Lender's consent is not required), it shall be null and void and shall constitute an immediate Event of Default under the Loan Documents. Lender may in its sole discretion consent to a Transfer (not otherwise expressly permitted by the terms hereof) and any such consent shall not constitute a consent as to any other Transfer.

4.3    Notwithstanding any language above to the contrary, and so long as there is no Event of Default under the Loan Documents (or event which with the passage of time or the giving of notice or both would be an Event of Default), Lender shall not unreasonably withhold its consent, upon 60 days advance written request and subject to satisfaction of the requirements stated below as determined by Lender as to each such transfer, to transfers of the Premises:

(i)    Prior review and approval of the proposed purchaser or other transferee and the subject transaction by Lender, in Lender's commercially reasonable discretion.  Review of the proposed purchaser or other transferee and the subject transaction shall encompass various factors, including, but not limited to, the proposed purchaser's or other transferee's creditworthiness, financial strength, and real estate management and leasing expertise as well as the proposed transaction's effect on the Premises, the Borrower, and other security for the Loan;

(ii)   Payment to Lender of an assumption fee equal to the greater of: (a) one percent (1%) of the principal balance of the Note; or (b) $15,000.00; provided, however, that Lender will require $15,000.00 of such fee to be paid at the beginning of Lender's review process, and such sum shall be nonrefundable and earned upon receipt by Lender whether or not the transaction is ultimately completed or Lender ultimately approves the proposed purchaser or other transferee;

(iii)  Receipt, at Borrower's expense, of a new standard loan policy in a form approved by the insurance commissioner of the State of Texas in the full amount of the Loan, in form and by an issuer satisfactory to Lender, and which insures this Deed of Trust to be a first and prior lien subject only to those exceptions which were previously approved by Lender and provides coverage against usury and mechanic's liens.  If usury coverage is not available, Borrower shall provide, at Borrower's expense, a usury opinion letter in form and substance and from counsel acceptable to Lender;

(iv)   Receipt by Lender of copies of all relevant information and documentation relating to or required by Lender in connection with the proposed transfer including but not limited to (a) the organizational documents of the proposed transferee; (b) the deeds or other

::ODMA\PCDOCS\ATL\1128769\1

instruments of transfer for the Premises or interests in Borrower and documents relating to the assignment and assumption of Leases; (c) evidence of compliance with the insurance requirements contained in the Loan Documents; (d) compliance with such other closing requirements as are customarily imposed by Lender in connection with such transactions; and (e) compliance with the representations and warranties herein regarding the proposed transferee's Required Entity Status;

(v)     Execution, delivery, acknowledgment and recordation, as applicable, of new, revised and/or replacement assumption agreements, loan modification agreements, indemnification agreements, property reserve agreements/ addendums, security instruments, financing statements, UCCs, new or revised letters of credit and/or guarantees in form and substance reasonably satisfactory to Lender;

(vi)    Payment of reasonable outside counsel fees and costs, if any, other applicable professional's reasonable fees and costs, taxes, recording fees and the like, and any other reasonable fees and costs incurred; and

(vii)   If applicable, receipt by Lender of a waiver from any tenant having a right or option to purchase the Premises or any portion thereof, waiving such right or option in form and substance acceptable to Lender.

4.4     Further notwithstanding anything above to the contrary, the sale, transfer or conveyance of direct or indirect ownership interests in 16062 SOUTHWEST FREEWAY, LLC, a Texas limited liability company (a) among owners of those interests ("Borrower Interest Owners"); and (b) to immediate family members (i.e. children, grandchildren, parents, spouses and siblings) ("Immediate Family Members") of Borrower Interest Owners or to trusts established for the benefit of Gary Greenberg and Betina Greenberg and/or such Immediate Family Members shall be permitted by Lender; provided the following conditions are complied with in each instance: (i) Gary Greenberg and Betina Greenberg retains at least 1% direct ownership interest in Borrower and retains management responsibility for and control of Borrower; (ii) an experienced individual or entity acceptable to Lender continues to manage and lease the Premises; (iii) Lender receives notice of such transfer within thirty (30) days of the consummation of such transfer; (iv) Lender receives an organizational chart for Borrower which includes ownership breakdowns for all entity levels and is certified by Borrower as true and correct; (v) Lender receives an acceptable background and credit check, at Borrower's cost, for the proposed transferee if said proposed transferee's interest in Borrower either directly or indirectly will equal or exceed 33%; (vi) Lender receives an acceptable OFAC report (research of the Office of Foreign Assets Control "Watched" companies list), at Borrower's cost; and (vii) Lender receives a reasonable fee for handling each such transfer.

4.5     Further notwithstanding anything contained above to the contrary, Lender shall not unreasonably withhold it consent to the conveyance of an immaterial (as reasonably determined by Lender) interest in the Premises by Borrower, such as a utility easement, and Borrower has satisfied such conditions as Lender deems reasonably advisable and appropriate, including the payment of any fees and costs related thereto.

## V. TAXES

5.1     Borrower shall pay or cause to be paid when due and before any penalty attaches or interest accrues all general taxes, special taxes, assessments (including assessments for benefits from public works or improvements whenever begun or completed), utility charges, water charges, sewer service charges, common area maintenance charges, if any, vault or space charges and all

other like charges against or affecting the Premises or against any property or equipment located on the Premises, or which might become a lien on the Premises, and shall, within 10 days following Lender's request, furnish to Lender a duplicate receipt of such payment. If any such tax, assessment or charge may legally be paid in installments, Borrower may, at its option, pay such tax, assessment or charge in installments.

5.2    If Borrower desires to contest any tax, assessment or charge relating to the Premises, Borrower may do so by paying the same in full, under protest, in the manner provided by law; provided, however, that

(i)    if contest of any tax, assessment or charge may be made without the payment thereof, and

(ii)    such contest shall have the effect of preventing the collection of the tax, assessment or charge so contested and the sale or forfeiture of the Premises or any part thereof or any interest therein to satisfy the same,

then Borrower may in its discretion and upon the giving of written notice to Lender of its intended action and upon the furnishing to Lender of such security or bond as Lender may require, contest any such tax, assessment or charge in good faith and in the manner provided by law. All costs and expenses incidental to such contest shall be paid by Borrower. In the event of a ruling or adjudication adverse to Borrower, Borrower shall promptly pay such tax, assessment or charge. Borrower shall indemnify and save harmless the Lender and the Premises from any loss or damage arising from any such contest and shall, if necessary to prevent sale, forfeiture or any other loss or damage to the Premises or to Lender, pay such tax, assessment or charge or take whatever action is necessary to prevent any sale, forfeiture or loss.

## VI. INSURANCE

6.1    Borrower shall at all times keep or cause to be kept in force (i) property insurance insuring all Improvements which now are or hereafter become a part of the Premises for perils covered by a causes of loss-special form insurance policy, including coverage against terrorism, with an ordinance or law coverage endorsement if the Premises are legally non-conforming if requested by Lender and provided there is verification of compliance with all Legal Requirements, containing both replacement cost and agreed amount endorsements or equivalent coverage; (ii) commercial general liability insurance naming Lender as an additional insured protecting Borrower and Lender against liability for bodily injury or property damage occurring in, on or adjacent to the Premises, with a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence with not less than a Two Million Dollar ($2,000,000) aggregate limit; (iii) boiler and machinery insurance if the property has a boiler or is an office building; (iv) rental value insurance for the perils specified herein for one hundred percent (100%) of the Rents (including operating expenses, real estate taxes, assessments and insurance costs which are lessee's liability) for a period of twelve (12) months; (v) builders risk insurance during all periods of construction; and (vi) insurance against all other hazards as may be reasonably required by Lender, including, without limitation, insurance against loss or damage by flood.

6.2    All insurance (including deductibles and exclusions) shall be in form, content and amounts approved by Lender and written by an insurance company or companies approved by Lender and which is licensed to do business in the state in which the Premises are located or a governmental agency or instrumentality approved by Lender. The policies for such insurance shall have attached thereto standard mortgagee clauses in favor of and permitting Lender to collect any and all proceeds payable thereunder and shall include a 30 day (except for nonpayment of premium,

in which case, a 10 day) notice of cancellation clause in favor of Lender. All certificates of insurance (or policies if requested by Lender) shall be delivered to and held by Lender as further security for the payment of the Note and any other obligations arising under the Loan Documents, with evidence of renewal coverage delivered to Lender at least 15 days before the expiration date of any policy. Borrower shall not carry or permit to be carried separate insurance, concurrent in kind or form and contributing in the event of loss, with any insurance required in the Loan Documents.

6.3     TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) BORROWER IS REQUIRED TO: (I) KEEP THE PREMISES INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (II) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN PARAGRAPH (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT THE BORROWER'S EXPENSE.

## VII. TAX AND INSURANCE ESCROWS

7.1     Borrower shall deposit with and pay to Lender, on the Closing Date (if required by Lender) and each payment date specified in the Note, sums calculated by Lender for payment of: (i) the estimated taxes and assessments assessed or levied against the Premises, and (ii) the estimated premiums for insurance required by the Loan Documents, excluding commercial general liability insurance (collectively, the "Tax and Insurance Escrows"). As determined by Lender, Lender shall either: (i) use the Tax and Insurance Escrows to pay the taxes, assessments and premiums, as applicable, when the same become due; or (ii) reimburse Borrower in connection with Borrower's payment of taxes, assessments and insurance premiums, as applicable, when the same become due. If the total payments made by Borrower under this Section exceed the amount of payments actually made by Lender (or reimbursed to Borrower, if applicable) for taxes, assessments and insurance premiums, such excess shall be credited by Lender on subsequent Tax and Insurance Escrow deposits to be made by Borrower. If, however, the Tax and Insurance Escrows are insufficient to permit Lender to pay the taxes, assessments and insurance premiums when the same shall be due and payable, Borrower will pay to Lender any amount necessary to make up the deficiency, within three (3) business days after Lender has notified Borrower of such deficiency, but in all events prior to the date when payment of such taxes, assessments and insurance premiums shall be delinquent. If at any time Borrower shall tender to Lender, in accordance with the provisions of the Note and the other Loan Documents, full payment of the entire Indebtedness, Lender shall, in computing the amount of such Indebtedness, credit to the account of Borrower any balance remaining in the Tax and Insurance Escrows. If there is an Event of Default resulting in a public sale of the Premises, or if Lender otherwise acquires the Premises after an Event of Default, Borrower shall be entitled to a credit of the Tax Escrow against any delinquent or accrued ad valorem taxes with respect to the Premises.

## VIII.  DAMAGE OR DESTRUCTION

8.1    In the event of any damage to or destruction of the Premises, or any part thereof:

(a)    Borrower will immediately notify Lender thereof in the manner provided in this Deed of Trust for the giving of notices and any such damage or destruction covered by insurance is hereinafter referred to as a "Casualty".  Lender shall have the right (which may be waived by Lender in writing) to settle and adjust any claim under such insurance policies required to be maintained by Borrower.  In all circumstances, the proceeds thereof shall be paid to Lender and Lender is authorized to collect and to give receipts therefore. Borrower agrees and acknowledges that such proceeds shall be held by Lender without any allowance of interest and that in any bankruptcy proceeding of Borrower, all such proceeds shall be deemed to be "Cash Collateral" as that term is defined in Section 363 of the Bankruptcy Code.  Provided that no Event of Default exists, Borrower shall have the right to participate in any settlement or adjustment; provided, however, that any settlement or adjustment where the aggregate amount of such proceeds equals or exceeds $100,000 shall be subject to the written approval of Lender, not to be unreasonably withheld.

(b)    Such proceeds, after deducting therefrom any reasonable expenses incurred by Lender in the collection thereof (including but not limited to reasonable attorneys' fees and costs), shall be applied by Lender to pay the Indebtedness secured hereby including, but not limited to the Make Whole Premium, whether or not then due and payable, provided, however, that if no Event of Default exists at the time of such application, no Make Whole Premium shall be due.

Notwithstanding anything hereinabove to the contrary,

(i)    in the event the Casualty occurs more than three (3) months prior to the Maturity Date and no Event of Default exists, Lender shall apply such proceeds as follows:

(A)    If the aggregate amount of such proceeds is less than $100,000, Lender shall pay such proceeds directly to Borrower, to be held in trust for Lender and applied to the cost of rebuilding and restoring the Premises.

(B)    If the aggregate amount of such proceeds equals or exceeds $100,000 Lender shall disburse such amounts of the proceeds as Lender reasonably deems necessary for the repair or replacement of the Premises, subject to the conditions set forth below.

(ii)    in the event (x) an Event of Default exists, or (y) the Casualty occurs during the last three (3) months prior to the Maturity Date and Lender determines that the repair and restoration of such Casualty cannot be completed prior to the Maturity Date, or (z) the conditions set forth below are not met, then Lender, in its sole and absolute discretion may either:

(A)    declare the entire Indebtedness to be immediately due and payable, provided, however, that if no Event of Default exists, no Make Whole Premium shall be due.  All proceeds shall be applied toward payment of the Indebtedness in such priority as Lender elects; or

::ODMA\PCDOCS\ATL\1128769\1

16

(B)    disburse such proceeds as Lender reasonably deems necessary for the repair or replacement of the Premises subject to those conditions set forth below which Lender in its sole and absolute discretion may require.

(c)    (i)    In the event that Borrower is to be reimbursed out of the Casualty insurance proceeds or out of any award or payment received with respect to a Taking, Lender shall from time to time make available such proceeds, subject to the following conditions: (a) there continues to exist no Event of Default; (b) the delivery to Lender of satisfactory evidence of the estimated cost of completion of such repair and restoration work and any architect's certificates, waivers of lien, contractor's sworn statements, and other evidence of cost and of payment and of the continued priority of the lien hereof over any potential liens of mechanics and materialmen (including, without limitation, title policy endorsements) as Lender may reasonably require and approve; (c) the time required to complete the repair and restoration work and for the income from the Premises to return to the level it was prior to the loss will not exceed the coverage period of the rental value insurance required hereunder; (d) the annual net cash flow (annual net operating income after deduction for tenant improvements, leasing commissions, annual replacement reserves and a management fee) shall equal or exceed 1.20 times the annual debt service on the Note, and only net operating income from approved executed Leases in effect on the Premises, having at least two (2) years remaining prior to the expiration of their term, with no uncured defaults and has not exercised or indicated an intent to exercise right to terminate as a result of the Casualty or Taking, shall be used in Lender's determination of the annual net cash flow; (e) Lender approves the plans and specifications of such work before such work is commenced if the estimated cost of rebuilding and restoration exceeds 25% of the Indebtedness or involves any structural changes or modifications, which approval shall not be unreasonably withheld; (f) if the amount of any insurance proceeds, award or other payment is insufficient to cover the cost of restoring and rebuilding the Premises, Borrower shall pay such cost in excess of such proceeds, award or other payment before being entitled to reimbursement out of such funds; (g) Borrower pays to Lender a non-refundable processing fee equal to the greater of $5,000.00 or .25% of the amount of such proceeds within sixty (60) days of the occurrence of any such damage or destruction and before Lender disburses any proceeds; and (h) such other conditions to such disbursements, in Lender's reasonable discretion, as would be customarily required by a construction lender doing business in the area where the Premises is located or which are otherwise required by any Rating Agency.

(ii)    No payment made by Lender prior to the final completion of the repair or restoration work shall, together with all payments theretofore made, exceed 90% of the cost of such work performed to the time of payment, and at all times the undisbursed balance of said proceeds shall be at least sufficient to pay for the cost of completion of such work free and clear of all liens. Any proceeds remaining after payment of the cost of rebuilding and restoration shall be paid to Borrower so long as no Event of Default has occurred and is continuing.

(iii)    Repair and restoration of the Premises shall be commenced promptly after the occurrence of the loss and shall be prosecuted to completion diligently, and the Premises shall be so restored and rebuilt to substantially the same character and

::ODMA\PCDOCS\ATL\1128769\1

quality as prior to such damage and destruction and shall comply with all Legal Requirements.

(d)    Should such Casualty or Taking occur after foreclosure or sale proceedings have been instituted, the proceeds of any such insurance policy or policies or awards or other payments related to a Casualty or Taking, if not applied in rebuilding or restoration of the Improvements, shall be used to pay (i) the Indebtedness then due and owing in the event of a non-judicial sale in such priority as Lender elects, or (ii) the amount due in accordance with any decree of foreclosure or deficiency judgment that may be entered in connection with such proceedings, and the balance, if any, shall be paid to the owner of the equity of redemption if it shall then be entitled to the same, or otherwise as any court having jurisdiction may direct.

## IX.  CONDEMNATION/TAKING

9.1    In the event of the commencement of a Taking affecting the Premises:

(a)    Borrower shall notify Lender thereof in the manner provided in this Deed of Trust for the giving of notices.  Lender may participate in such proceeding, and Borrower shall deliver to Lender all documents requested by it to permit such participation.

(b)    Borrower shall cause the proceeds of any award or other payment made relating to a Taking, to be paid directly to Lender.  Lender, in its sole and absolute discretion: (i) may apply all such proceeds to pay the Indebtedness in such priority as Lender elects, provided however, that if no Event of Default exists at the time of such application no Make Whole Premium shall be due; or (ii) subject to and in accordance with the provisions set forth in the Damage or Destruction section above, may disburse such amounts of the proceeds as Lender reasonably deems necessary for the repair or replacement of the Premises.

Notwithstanding anything herein above to the contrary, provided no Event of Default exists, Lender agrees to disburse the proceeds received from any Inconsequential Taking, as hereinafter defined, to Borrower for the repair and/or replacement of the Premises.  An Inconsequential Taking shall be a Taking which (i) results in less than $100,000 in proceeds; (ii) does not, in Lender's determination, materially or adversely affect the Improvements, parking, access, ingress, egress or use of the Premises; and (iii) does not trigger any rights or options of tenants under the Leases.

## X.  FEES AND TAXES

10.1    If by the laws of the United States of America or of any state or governmental subdivision having jurisdiction over Borrower or of the Premises or of the Loan evidenced by the Loan Documents or any amendments or modifications thereof, any tax or fee is due or becomes due or is imposed upon Lender in respect of the issuance of the Note hereby secured or the making, recording and registration of this Deed of Trust or otherwise in connection with the Loan Documents, the Environmental Indemnity or the Loan, except for Lender's income or franchise tax, Borrower covenants and agrees to pay such tax or fee in the manner required by such law, and to hold harmless and indemnify Trustee and Lender, their successors and assigns, against any liability incurred by reason of the imposition of any such tax or fee.

::ODMA\PCDOCS\ATL\1128769\1

18

XI. EVENTS OF DEFAULT

11.1    If one or more of the following events (herein called an "Event of Default" or "Events of Default" as the context so requires) shall have occurred:

    (a)    failure to pay when due any principal, interest, Make Whole Premium or other Indebtedness, utilities, taxes or assessments or insurance premiums required pursuant to the Loan Documents or the Environmental Indemnity, and such failure shall have continued for 5 days; or

    (b)    Borrower, Interest Owner or any guarantor voluntarily brings or acquiesces to any of the following: (A) any action for dissolution, act of dissolution or dissolution or the like of Borrower, Interest Owner or any guarantor under the Federal Bankruptcy Code as now or hereafter constituted; (B) the filing of a petition or answer proposing the adjudication of Borrower, Interest Owner or any guarantor as a bankrupt or its reorganization or arrangement, or any composition, readjustment, liquidation, dissolution or similar relief with respect to it pursuant to any present or future federal or state bankruptcy or similar law; or (C) the appointment by order of a court of competent jurisdiction of a receiver, trustee or liquidator of the Premises or any part thereof or of Borrower, Interest Owner or any guarantor or of substantially all of the assets of Borrower, Interest Owner or any guarantor; or

    (c)    one or more of the items set forth in the foregoing subsection (b) above occur which were not either voluntarily brought or acquiesced in by Borrower, Interest Owner or any guarantor, and which are not discharged or dismissed within 90 days after the action, filing or appointment, as the case may be; or

With respect to the matters in (b) and (c) above for an Interest Owner only, no Event of Default shall occur until an interested party or Interest Owner asserts a claim or right against Borrower or the Premises which delays or otherwise affects Lender's rights, remedies, or interests granted under the Loan Documents (whether or not such assertion is successful).

    (d)    with respect to the matters not described in any other subparagraphs of this section, failure to duly observe or perform any covenant, condition or agreement of the Borrower or any guarantor contained in this Deed of Trust, or in the Loan Documents, or in the Environmental Indemnity, and such failure shall have continued for 30 days after Notice specifying such failure is given by Lender to Borrower; or

If any failure to observe or perform under (d) above shall be of such nature that it cannot be cured or remedied within 30 days, Borrower shall be entitled to a reasonable period of time to cure or remedy such failure (not to exceed 90 days following the giving of Notice), provided Borrower commences the cure or remedy thereof within the 30 day period following the giving of Notice and thereafter proceeds with diligence, as determined by Lender, to complete such cure or remedy.

    (e)    the failure of Borrower to duly observe or perform or the breach of any of the covenants, conditions and agreements of the Borrower contained in the Due on Sale or Encumbrance/Transfers section of this Deed of Trust; or

    (f)    any representation when made by or on behalf of Borrower, Interest Owner or any guarantor regarding the Premises, the making or delivery of any of the Loan Documents

::ODMA\PCDOCS\ATL\1128769\1

or the Environmental Indemnity or in any material written information provided by or on behalf of Borrower, Interest Owner or any guarantor in connection with the Loan shall prove to be untrue or inaccurate in any material respect; or

(g)    the failure of Borrower to give Notice to Lender within 90 days after the death of any individual who is personally liable for any obligation under the Loan Documents or the Environmental Indemnity, as indemnitor or guarantor, whether or not such individual had executed the Note or this Deed of Trust; or

(h)    subject to the provisions of this Deed of Trust, the failure of Borrower to provide Lender with an assumption agreement in form and substance and executed by a person(s) or entity(ies) acceptable to Lender in its commercially reasonable discretion to assume the obligations of any deceased individual who is personally liable for any obligation under the Loan Documents or the Environmental Indemnity, as indemnitor or guarantor, whether or not such individual had executed the Note or this Deed of Trust, and such failure shall have continued for 90 days after the death of such individual; or

(i)    the failure of Borrower to maintain the Required Entity Status;

then, in each and every such case, the whole of said principal sum hereby secured shall, at the option of the Lender and without further notice to Borrower, become immediately due and payable together with accrued interest thereon, a Make Whole Premium calculated in accordance with the provisions of the Loan Documents and all other Indebtedness, and whether or not Lender has exercised said option, interest shall accrue on the entire principal balance and any interest or Make Whole Premium or other Indebtedness then due, at the Default Rate until fully paid or if Lender has not exercised said option, for the duration of any Event of Default.

## XII.  MAKE WHOLE PREMIUM

12.1    Borrower agrees that if Lender accelerates the whole or any part of the principal sum hereby secured after the occurrence of an Event of Default, Borrower waives any right to prepay the principal sum hereby secured in whole or in part without premium and agrees to pay, as yield maintenance protection and not as a penalty the lesser of (i) the maximum amount which is allowable under applicable law limiting the amount of interest which may be contracted for, charged or received, after considering all other amounts constituting or deemed to constitute interest, and (ii) the Make Whole Premium as provided in the Note.  However, in the event any proceeds from a Casualty or Taking are applied to reduce the principal balance under the Note, no Make Whole Premium shall be due so long as no Event of Default exists at the time of such application.

## XIII.  LENDER RIGHTS AFTER EVENT OF DEFAULT

13.1    (a)    Upon the occurrence of any Event of Default, Lender may, but need not, make any payment or perform any act herein required of Borrower, in any form and manner deemed expedient and may, but need not, purchase, discharge, compromise or settle any tax lien or other prior lien or title or claim thereof, or redeem from any tax sale or forfeiture affecting said Premises, or contest any tax or assessment.  All moneys paid for any of the purposes herein authorized and all reasonable expenses paid or incurred in connection therewith, including but not limited to, reasonable attorneys' fees and costs and reasonable attorneys' fees and costs on appeal, and any other money advanced by Lender to protect the Premises and the lien hereof, shall be so much additional

Indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon at the Default Rate from the date of expenditure or advance until paid.

(b)  .  In making any payment hereby authorized relating to taxes or assessments or for the purchase, discharge, compromise or settlement of any prior lien, Lender may make such payment according to any bill, statement or estimate secured from the appropriate public office without inquiry into the accuracy thereof or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof or without inquiry as to the validity or amount of any claim for lien which may be asserted. Trustee may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of Trustee.

(c)  In the event there is a foreclosure sale and Borrower continues to occupy or use the Premises following such sale, Borrower shall immediately become the tenant of the purchaser at such sale. Subject to the terms of any applicable non-disturbance and/or attornment agreement between Lender and any tenant(s) of the Premises, such tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the portion of the Premises occupied, such rental to be due daily to the purchaser. In the event the tenant fails to surrender possession of the portion of the Premises upon demand, the purchaser shall be entitled to institute and maintain an action for forcible entry and detainer of the Premises in the Justice of the Peace Court in the Justice Precinct in which the Premises is situated.

13.2  (a)  Upon the occurrence of any Event of Default, in addition to any other rights or remedies provided in the Loan Documents, at law, in equity or otherwise, Lender shall have the right to cause the Premises or any part thereof to be sold in order to accomplish the object of these trusts and upon demand by Lender, Trustee, without demand on Borrower, shall sell the Premises or such part thereof as Trustee in its sole discretion may deem necessary to accomplish the objects of these trusts having first given notice of the time and place of such sale as required by law for the sale of real property upon execution.

(b)  .Trustee may postpone such sale from time to time by giving notice of such postponement in the same manner in which any original notice of sale was given or by an announcement or proclamation made to the persons assembled at the time and place previously appointed and noticed for such sale or postponed sale, and on the date of such sale or the date to which such sale may have been postponed Trustee may sell the Premises to the highest bidder. Lender or its agents may bid and purchase at such sale. Trustee in conducting said sale may act either in person or through the agency of an auctioneer and may establish as one of the conditions of such sale that all bids and payments for said Premises be made in cash.

13.3  Following the occurrence of an Event of Default, Borrower shall forthwith upon demand of Trustee or Lender surrender to Lender possession of the Premises, and Lender shall be entitled to take actual possession of the Premises or any part thereof personally or by its agents or attorneys, and Lender in its discretion may, with or without force and with or without process of law, enter upon and take and maintain possession of all or any part of the Premises together with all documents, books, records, papers and accounts of the Borrower or the then owner of the Premises relating thereto, and may exclude Borrower, its agents or assigns wholly therefrom, and

::ODMA\PCDOCS\ATL\1128769\1

21

may in the name of the Borrower, or in its own name as Lender and under the powers herein granted:

(a)     hold, operate, maintain, repair, rebuild, replace, alter, improve, manage or control the Premises as it deems judicious, insure and reinsure the same and any risks related to Lender's possession and operation thereof and receive all Rents, either personally or by its agents, and with full power to use such measures, legal or equitable, as in its discretion it deems necessary to enforce the payment or security of the Rents, including actions for the recovery of Rent, actions in forcible detainer and actions in distress for Rents, hereby granting full power and authority to exercise each and every of the rights, privileges and powers herein granted at any and all times hereafter, without notice to Borrower; and

(b)     conduct leasing activity pursuant to the provisions hereof.

Neither Trustee nor Lender shall be obligated to perform or discharge, nor does either hereby undertake to perform or discharge, any obligation, duty or liability under any Lease. Except to the extent that the same is caused solely by Lender's gross negligence or willful misconduct, should Trustee or Lender incur any liability, loss or damage under any Leases, or under or by reason of the assignment of Leases contained herein, or in the defense of any claims or demands whatsoever which may be asserted against Lender or Trustee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements in any Lease, the amount thereof, including costs, expenses and reasonable attorneys' fees and costs, shall be added to the Indebtedness and secured hereby, **WHETHER OR NOT SUCH LIABILITY, LOSS OR DAMAGE ARISES OR ALLEGEDLY ARISES FROM OR IN CONNECTION WITH ANY ACTS OF NEGLIGENCE OF LENDER OR UNDER ANY THEORY OF STRICT LIABILITY.**

13.4     Upon the occurrence of an Event of Default, Trustee and Lender in the exercise of the rights and powers conferred upon them shall have the full power to use and apply the Rents, less costs and expenses of collection to the payment of or on account of the items listed in (a) - (c) below, at the election of Lender and in such order as Lender may determine as follows:

(a)     to the payment of (i) the expenses of operating and maintaining the Premises, (ii) premiums on insurance as hereinabove authorized, (iii) taxes and special assessments now due or which may hereafter become due on the Premises, and (iv) expenses of placing the Premises in such condition as will, in the sole judgment of Lender, make it readily rentable;

(b)     to the payment of any principal, interest or any other Indebtedness secured hereby or any deficiency which may result from any foreclosure sale;

(c)     to the payment of established claims for damages, if any, reasonable attorneys' fees and costs and reasonable attorneys' fees and costs on appeal.

The manner of the application of Rents, the reasonableness of the costs and charges to which such Rents are applied and the item or items which shall be credited thereby shall be within the sole and unlimited discretion of Lender. To the extent that the costs and expenses in (a) and (c) above exceed the amounts collected, the excess shall be added to the Indebtedness and secured hereby.

::ODMA\PCDOCS\ATL\1128769\1

## XIV. APPOINTMENT OF RECEIVER

14.1    Upon the occurrence of any Event of Default, unless the same has been specifically waived in writing, Lender may apply to any court having jurisdiction for the appointment of a receiver of the Premises. Such appointment may be made either before or after sale, without notice, without regard to the solvency or insolvency of Borrower at the time of application for such receiver and without regard to the then value of the Premises or the adequacy of Lender's security. Lender may be appointed as such receiver. The receiver shall have power to collect the Rents during the pendency of any foreclosure proceedings and, in case of a sale, during the full statutory period of redemption, if any, as well as during any further times when Borrower, except for the intervention of such receiver, would be entitled to collect such Rents. In addition, the receiver shall have all other powers which shall be necessary or are usual in such cases for the protection, possession, control, management and operation of the Premises during the whole of said period. The court from time to time may authorize the receiver to apply the net income in its possession at Lender's election and in such order as Lender may determine in payment in full or in part of those items listed in the section above.

## XV. APPLICATION OF PROCEEDS AFTER FORECLOSURE OR SALE

15.1    Upon such sale, Trustee shall make, execute, and after due payment is made, deliver to the purchaser or purchasers a deed or deeds for the Premises or part thereof sold and shall apply the proceeds of the sale, at the election of Lender first, to all of the expenses of such sale including the reasonable expenses of this trust or the Trustee and the fees and costs of any attorneys for this trust, the Trustee or Lender, all of which shall accrue and become due from and after any Event of Default, and, second, to the payment of all items which under the terms hereof constitute secured Indebtedness in such order as Lender may elect in its sole and absolute discretion, and then any surplus shall be paid to Borrower or Borrower's successors or assigns, as their rights may appear.

15.2    In the event of such a sale of the Premises or any part thereof and the execution of a deed or deeds therefore under these trusts, any recital therein of the occurrence of an Event of Default or of the giving or recording of any notice or demand by Trustee or Lender regarding such sale shall be conclusive proof thereof, and the receipt of the purchase money recited therein shall fully discharge the purchaser from any obligation for the proper application of the proceeds of sale in accordance with these trusts.

## XVI. PAYMENT OF COSTS/WAIVER AND OTHER RIGHTS OF LENDER

16.1    (a)    Borrower agrees that all reasonable costs, charges and expenses, including but not limited to, reasonable attorneys' fees and costs, incurred or expended by Trustee or Lender arising out of or in connection with any action, proceeding or hearing, legal, equitable or quasi-legal, in any way affecting or pertaining to the Loan Documents, the Environmental Indemnity, or the Premises, shall be promptly paid by Borrower. All such sums not promptly paid by Borrower shall be added to the Indebtedness secured hereby and shall bear interest at the Default Rate from the date of such advance and shall be due and payable on demand.

        (b)    To the full extent that such rights can be lawfully waived, Borrower hereby waives and agrees not to insist upon, plead, or in any manner take advantage of, any notice of acceleration, any stay, extension, exemption, homestead, marshaling or moratorium law or any law providing for the valuation or appraisement of all or any part of the Premises prior to any sale or sales thereof under any provision of this Deed of Trust or before or

after any decree, judgment or order of any court or confirmation thereof, or claim or exercise any right to redeem all or any part of the Premises so sold and hereby expressly waives to the full extent permitted by applicable law on behalf of itself and each and every person or entity acquiring any right, title or interest in or to all or any part of the Premises, all benefit and advantage of any such laws which would otherwise be available to Borrower or any such person or entity, and agrees that neither Borrower nor any such person or entity will invoke or utilize any such law to otherwise hinder, delay or impede the exercise of any remedy granted or delegated to Lender herein but will permit the exercise of such remedy as though such laws had not been enacted. Borrower hereby further expressly waives to the full extent permitted by applicable law on behalf of itself and each and every person or entity acquiring any right, title or interest in or to all or any part of the Premises any and all rights of redemption from any sale or any order or decree of foreclosure obtained pursuant to provisions of this Deed of Trust.

16.2    All rights and remedies granted to Trustee or Lender in the Loan Documents shall be in addition to and not in limitation of any rights and remedies to which it is entitled in equity, at law or by statute, and the invalidity of any right or remedy herein provided by reason of its conflict with applicable law or statute shall not affect any other valid right or remedy afforded to Trustee or Lender. No waiver of any default or Event of Default under any of the Loan Documents shall at any time thereafter be held to be a waiver of any rights of the Trustee or Lender hereunder, nor shall any waiver of a prior Event of Default or default operate to waive any subsequent Event of Default or default. All remedies provided for in the Loan Documents are cumulative and may, at the election of Lender, be exercised alternatively, successively or concurrently. No act of Trustee or Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision or to proceed against one portion of the Premises to the exclusion of any other portion. Time is of the essence under this Deed of Trust and the Loan Documents.

## XVII.  ASSIGNMENT OF LEASES AND RENTS

17.1    As a source of future payment of the Note and the other Indebtedness secured by the Deed of Trust, Borrower hereby authorizes Lender to demand, collect, give receipts and releases for any and all Rents herein assigned which may be or become due and payable by the lessees and other occupants of the Premises, and at its discretion to file any claim or take any other action or proceeding and make any settlement of any claims, either in its own name or in the name of Borrower or otherwise, which Lender may deem necessary or desirable in order to collect and enforce the payment of any and all Rents. Lessees of the Premises, or any part thereof, are hereby expressly authorized and directed to pay all Rents herein assigned to Lender or such nominee as Lender may designate in writing delivered to and received by such lessees who are expressly relieved of any and all duty, liability or obligation to Borrower in respect of all payments so made. Notwithstanding the direct and absolute assignment of the Rents, there shall be no pro tanto reduction of any portion of the Indebtedness except with respect to Rents actually received by Lender and applied by Lender toward payment of the Indebtedness.

17.2    (a)    Notwithstanding any provision herein to the contrary, prior to an Event of Default, Lender hereby grants to Borrower the revocable license to enforce all provisions contained in the Leases and collect and use (subject to the terms and conditions of the Loan Documents), all Rents, as the same become due and payable, but in any event for not more than one calendar month in advance, provided, however, Borrower's use of such Rents may be subject to the Recourse Obligations (as defined in the Note). Such license shall not be applicable to any Extraordinary Rental Payments (as hereinafter

defined), all of which shall be paid directly to Lender. Lender shall be entitled to hold Extraordinary Rental Payments it receives as additional security for the Note and the funds shall be governed by the terms set forth below. Borrower shall render such accounts of collections as Lender may reasonably require. The license herein granted to Borrower shall terminate immediately and automatically, without further action or documentation, upon an Event of Default; and upon written notice of Borrower's Event of Default at any time hereafter given by Lender to any lessee, all Rents thereafter payable and all agreements and covenants thereafter to be performed by any such lessee shall be paid and performed by such lessee directly to Lender in the same manner as if the above license had not been granted, without prosecution of any legal or equitable remedies under this Deed of Trust. Any lessee of the Premises or any part thereof is authorized and directed to pay to Borrower any Rent herein assigned currently for not more than one calendar month in advance, but shall make all Extraordinary Rental Payments to Lender and any payment so made, other than Extraordinary Rental Payments, prior to receipt by such lessee of the aforementioned notice shall constitute a full acquittance to lessee therefore. "Extraordinary Rental Payments" shall mean any payments under the Leases in excess of one calendar month in advance, lease termination payments and purchase option exercise payments.

(b)     All Extraordinary Rental Payments shall be delivered to Lender. Such Extraordinary Rental Payments shall be held by Lender and Borrower shall not be entitled to interest or crediting of interest on said Extraordinary Rental Payments (hereinafter referred to as the "Extraordinary Rental Escrow") and disbursed or applied as hereinafter provided. So long as no Event of Default has occurred under the Loan Documents, Lender shall disburse funds from the Extraordinary Rental Escrow for costs and expenses incurred by Borrower for tenant improvements and leasing commissions for Leases approved by Lender, not to exceed a combined rate per square foot of net rentable area leased as reasonably determined by Lender at the time such Extraordinary Rental Payments are received by Lender. Borrower shall be allowed disbursements from time to time for tenant improvements and leasing commissions as reasonably determined by Lender. Such disbursements of funds from the Extraordinary Rental Escrow shall be conditioned upon Borrower furnishing to Lender a written request for each such disbursement together with those items as Lender deems reasonably necessary in its discretion. Funds in the Extraordinary Rental Escrow shall constitute additional security for the Loan and shall remain as collateral for the Loan for the term of the Loan.

17.3    Lender shall be under no obligation to enforce any of the rights or claims assigned to it hereunder or to perform or carry out any of the obligations of the lessor under any of the Leases and does not assume any of the liabilities in connection with or arising out of the covenants and agreements of Borrower in the Leases; and Borrower covenants and agrees that it will faithfully perform all of the obligations imposed under any and all of the Leases. All Security Deposits collected by Borrower shall be maintained in accordance with all applicable Legal Requirements and, if cash, shall be deposited by Borrower at a federally insured institution reasonably satisfactory to Lender. Except to the extent that the same is caused solely as a result of Lender's gross negligence or willful misconduct, should Lender incur any liability, loss or damage under the Leases or under or by reason of this assignment of Leases, or in the defense of any claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any of the Leases, the amount thereof, including costs, expenses and reasonable attorneys' fees and costs, shall be added to the Indebtedness secured by this Deed of Trust, **WHETHER OR NOT SUCH LIABILITY, LOSS OR DAMAGE ARISES OR**

::ODMA\PCDOCS\ATL\1128769\1

25

ALLEGEDLY ARISES FROM OR IN CONNECTION WITH ANY ACTS OF NEGLIGENCE OF LENDER OR UNDER ANY THEORY OF STRICT LIABILITY.

17.4    Borrower covenants not to alter, modify, amend or change the terms of any of the Leases or give any consent or permission or exercise any option required or permitted by the terms thereof or waive any obligation required to be performed by any lessee or cancel, renew or terminate any of the Leases or accept a surrender thereof or enter into leases after the date hereof without the prior written consent of Lender, not to be unreasonably withheld, and Borrower will not make any further transfer or assignment thereof, or attempt to pledge, assign or encumber any of the Leases or Rents or other amounts payable thereunder. Borrower further covenants to deliver to Lender, promptly upon receipt thereof, copies of any and all demands, claims and notices of default received by Borrower from any lessee under any of the Leases assigned herein or of any default thereunder by lessee. Borrower shall keep and perform all terms, conditions and covenants required to be performed by lessor under the Leases. If requested by Lender, Borrower shall enforce the Leases and all remedies available to Borrower against the lessees thereunder in case of default under the Leases by lessees.

(a)    Notwithstanding the foregoing and subject to Lender's lease approval rights outlined in any Property Reserves Agreement, Borrower shall be permitted, in the ordinary course of business, to enter into, extend, renew, amend or modify (but not terminate) any Lease which covers less than twenty percent (20%) of the square feet of the total net rentable area of space at the Premises without Lender's prior written consent; provided that all of the following conditions are satisfied:

(1)    No Event of Default exists under the Loan Documents;

(2)    The Lease contains no purchase option or right of first refusal to purchase all or a portion of the Premises;

(3)    A new Lease must contain terms which are commercially reasonable;

(4)    All lease extensions, renewals, amendments or modifications (A) are in the ordinary course of business of Borrower; (B) are commercially reasonable; (C) do not involve the relocation of a tenant to space not located within the Premises; and (D) do not provide for reduction of rent or other tenant reimbursement amounts, unless otherwise approved by Lender in writing;

(5)    The new Lease, or any renewal, extension, amendment or modification of an existing Lease, does not or will not cause a default under any Lease, or any other document or instrument (recorded or otherwise) in any way burdening or affecting the Premises; and

(6)    The tenant's business does not and will not involve the presence of Hazardous Material on the Premises, including but not limited to businesses engaged in the processing of dry cleaning on-site.

(b)    Borrower shall furnish to Lender a true and complete copy of each Lease, extension, renewal, amendment or modification of lease, hereafter made by Borrower with respect to space in the Premises within thirty (30) days after delivery of each such Lease, extension, renewal, amendment or modification by the parties thereto. The delivery by Borrower of each Lease, extension, renewal, amendment or modification that does not

require Lender's consent under the terms hereof shall constitute a representation by Borrower that the conditions contained in this paragraph have been complied with.

(c)    With regard to those Leases for which Lender's consent is required, if:  (a) Borrower provides Lender with a written request for consent to such Lease and the request is accompanied by:  (i) a copy of the Lease; and (ii) copies of the most recently completed balance sheets and income statements for such lessee, to the extent reasonably available; (b) the request is given in the manner provided for the giving of Notices in this Deed of Trust; and (c) the request is boldly noted as a request for consent to a Lease for which Lender's consent is required and specifically states that the Lease will be deemed approved if Lender fails to respond within 15 business days (Lender and Borrower hereby agree that such 15 business day period shall commence on the date of Lender's actual receipt of all information reasonably required by Lender in connection with Lender's review of said Lease); then in the event Lender fails to respond within said 15 business day period, said consent shall be deemed to have been given.  Lender may condition its consent to any Lease on Lender's receipt of a fully executed Subordination, Non-Disturbance and Attornment Agreement, in form and substance reasonably satisfactory to Lender.

17.5    Following the occurrence of an Event of Default, Lender may in the name of Borrower or in its own name as Lender and under the powers granted herein extend, modify, or terminate (to the extent permitted by law or the terms of the specific lease) any then existing leases or subleases and make new leases, which extensions, modifications or new leases may provide for terms to expire, or for options to lessees to extend or renew terms to expire, beyond the Maturity Date.

17.6    (a)    It is the intention of Lender and Borrower that the assignment effectuated hereby with respect to the Rents and other amounts due under the Leases shall be a direct, absolute and currently effective assignment and shall not constitute merely the granting of a lien, collateral assignment or a security interest or pledge for the purpose of securing the Indebtedness secured by this Deed of Trust and is effective whether or not a default occurs hereunder or under the Loan Documents.  In the event that a court of competent jurisdiction determines ·that, notwithstanding such expressed intent of the parties, Lender's interest in the Rents or other amounts payable under the Leases constitutes a lien on or security interest in or pledge thereof, it is agreed and understood that the forwarding of a notice to Borrower after the occurrence of an Event of Default, advising Borrower of the revocation of Borrower's license to collect such Rents shall be sufficient action by Lender to (i) perfect such lien on or security interest in or pledge of the Rents, (ii) take possession thereof, and (iii) entitle Lender to immediate and direct payment of the Rents for application as provided in the Loan Documents, all without the necessity of any further action by Lender, including, without limitation, any action to obtain possession of the Land, Improvements or any other portion of the Premises. Notwithstanding the direct and absolute assignment of the Rents, there shall be no partial reduction of any portion of the Indebtedness secured by this Deed of Trust except with respect to Rents actually received by Lender and applied by Lender toward payment of such Indebtedness.

(b)    Without limitation of the absolute nature of the assignment of the Rents, Borrower and Lender agree that (i) this Deed of Trust shall constitute a "security agreement" for purposes of 11 U.S.C. Section 552(b), (ii) the security interest created by this Deed of Trust extends to property of Borrower acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents (including, without limitation, any

Extraordinary Rental Payments), and (iii) such security interest shall extend to all Rents (including, without limitation, any Extraordinary Rental Payments) acquired by the estate after the commencement of any case in bankruptcy. Without limitation of the absolute nature of the assignment of the Rents, to the extent Borrower (or Borrower's bankruptcy estate) shall be deemed to hold any interest in the Rents (including, without limitation, any Extraordinary Rental Payments) after the commencement of a voluntary or involuntary bankruptcy case, Borrower hereby acknowledges and agrees that such Rents (including, without limitation, any Extraordinary Rental Payments) are and shall be deemed to be "cash collateral" under Section 363 of the Bankruptcy Code. Borrower may not use the cash collateral without the consent of Lender and/or an order of any bankruptcy court pursuant to 11 U.S.C. 363(c)(2), and Borrower hereby waives any right it may have to assert that such Rents (including, without limitation, any Extraordinary Rental Payments) do not constitute cash collateral. No consent by Lender to the use of cash collateral by Borrower shall be deemed to constitute Lender's approval, as the case may be, of the purpose for which such cash collateral was expended.

(c)     Borrower acknowledges and agrees that, upon recordation of this Deed of Trust, Lender's interest in the Rents shall be deemed to be fully perfected, and enforced as to Borrower and all third parties, including, without limitation, any subsequently appointed trustee in any case under the Bankruptcy Code, without the necessity of (a) commencing a foreclosure action with respect to this Deed of Trust, (b) furnishing notice to Borrower or tenants under the Leases, (c) making formal demand for the Rents, (d) taking possession of the Premises as a lender-in-possession, (e) obtaining the appointment of a receiver of the Rents and profits of the Premises, (f) sequestering or impounding the Rents, or (g) taking any other affirmative action.

### XVIII.  FINANCIAL REPORTING

18.1    Borrower shall keep adequate books and records of account in accordance with generally accepted accounting principles or a tax basis of accounting or in accordance with other methods of accounting acceptable to Lender in its sole discretion, consistently applied ("Approved Accounting Method") and shall furnish to Lender the following, which shall be prepared, dated and certified by Borrower as true, correct and complete in the form required by Lender, unless otherwise specified below:

(A)     Within 90 days after the end of each fiscal year for Borrower, detailed financial reports covering the full and complete operation of the Premises, prepared in accordance with the Approved Accounting Method, including, without limitation, income and expense statements;

(B)     Within thirty (30) days after the end of each fiscal quarter for Borrower, the reports described in paragraph (A) above, prepared on both a quarterly and year-to-date basis, and said reports may be internally prepared by Borrower;

(C)     Within 30 days after the end of each fiscal quarter of Borrower, a detailed rent roll of the leasing status of the Premises as of the end of such quarter identifying the lessee (and assignee, subtenants and licensees, if any) and location of demised premises; square footage leased; base and additional rental amounts including any increases; rental concessions, allowances, abatements and/or rental deferments; pass-through amounts; purchase options; commencement and expiration dates; early termination dates; renewal options and annual renewal rents; total net rentable area of the Premises; the existence of any affiliation between Borrower and tenant; and a detailed listing of tenant defaults;

::ODMA\PCDOCS\ATL\1128769\1

28

Notwithstanding anything contained in paragraphs 18.1 (B) and (C) to the contrary, if the entire Premises is leased to one (1) lessee, there is no default under the lease or the Loan Documents, and the lessee under said lease performs and/or pays for all obligations under the lease directly to the taxing authority and/or vendor(s), then the Borrower shall be required to provide the reports required in 18.1(A) and (C) on an annual basis. Upon request from Lender, Borrower shall provide such reports on a quarterly basis.

(D)    Within 15 days following Lender's request, (i) a detailed annual budget for the current fiscal year, in form and content reasonably acceptable to Lender, to include, without limitation, a comparison showing corresponding information for Borrower's preceding fiscal year; (ii) a copy of Borrower's and, if applicable, Guarantor's signed federal income tax return for the immediately preceding fiscal year; (iii) detailed annual financial reports for Borrower and Guarantor for the immediately preceding fiscal year; (iv) a listing of sales volumes attained by lessees of the Premises under percentage leases for the immediately preceding year; and (v) an aged accounts receivable report; and

(E)    Such other financial statements, and such other information and reports as may, from time to time, be reasonably required by Lender.

## XIX.  TRANSFER OF LOAN BY LENDER

19.1    Lender may, at any time, sell, transfer or assign the Note, the other Loan Documents and the Environmental Indemnity, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (each, as designated by Lender, a "Securitization Transaction"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securitization Transaction or any Rating Agency (collectively, the "Investor") and each prospective Investor and the advisor of each of the foregoing, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrower, any guarantor, if any and the Premises, whether furnished by Borrower, any guarantor, if any or otherwise, as Lender determines necessary or desirable.

19.2    Borrower agrees that it shall cooperate with Lender and use Borrower's reasonable efforts to facilitate the consummation of any Securitization Transaction, including, without limitation, by: (i) promptly and reasonably providing such information as may be requested in connection with the preparation of any documentation related to such Securitization Transaction; (ii) providing within 10 days of Lender's request any reports that Lender is entitled to request under this Deed of Trust and monthly income information for each of the preceding 12 months; and (iii) permitting Lender, or its designees to inspect the Premises during normal business hours upon advance notice from Lender requesting same and to discuss with Borrower or its agents information and documentation with respect to the operation and management of the Premises. Lender shall make reasonable efforts to ensure that the lessees' business operations are not disrupted.

19.3    Lender agrees that any costs and expenses incurred by Lender under this section shall be the responsibility of and paid for by Lender.

## XX.  MANAGEMENT OF PREMISES

20.1    The Premises shall at all times be managed by the Borrower or a professional property manager acceptable to Lender. If the Premises are managed by Borrower or an affiliate of Borrower, then upon the occurrence of an Event of Default, Lender may request, upon thirty (30) days prior written

::ODMA\PCDOCS\ATL\1128769\1

29

notice to Borrower, that Borrower select a successor manager not affiliated with Borrower to manage the Premises. If a successor manager is required pursuant hereto, Borrower shall immediately seek to appoint a successor manager acceptable to Lender in Lender's reasonable discretion which successor manager shall be a reputable management company having at least seven (7) years' experience in the management of commercial properties with similar uses as the Premises and in the jurisdiction in which the Premises is located and shall not be paid management fees in excess of fees which are market fees in the surrounding geographic area.

## XXI. TRUSTEE

21.1    Lender, from time to time, may substitute another Trustee in place of the Trustee named herein, to execute the trusts hereby created; and upon such appointment, and without conveyance to the successor trustee, the successor trustee shall be vested with all the title, interest, powers, duties and trusts in the Premises hereby vested in or conferred upon Trustee herein named. Each such appointment and substitution shall be made by written instrument executed by the Lender containing reference to this Deed of Trust sufficient to identify it, which instrument, when recorded in the office of the County Recorder of the county or counties in which the Premises is situated, shall be conclusive proof of proper appointment of the successor trustee. The recital or statement, in any instrument executed by Trustee in pursuance of any of said trusts, of the due authorization of any agent of the Trustee executing the same shall for all purposes be conclusive proof of such authorization.

21.2    Trustee at any time, at Trustee's option, may commence and maintain suit in any court of competent jurisdiction and obtain the aid and direction of said court in the execution by it of the trusts or any of them, herein expressed or contained, and, in such suit, may obtain the orders or decrees, interlocutory or final of said court directing the execution of said trusts, and confirming and approving Trustee's acts, or any of them, or any sales or conveyances made by Trustee, and adjudging the validity thereof, and directing that the purchasers of the property sold and conveyed be let into immediate possession thereof, and providing for orders of court or other process requiring the Sheriff of the county in which said property is situated to place and maintain said purchasers in quiet and peaceable possession of the property so purchased by them, and the whole thereof.

21.3    Borrower, forthwith upon request, at any and all times hereafter, at the expense of Borrower, will cause to be made, executed, acknowledged and delivered to Trustee, any and every deed or assurance in law which Trustee or counsel of Trustee shall reasonably advise or require for the more sure, effectual and satisfactory granting and confirming of said Premises unto Trustee.

21.4    Trustee shall not be liable or responsible for its acts or omissions hereunder, **INCLUDING TRUSTEE'S NEGLIGENCE**, except for Trustee's own gross negligence or willful default, or be liable or responsible for any acts or omissions of any agent, attorneys or employee by him employed hereunder, if selected with reasonable care.

21.5    Trustee accepts this trust when this Deed of Trust executed and acknowledged is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Borrower, Lender, or Trustee shall be a party unless brought by Trustee.

::ODMA\PCDOCS\ATL\1128769\1

## XXII. GENERAL

22.1    By accepting payment of any sum secured hereby after its due date, Lender does not waive its right either to require prompt payment when due of all other sums or installments so secured or to declare a default for failure to pay such other sums or installments.

22.2    The usury provisions of the Note and the Recourse Obligations of the Note are fully incorporated herein by reference as if the same were specifically stated here.

22.3    In the event one or more provisions of the Loan Documents shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and the Loan Documents shall be construed as if any such provision had never been contained herein.

22.4    If the payment of the Indebtedness secured hereby or of any part thereof shall be extended or varied, or if any part of the security be released, all persons now or at any time hereafter liable therefore, or interested in said Premises, shall be held to assent to such extension, variation or release, and their liability and the lien and all provisions hereof shall continue in full force, the right of recourse against all such persons being expressly reserved by Lender notwithstanding such variation or release.

22.5    Upon payment in full of the principal sum, interest and other Indebtedness secured by the Loan Documents, these presents shall be null and void, and Lender shall release this Deed of Trust and the lien hereof by proper instrument executed in recordable form.

22.6    (a)    Borrower hereby grants to Lender and its respective agents, attorneys, employees, consultants, contractors and assigns an irrevocable license and authorization to enter upon and inspect the Premises and all facilities located thereon and to conduct such inspection including but not limited to, environmental audits, of the Premises at reasonable times.

          (b)    In the event there has been an Event of Default or in the event Lender has formed a reasonable belief, based on its inspection of the Premises or other factors known to it, that Hazardous Materials may be present on the Premises, then Borrower grants to Lender and its respective agents, attorneys, employees, consultants, contractors and assigns an irrevocable license and authorization to conduct, at Borrower's expense, environmental tests of the Premises, including without limitation, a Phase II environmental audit, subsurface testing, soil and ground water testing, and other tests which may physically invade the Premises or facilities (the "Tests").

          (c)    Provided no Event of Default has occurred, Lender will provide Borrower with reasonable notice of Lender's intent to enter, inspect and conduct the Tests provided for in this paragraph. In addition, Lender shall conduct such inspections and Tests during normal business hours and use reasonable efforts to minimize disruption of lessees' business operations.

The foregoing licenses and authorizations are intended to be a means of protection of Lender's security interest in the Premises and nothing further.

22.7    Within 15 days after any written request by any party to this Deed of Trust, the requested party shall certify, by a written statement duly acknowledged, the amount of principal, interest and other Indebtedness then owing on the Note, the terms of payment, Maturity Date and the date to

::ODMA\PCDOCS\ATL\1128769\1

which interest has been paid. Borrower shall further certify whether any defaults, offsets or defenses exist against the Indebtedness secured hereby. Borrower shall also furnish to Lender, within 30 days of its request therefore, tenant estoppel letters from such tenants of the Premises as Lender may reasonably require; which Lender shall not request more than one (1) time per annum, nor more than one (1) time prior to the date of the Securitization Transaction.

22.8   The terms of the Loan Documents and the Environmental Indemnity shall be construed and interpreted without any presumption, inference, or rule requiring construction or interpretation of any provision of the Loan Documents and the Environmental Indemnity against the interest of the party causing the Loan Documents and the Environmental Indemnity or any portion of it to be drafted. Borrower is entering into the Loan Documents and the Environmental Indemnity freely and voluntarily without any duress, economic or otherwise.

22.9   This Deed of Trust and all provisions hereof shall inure to the benefit of the heirs, successors and assigns of Lender and shall bind the heirs and permitted successors and assigns of Borrower.

22.10  This Deed of Trust shall be governed by, and construed in accordance with, the laws of the state where the Premises are located, without regard to its conflicts of law principles.

22.11  BORROWER AND LENDER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTIONS BROUGHT BY BORROWER, TRUSTEE OR LENDER IN CONNECTION WITH THIS DEED OF TRUST, ANY OF THE LOAN DOCUMENTS, THE INDEBTEDNESS SECURED HEREBY, OR ANY OTHER STATEMENTS OR ACTIONS OF LENDER.

22.12  This Deed of Trust and the Indebtedness secured hereby is for the sole purpose of conducting or acquiring a lawful business, professional or commercial activity or for the acquisition or management of real or personal property as a commercial investment, and all proceeds of such Indebtedness shall be used for said business or commercial investment purpose. Such proceeds will not be used for the purchase of any security within the meaning of the Securities Exchange Act of 1934, as amended, or any regulation issued pursuant thereto, including without limitation, Regulations U, T and X of the Board of Governors of the Federal Reserve System. This is not a purchase money deed of trust where a seller is providing financing to a buyer for the payment of all or any portion of the purchase price, and the Premises secured hereby is not a residence or homestead or used for mining, grazing, agriculture, timber or farming purposes.

22.13  Unless Lender shall otherwise direct in writing, Borrower shall appear in and defend all actions or proceedings purporting to affect the security hereunder, or any right or power of the Lender. The Lender shall have the right to appear in such actions or proceedings. Borrower shall save Lender harmless from all reasonable costs, and expenses, including but not limited to, reasonable attorneys' fees and costs, costs of a title search, continuation of abstract and preparation of survey incurred by reason of any action, suit, proceeding, hearing, motion or application before any court or administrative body in and to which Lender may be or become a party by reason hereof. All money paid or expended by Lender in that regard, together with interest thereon from date of such payment at the applicable interest rate shall be additional Indebtedness secured hereby and shall be immediately due and payable by Borrower without notice.

22.14  If more than one person or entity constitutes Borrower, all obligations and agreements of the persons or entities constituting Borrower are joint and several.

::ODMA\PCDOCS\ATL\1128769\1

22.15  This Deed of Trust may be executed in counterparts, each of which shall be deemed an original; and such counterparts when taken together shall constitute but one agreement.

22.16  That portion of the Premises which is personal property is referred to herein as the "Collateral". To secure the payment of the Indebtedness, Borrower hereby grants to Lender a security interest in the Collateral, together with all proceeds of the Collateral. Upon the occurrence of an Event of Default, Lender may exercise its rights of enforcement with respect to the Collateral under the Texas Business and Commerce Code, as amended. This Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Premises and is to be filed for record in the real estate records in the Office of the County Clerk where the Premises (including said fixtures) is situated. This Deed of Trust shall also be effective as a financing statement covering as-extracted collateral and is to be filed for record in the real estate records of the county where the Premises is situated. The mailing address for Borrower (debtor) is set forth on the first page of this Deed of Trust and the address of Lender (secured party) from which information concerning the security interest may be obtained is the address of Lender set forth on the first page of this Deed of Trust.

(Signatures on next page)

::ODMA\PCDOCS\ATL\1128769\1

33

IN WITNESS WHEREOF, Borrower has caused this Deed of Trust to be duly executed and delivered as of the date first above written.

16062 SOUTHWEST FREEWAY, LLC

By: _____
Name: GARY L GREENBERG
Title: MANAGER


STATE OF _CALIFORNIA_ §
                      §
COUNTY OF _SAN DIEGO_ §

This instrument was acknowledged before me on _Feb. 23_____, 2007, by _Gary L. Greenberg, Manager___ of 16062 Southwest Freeway, LLC, a Texas limited liability company, on behalf of said company.

Notary Public, State of _CALIFORNIA_____

My Commission Expires:                 Print Name of Notary Public: _____

_3-4-08_                                _____

```
G. HORTON
Commission # 1474359
Notary Public - California
Contra Costa County
My Comm. Expires Mar 4, 2008
```

::ODMA\PCDOCS\ATL\1128769\1

34

**EXHIBIT A**

LEGAL DESCRIPTION

::ODMA\PCDOCS\ATL\1128769\1

Exhibit A                    GF-Number 07R03059

Unrestricted Reserve "C-2", Block 1, of TOWN CENTER LAKESIDE, PHASE 3, REPLAT
OF UNRESTRICTED RESERVES "A, C1 & C2", according to the map or plat thereof
recorded Slide Number 2343B of the Plat Records of Fort Bend County, Texas.

# EXHIBIT "3"

**GUARANTY**
Loan No. 755698

THIS GUARANTY (as the same may from time to time hereafter be modified, supplemented or amended, the "Guaranty") is made as of MARCH 7 , 2007 by GARY GREENBERG, an individual, having an office at 934 Muirlands Dr., La Jolla, California 92037("Guarantor"), in favor of PRINCIPAL COMMERCIAL FUNDING, LLC, a Delaware limited liability company (together with its successors and assigns, the ("Lender").

RECITALS:

Lender has agreed to make a loan (the "Loan") in the original principal sum of TWO MILLION SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($2,700,000) (the "Loan Amount") to 16062 SOUTHWEST FREEWAY, LLC, a Texas limited liability company, ("Borrower"); and

The Loan is evidenced by Borrower's secured promissory note made payable and delivered to Lender (as the same may from time to time hereafter be modified, amended, supplemented, extended or consolidated in writing, and any note(s) issued in exchange therefore or replacement thereof, the "Note") and further evidenced and secured by a "Mortgage" (as defined in said Note) on certain real estate, together with all existing improvements constructed thereon (the "Premises"), said Premises being more particularly described in said Mortgage; and

In connection with the Loan, the Borrower has also executed that certain Environmental Indemnity ("Environmental Indemnity") for the benefit of Lender (the Note, Environmental Indemnity, and Mortgage and all other instruments or agreements by which the Loan is evidenced or secured are hereinafter collectively referred to as the "Underlying Instruments"); and

It is a condition of Lender's agreement to make the Loan that Guarantor be unconditionally liable for and personally guarantee the payment and performance of certain liabilities and obligations of the Borrower under the Underlying Instruments upon the terms and conditions as are hereinafter set forth.

NOW, THEREFORE, in order to induce Lender to make the Loan to Borrower, Guarantor intending to be legally bound, hereby makes the following representations and warranties to the Lender and hereby covenants and agrees with the Lender as follows:

1.      Guarantor absolutely, personally, irrevocably and unconditionally guarantees to the Lender payment and the full, faithful and timely performance of any and all liabilities and obligations of Borrower whether now existing or hereafter incurred under the Underlying Instruments (all of which payments, liabilities and obligations are hereinafter collectively referred to as the "Guaranteed Obligations").

2.      Guarantor absolutely, irrevocably and unconditionally waives notice of acceptance of this Guaranty and notice of any payment, liability or obligation to which it may apply, and waives presentment, demand of payment, protest, notice of dishonor or nonpayment of such liabilities under this Guaranty or any of the Underlying Instruments creating the Guaranteed Obligations and any suit or taking other action by the Lender against, and any other notice to, any party liable thereon or any property which may be security therefore.

3.      The Lender may at any time and from time to time without the consent of, or notice to, Guarantor, without incurring any responsibility to Guarantor and without impairing or releasing

::ODMA\PCDOCS\ATL\112909\1\

any of the obligations of Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(a)     renew, alter or change the interest rate, manner, time, place or terms of payment or performance of any of the Guaranteed Obligations, or any liability incurred directly or indirectly in respect thereof, whereupon the guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)     settle or compromise any of the Guaranteed Obligations, or sell, exchange, release, surrender, and in any manner and in any order realize upon or otherwise deal with any property at any time directly and absolutely assigned or pledged or mortgaged to secure the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof;

(c)     exercise or refrain from exercising any rights against Borrower or any other person (including Guarantor) or otherwise act or refrain from acting with regard to the Underlying Instruments, Guaranteed Obligations or this Guaranty;

(d)     apply any sums in whatever manner paid or realized to any liability or liabilities of Borrower to the Lender regardless of what liability or liabilities of Borrower remain unpaid;

(e)     consent to or waive any breach of or any act, omission or default under the Underlying Instruments or otherwise amend, modify or supplement any of such instruments or agreements; and/or

(f)     sell, convey or assign, whether into a securitized transaction or otherwise, all or any part of Lender's interest in this Guaranty and the Underlying Instruments.

4.     (a)     No invalidity, irregularity or unenforceability of all or any part of the Underlying Instruments, the Guaranteed Obligations or this Guaranty, or of any security therefore, shall affect, impair or constitute a defense to this Guaranty. This Guaranty is a direct and primary obligation of Guarantor, and Guarantor's obligations hereunder are not as a surety. This is a guaranty of payment and performance, and not merely a guaranty of collection.

(b)     Guarantor acknowledges and agrees that this Guaranty and Guarantor's obligations with respect to payments and performance under the Environmental Indemnity shall terminate four (4) years after the Indebtedness evidenced by the Loan Documents has been paid in full, so long as no notice of claim or allegation of Losses has been made by an Indemnified Party under said Environmental Indemnity.

5.     (a)     Notwithstanding any payment or payments made by Guarantor hereunder, Guarantor will not assert or exercise any right of the Lender or of such Guarantor against Borrower to recover the amount of any payment made by such Guarantor to the Lender by way of subrogation, reimbursement, contribution, indemnity or otherwise arising by contract or operation of law, and Guarantor shall not have any right of recourse to or any claim against assets or property of Borrower, whether or not the obligations of Borrower have been satisfied, all of such rights being herein expressly waived by Guarantor. The provisions of this paragraph shall survive the termination of this Guaranty, and any

::ODMA\PCDOCS\ATL\1129098\1

2

satisfaction and discharge of Borrower by virtue of any payment, court order or any applicable law.

(b)    Notwithstanding the provisions of the paragraph above, Guarantor shall have and be entitled to all rights of subrogation otherwise provided by applicable law in respect of any payment Guarantor may make or be obligated to make under this Guaranty, and to assert and enforce the same, in each case on and after, but at no time prior to, the date (the "Subrogation Trigger Date") which is 91 days after the date on which all obligations under the Underlying Instruments shall have been paid or performed in full, if and only if the existence of Guarantor's rights under this paragraph would not make Guarantor a creditor (as defined in the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto) of Borrower in any insolvency bankruptcy, reorganization or similar proceeding commenced on or prior to the Subrogation Trigger Date.

(c)    In the event that Guarantor shall advance or become obligated to pay any sums with respect to any obligation hereby guaranteed or in the event that for any reason whatsoever the Borrower or any subsequent owner of the collateral securing the Loan is now, or shall hereafter become, indebted to Guarantor, Guarantor agrees that the amount of such sums and of such Indebtedness together with all interest thereon, shall at all times be subordinate as to the lien, time of payment and in all other respects, to all sums, including principal, interest and other Indebtedness, at any time owing to the Lender under any of the Underlying Instruments. Nothing herein contained is intended or shall be construed to give to Guarantor any right to participate in any way in the right, title or interest of the Lender in or to the collateral securing the Loan, notwithstanding any payments made by Guarantor under this Guaranty, all such rights of participation being hereby expressly waived and released.

6.    Guarantor agrees that to the extent that Borrower makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required, for any of the foregoing reasons or for any other reasons, to be repaid or paid over to a custodian, trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

7.    Guarantor makes the following representations and warranties which shall survive the execution and delivery of this Guaranty:

(a)    Guarantor has and, until the Indebtedness is paid in full, will continue have the requisite power to execute, deliver and perform its obligations under this Guaranty.

(b)    The execution, delivery and performance of this Guaranty (i) have been authorized by all requisite action; (ii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iii) does not and will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the governing organizational instruments of Guarantor, or any indenture, agreement or other instrument to which Guarantor is a party or by which Guarantor or any of Guarantor's assets is or may be bound or affected; (iv) does not and will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of Guarantor's

::ODMA\PCDOCS\ATL\1129098\1

3

assets; and (v) does not and will not require any authorization or license from, or any filing with, any governmental authority or other body.

(c)    This Guaranty constitutes the legal, valid and binding obligations of Guarantor, enforceable against Guarantor in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

8.    Guarantor and Borrower are affiliated and/or related; but are separate and distinct entities with no identity of interest with respect to any Indebtedness which may become owed or any payments which may be made hereunder. Borrower is not contractually bound to Guarantor with respect to any payments hereafter made under this Guaranty in any manner which would have the effect of imputing the liability of Guarantor hereunder to Borrower.

9.    Nothing herein contained shall in any manner affect the lien or priority of the Mortgage, and upon the occurrence of an Event of a Default, the Lender may invoke any remedies it may have under the Underlying Instruments, or this Guaranty, either concurrently or successively and the exercise of any one or more of such remedies shall not be deemed an exhaustion of such remedy or remedies or a waiver of any other remedy or remedies and shall not be deemed an election of remedies. Guarantor hereby specifically waives any defense to its performance under this Guaranty based upon an election of remedies by Lender, including but not limited to an election to foreclose by nonjudicial sale under any deed of trust or security agreement and pursue any other remedy which destroys, lessens or otherwise affects Guarantor's subrogation rights and/or its rights to reimbursement from or to proceed against Borrower or any other person, when resulting from the judicial or nonjudicial foreclosure (under any deed of trust or security agreement) or the selling or otherwise disposing of or collecting or applying any property, real or personal, securing the Note, or otherwise. The exercise by the Lender of any such remedies shall not release or discharge Guarantor from its obligations hereunder unless and until the full amount of the Indebtedness evidenced by the Note and secured as aforesaid has been fully paid and satisfied, and any such release or discharge shall be subject to any prior provisions referenced above.

10.    This Guaranty shall remain in full force and effect until all obligations of the Borrower under the Underlying Instruments have been satisfied in full. No delay on the part of the Lender in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by the Lender unless the same shall be in writing, duly signed on behalf of the Lender, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Lender or the obligations of Guarantor to the Lender in any other respect at any other time. This Guaranty and the rights and obligations of the Lender and of Guarantor hereunder shall be governed and construed in accordance with the laws of the state where the Premises is located, without regard to its conflicts of law principles and this Guaranty is binding upon Guarantor, Guarantor's heirs, personal representatives and permitted successors or assigns, and shall inure to the benefit of the Lender and its successors or assigns.

11.    Guarantor acknowledges that copies of the Underlying Instruments have been made available to Guarantor and that Guarantor is familiar with their contents. Guarantor affirmatively agrees that upon any Permitted Transfer effected in accordance with the provisions of the Underlying Instruments or any transfer by Lender of all or any portion of its interest in the Loan, it shall not

::ODMA\PCDOCS\ATL\112909\1

4

be necessary for Guarantor to reaffirm its continuing obligations under this Guaranty, but Guarantor will do so upon request by Lender.

12.    GUARANTOR AND LENDER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTIONS BROUGHT BY GUARANTOR OR LENDER IN CONNECTION WITH THIS GUARANTY, ANY OF THE LOAN DOCUMENTS, THE INDEBTEDNESS SECURED HEREBY, OR ANY OTHER STATEMENTS OR ACTIONS OF LENDER.

13.    Each notice, consent, request or other communication under this Guaranty (each a "Notice") which any party hereto may desire or be required to give to the other shall be deemed to be adequate and sufficient notice if given in writing and service is made by either (i) registered or certified mail, postage prepaid, in which case notice shall be deemed to have been received three (3) business days following deposit to U.S. Mail; or (ii) a nationally recognized overnight air courier, next day delivery, prepaid, in which case such notice shall be deemed to have been received one (1) business day following delivery to such nationally recognized overnight air courier. All Notices shall be addressed to Guarantor at its address given on the first page hereof, or to Lender at c/o Principal Global Investors, LLC, 801 Grand Avenue, Des Moines, Iowa 50392-1450, Attn: Commercial Mortgage Servicing, and including a reference to the assigned loan number for the Loan, or to such other place as any party may by notice in writing to the other parties designate as a place for service of notice.

14.    Each Guarantor (if more than one) whose signature appears below shall be deemed to be bound by the provisions of this Guaranty and the Guaranteed Obligations, whether each signature was affixed at the same or different times, and the term "Guarantor" as used herein shall be deemed to refer to each individually, as well as collectively, and each of the undersigned shall be jointly and severally liable for the Guaranteed Obligations hereunder, both personally and with recourse. Guarantor agrees that if this Guaranty is placed in the hands of an attorney for enforcement, Guarantor will reimburse Lender all expenses incurred, including reasonable attorney's fees.

15.    This Guaranty may be executed in counterparts, each of which shall be deemed an original; and such counterparts when taken together shall constitute but one agreement.

16.    Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Underlying Instruments.

[remainder of page left intentionally blank]

::ODMA\PCDOCS\ATL\1129098\1

5

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first set forth above.

GARY GREENBERG, an individual