# EXHIBIT "1"

automobile accident caused by negligent driving in a jurisdiction having its own laws regarding the operation of automobiles.

The Roldans further assert that Mexico has no policy interest in applying its law to this accident. Mexico has adopted laws limiting liability in negligence cases to an amount based upon a statutory formula. Unlike Texas law, Mexican law does not provide for derivative claims, such as the bystander or loss of consortium claims filed by Roldan's wife and mother. Because Mexico's underlying policy interest in adopting laws restricting tort recovery is to protect Mexican businesses and citizens from excessive liability claims, the Roldans argue that since this case involves a Texas citizen and a Texas corporation as defendants, Mexico's policy interests are not offended by applying Texas law. We generally agree with that concept and the reasoning behind the Roldans' argument. *See e.g. Baird*, 491 F.Supp. at 1141 (jurisdiction where accident occurred and which did not have a products liability cause of action would presumably be disinterested in the outcome of a products liability case involving a foreign defendant). Here, however, Mexico indeed has a policy interest in applying its law, including the protection intended by limited damages, inasmuch as Rock Shop maintains a warehouse and does business in Mexico.

### CONCLUSION

The relevant conduct in this case occurred in Mexico and the relationship between these parties arose there as a result of that conduct. We find that Texas has no important policy interest in applying its law to this case while Mexico has at least some policy interest in applying its law to Rock Shop. Further, we do not find that the facts of this case significantly impact any of the other qualitative policy factors stated in Section 6 of the Restatement. Accordingly, we sustain Appellants' second point of error. Because our determination requires retrial of all issues pursuant to substantive Mexican law, it is unnecessary for us to reach Appellants' first point of error or Appellees' cross-points. We

reverse the judgment of the trial court and remand the cause for trial.



**BURLINGTON NORTHERN RAILROAD COMPANY, Appellant**

v.

**SOUTHWESTERN ELECTRIC POWER COMPANY, Appellee.**

No. 06–95–00024–CV.

Court of Appeals of Texas, Texarkana.

Argued April 23, 1996.

Decided April 30, 1996.

Opinion Overruling Rehearing June 4, 1996.

Rehearing Overruled July 16, 1996.

Electric utility brought action against railroad, seeking damages for railroad's alleged overcharges under coal transportation contracts. The 102nd Judicial District Court, Bowie County, John F. Miller, Jr., J., entered judgment for utility on unjust enrichment theory, issued declaratory judgment establishing method for assessing rates for remainder of contracts, and awarded utility attorney fees. Railroad appealed, and utility raised conditional cross-points of error. The Court of Appeals, Bleil, J., held that: (1) railroad was not liable to utility for unjust enrichment under contracts that allegedly allowed railroad, through price adjustment clauses, to charge excessively high rates for transporting coal for utility; (2) declaratory judgment, that rates produced by escalation formulas in contracts were interim rates and that final rates were to be based on amounts necessary to compensate railroad for changes in cost of transporting coal above or below base levels specified in contracts, impermissibly failed to conform to jury's verdict; (3) trial court acted within its discretion in finding, for purposes of granting railroad's

motion for sanctions for abuse of discovery, that certification date on railroad's officer's deposition established that utility had document in its possession for excessive length of time before producing it to railroad under railroad's existing discovery request; and (4) evidence of utility's financial condition was admissible. On utility's motion for rehearing, the Court of Appeals further held that: (5) trial court acted within its discretion in excluding officer's deposition from evidence for abuse of discovery, despite Interstate commerce commission (UCC) Secretary's letter indicating that certification date stamped on officer's deposition was one month earlier than correct date, and (6) any error was harmless in exclusion of deposition from evidence.

Reversed and rendered.

**1. Implied and Constructive Contracts ⟐60.1**

Railroad was not liable to electric utility for unjust enrichment under coal transportation contracts that allegedly allowed railroad, through price adjustment clauses, to charge excessively high rates for transporting coal for utility; rates charged for railroad's hauling of utility's coal were fully governed by terms of contracts, railroad satisfied all of its contractual duties pertaining to shipment of coal, and railroad assessed only rates expressly allowed by contract.

**2. Implied and Constructive Contracts ⟐3**

Doctrine of unjust enrichment belongs to measure of damages known as quasi-contract or restitution.

**3. Implied and Constructive Contracts ⟐4**

Purpose of restitution is to place aggrieved plaintiff in position he occupied prior to his dealings with defendant; this purpose is accomplished by requiring defendant to return to plaintiff any rendered performance to which defendant is not entitled.

**4. Implied and Constructive Contracts ⟐3**

Unjust enrichment doctrine applies principles of restitution to disputes which for one reason or another are not governed by contract between the contending parties.

**5. Implied and Constructive Contracts ⟐3**

When defendant has been unjustly enriched by receipt of benefits in manner not governed by contract, law implies contractual obligation upon defendant to restore benefits to plaintiff.

**6. Implied and Constructive Contracts ⟐3**

Unjust enrichment is typically found under circumstances in which one person has obtained benefit from another by fraud, duress, or taking of undue advantage.

**7. Implied and Constructive Contracts ⟐55**

Recovery under principles of unjust enrichment is appropriate when contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons.

**8. Implied and Constructive Contracts ⟐55**

Remedy such as unjust enrichment that is based on quasi-contract or contract implied in law is unavailable when valid, express contract governing subject matter of dispute exists.

**9. Implied and Constructive Contracts ⟐55**

Doctrine of unjust enrichment does not apply when contractual duty at issue has been performed.

**10. Implied and Constructive Contracts ⟐55**

Fact that party to contract has made profit is insufficient ground on which to order restitution on theory of unjust enrichment.

**11. Implied and Constructive Contracts ⟐55**

Doctrine of unjust enrichment does not operate to rescue party from consequences of bad bargain, and enrichment of one party at expense of the other is not unjust when it is permissible under terms of express contract.

**12. Implied and Constructive Contracts ⟐3**

Unjust enrichment is not proper remedy merely because it might appear expedient or generally fair that some recompense be af-

forded for unfortunate loss to claimant, or because benefits to person sought to be charged amount to windfall.

**13. Declaratory Judgment** ⇐383

Declaratory judgment, that rates produced by escalation formulas in coal transportation contracts between railroad and electric utility were interim rates and that final rates were to be based on amounts necessary to compensate railroad for changes in cost of transporting coal above or below base levels specified in contracts, impermissibly failed to conform to jury's verdict in utility's action against railroad alleging overcharges; jury refused to find that calculation of rates solely according to contract escalation formulas resulted in gross inequity to utility by failing to fairly cover changes in railroad's costs, and declaratory provisions in judgment directly contradicted verdict by effectively holding that use of escalation formulas alone to calculate rates failed to fairly cover railroad's cost changes.

**14. Declaratory Judgment** ⇐392.1

Railroad did not waive its asserted point of error on appeal as to impropriety of declaratory relief in action brought against it by electric utility, despite contention that railroad failed to preserve the complaint through objection in trial court; railroad repeatedly moved for instructed verdict on declaratory relief requested by utility, and, following entry of judgment, railroad was not required to raise its insufficient evidence point on this issue in motion for new trial, because declaratory judgment itself was not issue tried to jury. Rules App.Proc., Rule 52(d).

**15. Declaratory Judgment** ⇐393

Declaratory judgments are reviewed under same standards as are other judgments and decrees. V.T.C.A., Civil Practice & Remedies Code § 37.010.

**16. Pretrial Procedure** ⇐221

Trial court acted within its discretion in finding, for purposes of granting railroad's motion for sanctions for abuse of discovery, that certification date on railroad's officer's deposition established that electric utility had document in its possession for excessive length of time before producing it to railroad under railroad's existing discovery request in utility's action against railroad, seeking damages for railroad's alleged overcharges under coal transportation contracts; certification date indicated that utility's attorneys obtained certified copy of deposition 40 days before utility produced it to railroad. Vernon's Ann.Texas Rules Civ.Proc., Rule 215(5).

**17. Appeal and Error** ⇐961

Trial court's ruling on discovery motion will be reversed only upon showing that court committed clear abuse of discretion.

**18. Carriers** ⇐196.5

Evidence of electric utility's financial condition was admissible in utility's action against railroad, seeking damages for railroad's alleged overcharges under coal transportation contracts; trial court could have concluded that evidence was relevant to issue of whether utility suffered gross inequity.

**19. Evidence** ⇐107

Evidence of party's financial condition is admissible if it is pertinent to material issue in case.

**19. Evidence** ⇐107

Evidence of party's financial condition is admissible if it is pertinent to material issue in case.

On Motion for Rehearing

**20. Pretrial Procedure** ⇐434

Trial court acted within its discretion in excluding from evidence deposition of railroad's officer for abuse of discovery, on basis that electric utility had document in its possession for excessive length of time before producing it to railroad under railroad's existing discovery request, in utility's action against railroad, seeking damages for railroad's alleged overcharges under coal transportation contracts, despite Interstate Commerce Commission (ICC) Secretary's letter indicating that certification date stamped on officer's deposition was one month earlier than correct date; court could have found that utility had duty to furnish document to

railroad earlier than it did, as court could have concluded that utility could have located and furnished document earlier had it been diligent, and that it was unreasonable for utility to fail to enclose copy of deposition in letter notifying railroad of existence of document. Vernon's Ann.Texas Rules Civ.Proc., Rule 215, subd. 5.

### 21. Appeal and Error ⚖=1043(6)

Any error was harmless in exclusion from evidence of deposition of railroad's officer for abuse of discovery, in electric utility's action against railroad, seeking damages for railroad's alleged overcharges under coal transportation contracts, despite utility's contention that excluded testimony was crucial because it demonstrated that top railroad official once interpreted clause of contracts in same manner utility urged that they be interpreted at trial, where trial court allowed utility to offer extensive evidence of substantially similar statements made by other high-ranking railroad officials and utility relied heavily on that evidence in its arguments to jury. Vernon's Ann.Texas Rules Civ.Proc., Rule 215, subd. 5.

———

John R. Mercy, Texarkana, Martin D. Schneiderman, Washington, DC, and Mike A. Hatchell, Tyler, for appellant.

Michael V. Powell, Dallas, David E. Keltner, Fort Worth, G. William Lavender, Texarkana, AR and David R. Taggart, Shreveport, LA, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

Burlington Northern Railroad Company (Burlington) appeals a judgment entered in favor of Southwestern Electric Power Company (SWEPCO) following a jury trial. Burlington challenges the trial court's submission of certain jury questions, entry of a declaratory judgment, and award of attorney's fees. SWEPCO raises two conditional cross-points of error challenging certain evidentiary rulings made by the trial court for our consideration only in the event we decide to reverse the judgment. We sustain each of Burlington's points of error, overrule SWEPCO's cross-points, and render judgment that SWEPCO take nothing.

In 1974, Burlington and SWEPCO entered into a long-term contract[1] for the hauling of coal from Wyoming to two SWEPCO power plants in Texas and Arkansas.[2] The contract called for shipments to the Welsh plant to commence on October 1, 1976, and continue for twenty-five years. Shipments to the Flint Creek plant were to commence in 1977, and also continue for twenty-five years.

Initial shipping rates to be charged by the railroads were listed in the contract. In an appendix to the contract, a clause entitled "Escalation Formula" provided that the rates would be adjusted once each year according to the AAR Western Index of Railroad Material Prices, Wage Rates and Supplements Combined, published annually by the Interstate Commerce Commission. Immediately following the escalation formula provision was this clause entitled "Formula Intent":

It is the intent of [the parties] that the formula described above will compensate [the railroads] for any changes in the cost of transporting SWEPCO's coal tonnages above or below the 1971 base cost level. If any one of the parties should suffer a gross inequity as a result of unusual economic conditions, which result in the formula failing to fairly cover cost changes, such inequities will be resolved by mutual agreement among [the parties]. Pending such agreement, no party shall be relieved of its

---

1. Because the enforceability of a long-term contract between a railroad and one of its customers was unclear under the regulatory system prevailing at the time, the terms of the contract were set out in a letter of understanding signed by each of the parties.

2. The Kansas City Southern Railway Company and the Louisiana and Arkansas Railway Company were also parties to the contract and were original defendants in this suit. Before trial these parties settled with SWEPCO.

obligations as outlined in the effective tariff.

In 1984, the parties entered into a second contract which superseded the original contract as to the Welsh plant only. The terms of this contract were similar to those of the first, including the escalation formula and formula intent clauses, except that the rates were to be adjusted quarterly based on the Interstate Commerce Commission Interim Mid–Quarter Forecast Index. The first contract continued in force as to the Flint Creek plant. Both contracts specified minimum and maximum quantities of coal to be shipped each year.

Each year since the effective dates of the contracts, Burlington has delivered and SWEPCO has received quantities of coal within the annual contractual ranges. Rates have been computed according to the formulas and indexes specified in each contract.

In the late 1980s, SWEPCO began to suspect that Burlington's costs of transporting coal were not increasing at the same rate at which the industry indexes were causing shipping charges to rise under the contract. Following unsuccessful negotiations with Burlington, SWEPCO filed this suit, claiming that under the contracts' formula intent clauses, it had suffered gross inequities as a result of unusual economic conditions which caused the formulas to fail to fairly cover changes in the cost of transporting the coal. SWEPCO sought damages for alleged overcharges caused by discrepancies between Burlington's actual shipping costs and the rates charged from 1987 to 1994.

The jury found that SWEPCO had not suffered a gross inequity under either contract as a result of the escalation formulas failing to fairly cover changes in Burlington's cost of transporting SWEPCO's coal.[3]  In

response to additional questions, however, the jury found that Burlington had received an unjust enrichment of $100 million from SWEPCO's payments under both contracts ($25 million for Flint Creek and $75 million for Welsh).[4]  The trial court later reduced this total to $71,663,258.00 pursuant to a pretrial litigation agreement between the parties to grant Burlington credit for a portion of SWEPCO's settlement with the other original defendants. The jury also found that SWEPCO was entitled to attorney's fees of $2 million. The court entered judgment on these findings. In addition, the court entered a declaratory judgment governing the shipping rates to be charged for the remainder of the life of each contract. The judgment declared that the rates calculated by the escalation formulas were interim rates and ordered that the correct and final rate for each future period under the contract be set at that amount necessary to compensate Burlington for changes in its costs of transporting SWEPCO's coal above or below the base costs specified in the original contracts.

[1] Burlington contends that the trial court erred in submitting to the jury the questions regarding unjust enrichment. Burlington argues that recovery by SWEPCO of alleged overcharges under principles of unjust enrichment is barred because the issue of the rates to be charged for the coal shipments was fully addressed by the contracts themselves. Burlington asserts that the jury's finding that SWEPCO suffered no gross inequity, as defined in the contracts' formula intent clauses, prohibits SWEPCO from challenging the rates it paid under the express terms of the contract.

[2, 3] The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution. *LaChance v.*

---

3. The questions regarding gross inequity read as follows:

  Do you find that SWEPCO has suffered a gross inequity as a result of unusual economic conditions resulting in the escalation formula in the [Flint Creek, Welsh] Contract ... failing to fairly cover changes in the Railroads' cost of transporting SWEPCO's coal tonnages from Wyoming to Flint Creek above or below the [1971, 1984] base cost level?
  The jury answered "no" as to both contracts.

4. The questions regarding unjust enrichment read as follows:

  Did the Railroads receive an unjust enrichment by retaining all or a part of the difference, if any, between the rate actually charged for shipping SWEPCO's coal tonnages from Wyoming to [Flint Creek, Welsh] and the rates that should have been charged?
  The jury answered "yes" as to the rates for shipments to both power plants.

*Hollenbeck,* 695 S.W.2d 618, 620 (Tex.App.—Austin 1985, writ ref'd n.r.e.); *see also* 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1.20 (rev. ed. 1993); 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS §§ 1102, 1104 (1964); 42 C.J.S. *Implied and Constructive Contracts* §§ 4–6 (1991); *cf. Ferrous Prods. Co. v. Gulf States Trading Co.,* 323 S.W.2d 292, 296–97 (Tex.Civ.App.—Houston 1959), *aff'd,* 160 Tex. 399, 332 S.W.2d 310 (1960). The purpose of restitution is to place an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant. 42 C.J.S. *Implied and Constructive Contracts* § 6; 5 CORBIN § 1102. This purpose is accomplished by requiring the defendant to return to the plaintiff any rendered performance to which the defendant is not entitled. 5 CORBIN § 1102.

[4–7] The unjust enrichment doctrine applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties. *See Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 154 (Tex.App.—Texarkana 1988, writ denied). When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon the defendant to restore the benefits to the plaintiff. *Barrett v. Ferrell,* 550 S.W.2d 138, 143 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.); 42 C.J.S. *Implied and Constructive Contracts* § 5. Unjust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Recovery under principles of unjust enrichment is also appropriate when a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons. *City of Harker Heights v. Sun Meadows Land, Ltd.,* 830 S.W.2d 313, 319 (Tex.App.—Austin 1992, no writ).

[8, 9] A remedy such as unjust enrichment that is based on quasi-contract or a contract implied in law is unavailable when a valid, express contract governing the subject matter of the dispute exists. *Woodard v. Southwest States, Inc.,* 384 S.W.2d 674, 675 (Tex.1964); *Lone Star Steel,* 759 S.W.2d at 154; *see also* 42 C.J.S. *Implied and Constructive Contracts* § 5. Similarly, the doctrine of unjust enrichment does not apply when the contractual duty at issue has been performed. *Barrett,* 550 S.W.2d at 143.

[10–12] The fact that a party to a contract has made a profit is an insufficient ground on which to order restitution on a theory of unjust enrichment. *City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.,* 736 S.W.2d 247, 250 (Tex.App.—Corpus Christi 1987, writ denied). The doctrine does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract. 42 C.J.S. *Implied and Constructive Contracts* § 5; *see also Harris v. Sentry Title Co.,* 715 F.2d 941, 949 (5th Cir.1983) (applying Texas law). Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall. *Heldenfels Bros.,* 832 S.W.2d at 42; *Austin v. Duval,* 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied).

In this case, the rates charged for Burlington's hauling of SWEPCO's coal were fully governed by the terms of the contracts. The contracts established base rates to be applied initially and then incorporated formulas by which the rates were to be adjusted periodically. SWEPCO concedes that Burlington satisfied all of its contractual duties pertaining to the shipment of coal and that the rates assessed were in accordance with the formulas set out in the contracts.

The trial court is required to submit requested questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992). SWEPCO argues that the following sentence in each of the contracts' formula intent clauses required the trial court's submission to the jury of the unjust enrichment questions:

It is the intent of [the parties] that the formula described above will compensate [the railroads] for any changes in the cost of transporting SWEPCO's coal tonnages above or below the 1971 base cost level.

SWEPCO argues that under this provision, evidence at trial that the formula overcompensated Burlington for changes in its shipping costs raised an issue of unjust enrichment which the court was required to submit to the jury.[5]

SWEPCO's reliance on a contractual provision to justify the court's submission of the unjust enrichment questions exhibits a misunderstanding of the basis of the unjust enrichment doctrine. SWEPCO is actually arguing that Burlington breached the formula intent provisions of the contracts by charging excessively high rates pursuant to the escalation formulas. SWEPCO's pleadings properly complained of this alleged breach by claiming that the rates had risen so high as to constitute a gross inequity as defined in the formula intent clause. Not only was this claim the primary ground of recovery SWEPCO pursued at trial, it was in fact the only valid ground. The jury failed to find that SWEPCO suffered a gross inequity under the contract. Because the issue of shipping rates was completely governed by the contract, there was no evidence to justify the court's submission to the jury of additional questions concerning unjust enrichment.[6]

SWEPCO cites the opinion of this court in *Bowers v. Missouri, K. & T. Ry. Co.*, 241 S.W. 509 (Tex.Civ.App.—Texarkana 1922, no writ), for the proposition that restitution may be awarded despite the existence of a contract between the parties. In that case, however, this court granted relief because the rate actually charged was higher than the rate agreed upon by the parties. In the present case, Burlington assessed only the rates expressly allowed by the contract.

SWEPCO cites numerous other cases in an attempt to support its novel interpretation of the unjust enrichment doctrine. *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686 (1951); *Greer v. White Oak State Bank*, 673 S.W.2d 326 (Tex.App.—Texarkana 1984, no writ); *Acoustical Screens in Color, Inc. v. T.C. Lordon Co.*, 524 S.W.2d 346 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.); *Fun Time Ctrs., Inc. v. Continental Nat'l Bank*, 517 S.W.2d 877 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.). In each of the cited cases, however, the agreement contemplated by the parties was unenforceable, not fully performed, thwarted by mutual mistake, or void for other legal reasons. *See City of Harker Heights*, 830 S.W.2d at 319. We have been unable to locate any case in which an unjust enrichment remedy was allowed when the contested issue was governed by a valid contract. We hold that the trial court erred in submitting to the jury the questions regarding unjust enrichment and that the jury's awards pursuant to those questions are therefore improper.

[13–15]  Burlington also contends that the trial court erred in granting the declaratory judgment establishing the method by which rates are to be assessed for the remainder of the life of each contract.[7] Declaratory judgments are reviewed under the same stan-

---

5. SWEPCO asserts that the jury question was valid as an element of an action for "money had and received," which belongs conceptually to the doctrine of unjust enrichment. *See Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687–88 (1951); *Greer v. White Oak State Bank*, 673 S.W.2d 326, 329 (Tex.App.—Texarkana 1984, no writ).

6. We concur with the court's conclusion on similar facts in *Barrett* that:

   There is nothing in the evidence to suggest that appellant obtained the funds wrongfully or that in good conscience and justice he should not be allowed to keep the consideration paid him.... Appellee does not aver fraud, accident, mistake, duress or bad faith on the part of appellant. Appellee is in no position to seek

   restitution ... since appellant fulfilled his obligation under the agreement.

   *Barrett v. Ferrell*, 550 S.W.2d 138, 143 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.).

7. SWEPCO maintains that Burlington has waived this point of error by failing to preserve the complaint through objection in the trial court. Burlington repeatedly moved for an instructed verdict on the declaratory relief requested by SWEPCO. Furthermore, following the entry of judgment, Burlington was not required to raise its insufficient evidence point on this issue in a motion for new trial, because the declaratory judgment itself was not an issue tried to the jury. TEX.R.APP.P. 52(d).

dards as are other judgments and decrees. TEX.CIV.PRAC. & REM.CODE ANN. § 37.010 (Vernon 1986); *Truck Ins. Exch. v. Musick*, 902 S.W.2d 68, 69 (Tex.App.—Fort Worth 1995, writ denied).

In the declaratory judgment, the trial court held that the rates produced by the contracts' escalation formulas were interim rates and decreed that the final rates were to be based on the amounts necessary to compensate Burlington for any changes in the cost of transporting the coal above or below the base levels specified in the contracts. These declarations fatally conflict with the jury's answers to the two questions regarding gross inequities under the contract.

Issues of fact in a declaratory judgment proceeding may be decided by a jury. TEX. CIV.PRAC. & REM.CODE ANN. § 37.007 (Vernon 1986). The court's charge listed each of the material terms of the formula intent and gross inequity provisions of the contract and instructed the jury to interpret them. *Cf. Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993). The jury's answers of "no" to the two questions regarding the triggering of these contractual provisions constituted a refusal to find that calculation of the rates solely according to the escalation formulas resulted in a gross inequity to SWEPCO by failing to fairly cover changes in Burlington's costs of transporting the coal. The declaratory provisions in the judgment directly contradict the verdict because they effectively hold that use of the escalation formulas alone to calculate rates does in fact fail to fairly cover Burlington's cost changes. In light of the jury's verdict, the trial court had no authority to make the findings on which the declaratory judgment was based. *See Rathmell v. Morrison*, 732 S.W.2d 6, 16–17 (Tex.App.—Houston [14th Dist.] 1987, no writ). We hold that the declaratory judgment must be reversed because it failed to conform to the jury's verdict. TEX.R.CIV.P. 301.

The trial court based its award of attorney's fees on TEX.CIV.PRAC. & REM.CODE ANN. §§ 37.009 and 38.001 (Vernon 1986). Section 37.009 allows the award of attorney's fees in declaratory judgment actions. Section 38.001 allows attorney's fees in a suit for freight or express overcharges. Because we invalidate both grounds of recovery contained in the judgment, the award of attorney's fees must be reversed as well.

SWEPCO raises two conditional cross-points to be considered by this court only in the event that we decide to reverse the trial court's judgment. *See Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 927 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.).

[16] SWEPCO contends that the trial court erred in granting Burlington's motion for sanctions for abuse of discovery under TEX.R.CIV.P. 215(5) with regard to a copy of deposition testimony given in an unrelated proceeding by Burlington vice-president Richard Sandgren. The evidence indicated that Burlington made numerous requests in the months preceding trial for SWEPCO to produce all documents in its possession containing any testimony by Burlington employees or former employees. In April 1994, Burlington specifically requested production of any statements made by Sandgren. Counsel for SWEPCO testified that they became aware that the Sandgren deposition was in their possession sometime in September or October 1994. SWEPCO notified Burlington of the document's existence on October 7. Burlington repeated its request for the document during pretrial hearings on October 12 and 17. The document was ultimately produced to Burlington on October 21. Jury selection for the trial began on October 18, and opening statements were made on October 24.

The trial court based its imposition of the sanction primarily on a certification date contained on the front of the document in question. The date indicated that SWEPCO's attorneys obtained a certified copy of the deposition on September 11, 1994. The trial court held that, based on this certification date, it was an abuse of discovery for SWEPCO to fail to deliver the document until October 21.

[17] A trial court's ruling on a discovery motion will be reversed only upon a showing that the court committed a clear abuse of discretion. *Global Servs., Inc. v. Bianchi*,

901 S.W.2d 934, 937 (Tex.1995). It was within the trial court's discretion to find that the certification date on the deposition established that SWEPCO had the document in its possession for an excessive length of time before producing it to Burlington. We overrule this cross-point.

[18, 19] SWEPCO further contends that the trial court erred in allowing Burlington to introduce evidence of SWEPCO's financial condition. Evidence of a party's financial condition is admissible if it is pertinent to a material issue in the case. *See Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 366 (Tex.1987); *Mortgage Co. of Am. v. McCord,* 466 S.W.2d 868, 872 (Tex.Civ. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.). The court could have concluded that the evidence was relevant to the issue of whether SWEPCO suffered a gross inequity. The court did not abuse its discretion in admitting the evidence.

The trial court's judgment is reversed, and judgment is rendered that SWEPCO take nothing by its suit.

### OPINION ON MOTION
### FOR REHEARING

#### PER CURIAM.

[20] On motion for rehearing, SWEPCO directs the court's attention to a letter sent by Vernon A. Williams, Secretary of the Interstate Commerce Commission, to the trial court during trial of this matter. In the letter, Secretary Williams states that the certification date stamped on the Sandgren deposition is incorrect. The letter confirms that the correct date on which SWEPCO received the certified copy of the deposition from the ICC was not September 11, 1994, as the stamp indicates, but instead October 11, 1994. SWEPCO introduced this letter into evidence on November 16, 1994, and on the basis of the information contained therein, asked the trial court to reverse its earlier ruling excluding the Sandgren deposition. The court once again refused to admit the deposition, however, ruling that SWEPCO had still failed to show good cause for not producing the document earlier. SWEPCO now contends that the trial court abused its discretion in excluding the deposition after receiving uncontroverted evidence that the original certification date was incorrect, and that this error probably caused the rendition of an improper judgment.

After reviewing the record, we believe that it was within the trial court's discretion to exclude the deposition despite the evidence of the incorrect certification date. Counsel for SWEPCO told the trial court that it discovered the document in its files on September 30, 1994. The deposition itself, however, was taken in an unrelated proceeding before the ICC on June 21, 1979. In a request for production made April 28, 1994, Burlington asked SWEPCO to produce any sworn testimony given previously by Sandgren which SWEPCO intended to use at trial. SWEPCO responded that it had no such statements in its possession.

On October 7, 1994, counsel for SWEPCO sent a letter to Burlington stating that it had discovered the Sandgren deposition in its files. In the letter, SWEPCO identified the date of the deposition and the docket number of the proceeding in which it was taken, but did not include a copy of the document. Burlington then made specific requests on October 12 and October 17 for a copy of the document. SWEPCO finally produced a copy of the document on October 21, after trial had begun.

Based on this evidence, the trial court could have found that SWEPCO had a duty to furnish the document to Burlington earlier than it did. The evidence indicated that the document was in the files of SWEPCO's counsel long before it was claimed to have been discovered. The trial court could have concluded that had SWEPCO been diligent in responding to the request for production, it could have located and furnished the document earlier. Furthermore, the court could have found that it was unreasonable for SWEPCO to fail to enclose a copy of the deposition in the letter notifying Burlington of the existence of the document, and that SWEPCO's ultimate production of the document after trial had begun was therefore unreasonably late. *See Foster v. Cunningham,* 825 S.W.2d 806, 808–09 (Tex.App.— Fort Worth 1992, writ denied) (evidence dis-

covered five days before trial properly excluded where counsel had convenient opportunity to promptly apprise opposing counsel of the evidence, but failed to do so). The trial court thus did not err in excluding the deposition.

[21] Furthermore, even if we believed that the court's exclusion of the evidence was error, we would hold that the error was not so serious as to warrant reversal. SWEPCO argues that the excluded testimony was crucial, because it demonstrated that Sandgren, a top Burlington official, once interpreted the gross inequity clause of the contracts in the same manner SWEPCO urged that they be interpreted at trial. The trial court allowed SWEPCO, however, to offer extensive evidence of substantially similar statements made by other high-ranking Burlington officials. SWEPCO relied heavily on this evidence in its arguments to the jury, advancing precisely the theory it now claims it was precluded from presenting at trial. Because the excluded evidence was thus substantially similar to other, admitted evidence, any error committed by the trial court probably did not cause the rendition of an improper judgment in this case. TEX.R.APP.P. 81(b)(1).

The motion for rehearing is overruled.



# EXHIBIT "2"

[No. B194004. Second Dist., Div. Three. Jan. 25, 2007.]

FIRST AMERICAN TITLE INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JEFFREY ALBERT SJOBRING et al., Real Parties in Interest.

SUMMARY

A class action representative sought to obtain precertification discovery
from defendants for the express purpose of identifying a class member who
was willing to become a named plaintiff and pursue the action. The class
representative argued that he might have standing to assert a kickback in his
purchase of title insurance, or that he might have standing to bring a class
action on behalf of all customers of the lead defendant whose premiums
might have been increased as a result of a reinsurance kickback scheme. The
trial court granted the class representative's motion for precertification dis-
covery. (Superior Court of Los Angeles County, No. BC329482, Anthony J.
Mohr, Judge.)

The Court of Appeal issued a writ of mandate directing the trial court to
vacate its order granting the class representative's motion for precertification
discovery and to enter a new order denying that motion. The court held that a
plaintiff who purports to bring a cause of action on behalf of a class of which
the plaintiff was never a member may not obtain precertification discovery to
find a new class representative. Regardless of whether he might have another,
unpleaded, claim against the lead defendant, and regardless of whether he
made his initial allegations in good faith, the class representative was not, and
never had been, a member of the class that he purported to represent. The
class representative was, in effect, a stranger to the action. Because the
potential for abuse of the class action procedure was overwhelming, while
the interests of the real parties in interest were minimal, precertification
discovery under the circumstances was an abuse of discretion. (Opinion by
Croskey, J., with Klein, P. J., and Aldrich, J., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

**(1)  Parties § 6—Class Actions—New Class Representative—Precertification Discovery.**—A plaintiff, who purported to bring a cause of action on behalf of a class of which he was never a member, was not entitled to obtain precertification discovery to find a new class representative.

> [4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 264; 3 Kiesel, Matthew Bender Practice Guide: Cal. Pretrial Civil Procedure (2006) § 33.08.]

**(2)  Parties § 6—Class Actions—Named Plaintiff—Member of Class.**—The named plaintiff in a class action must be a member of the class he or she purports to represent.

**(3)  Parties § 6—Class Actions—Unfair Business Practice—Member of Class.**—An individual or entity may bring an unfair business practices class action only if that individual is a member of the class injured by the practice (Bus. & Prof. Code, § 17204).

**(4)  Parties § 1.2—Standing—Allegations in Complaint.**—Issues of standing are generally determined by reference to the allegations made in the complaint.

**(5)  Parties § 6—Class Actions—Lack of Standing to Represent Class—Leave to Amend.**—When it is determined that a class representative lacks standing to represent the class, the representative may be granted leave to amend to redefine the class or add new individual plaintiffs, or both. This rule is usually applied in situations where the class representative originally had standing, but has since lost it by intervening law or facts.

**(6)  Parties § 6—Class Actions—Identity of Class Members—Precertification Discovery.**—Regarding the precertification discovery of the identity of class members, the trial court, in exercising its discretion, must weigh the danger of possible abuses of the class action procedure against the rights of the parties under the circumstances.

COUNSEL

Bryan Cave, Charles A. Newman, Jason E. Maschmann, Howard O. Boltz and Jennifer A. Jackson for Petitioners.

No appearance for Respondent.

Bernheim Law Firm, Bernie Bernheim, Justin A. Shiau; Kick Law Firm, Taras Kick and Graig Woodburn for Real Parties in Interest.

OPINION

**CROSKEY, J.**—If a class action representative plaintiff is not—and never was—a member of the class he purports to represent, may he obtain precertification discovery from the defendants for the express purpose of identifying a member of the class who is willing to become a named plaintiff and pursue the action? As the current plaintiff is, in effect, a stranger to the action, we conclude the grant of such discovery would sanction an abuse of the class action procedure. We therefore conclude the trial court's order granting the discovery was an abuse of discretion, and grant defendants' petition for writ relief.

### FACTUAL AND PROCEDURAL BACKGROUND

In February 2004, plaintiff Jeffrey Albert Sjobring bought a house. The house was not newly constructed; Sjobring bought it from its then current owners. Sjobring's loan broker obtained a purchase money loan for Sjobring from Wilmington Finance. The seller's real estate agent selected the escrow company and the title insurer, First American Title Insurance Company.[1] Indeed, Sjobring had wanted to use a different title company, but the seller's agent and the escrow company selected by the seller's agent had been adamant about using First American. Sjobring suspected that the seller's agent might have received a kickback, either from the escrow company or First American. At some point, either during or immediately after closing, Sjobring's loan agent commented to Sjobring that several of the escrow costs

---

[1] As we shall discuss, there are many First American entities. The closing notice provided to Sjobring after his purchase stated that the title policy was issued by First American Title Company of Los Angeles. It is not clear, however, which First American entity actually issued Sjobring's title policy.

for which he had been charged seemed suspiciously high, including the cost of title insurance. Sjobring made no complaint at this time.

In November 2004,[2] the Colorado Division of Insurance began an investigation into unlawful title insurance practices, in which it uncovered a reinsurance kickback scheme.[3] Pursuant to the scheme, certain homebuilders, lenders and realtors formed their own reinsurance companies, known as "captive insurers." They would refer all of their title insurance business to a particular title company if that title company agreed to "reinsure" the title policies with the captive insurer. The title company would forward premiums to the reinsurer, yet, in practice, the reinsurer did not accept any risk and the premium payments far exceeded any minimal risk the reinsurer may have accepted. In short, the reinsurance agreement was simply a way for the title insurer to transfer funds to the captive insurer as a payment for the referral of customers. In January 2005, the California Department of Insurance began its own investigation into the same practice. On February 21, 2005, Colorado announced that it had reached a settlement with First American Title Insurance Company by which that entity agreed to refund $24 million to consumers *nationwide*, and also agreed to end the practice.

Four days later, Sjobring filed the instant action, purporting to sue on behalf of himself, all others similarly situated, and the general public. He named as defendants First American Title Company of Los Angeles, Wilmington Finance, and numerous Doe defendants. He alleged causes of action for breach of fiduciary duty, constructive fraud, unjust enrichment, violation of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA), unfair business practices, and declaratory relief. Sjobring's "introductory allegations" explained, "This class action is brought by plaintiff charging that title insurers in the State of California are paying money for referral business from *lenders*. These payments to *lenders* are rewards for channeling business to them. These kickbacks may be disguised as payments for bogus reinsurance which is purchased from captive insurers operated by the firms sending business to the title insurers." (Italics added.) Sjobring alleged that he was "directed in part through his lender to purchase a title

---

[2] The investigation may have begun as early as the summer of 2004.

[3] Sjobring has submitted documents relating to the Colorado investigation, and that of other states, in support of his return to the petition for writ of mandate. Defendants moved to strike these documents, as they were not before the trial court. As we conclude these documents are, in fact, harmful to the position taken by Sjobring, we consider his reliance on such documents to constitute an admission which we have considered in reaching our decision on this matter. We therefore have denied defendants' motion to strike.

insurance policy from defendant First American Title Company of Los Angeles."[4] He alleged, on information and belief, that First American Title Company of Los Angeles paid part of his premium to Wilmington Finance as a payment for the referral of his business. Sjobring's class allegations defined the class as all persons "[w]ho paid in whole or in part for a title insurance policy, from First American Title Company of Los Angeles and/or Does 1 through 249, which provided coverage for property located in the State of California . . . [f]or whom part of the premium paid for the title insurance policy was received by Wilmington Finance, Inc., and/or Does 250 through 500."

The California Department of Insurance investigation continued. On July 20, 2005, the Department of Insurance announced a $37.8 million settlement with nine different title insurance companies.[5] First American Title Insurance Company accounted for $20 million of the settlement. Some $15 million of the First American Title Insurance Company settlement consisted of the share of the Colorado settlement payable to California consumers. This amount was described as "a full refund of the ceded premium," which was to be refunded to some 38,000 individuals.[6] The remaining $5 million was a penalty obtained by the California Department of Insurance. The investigation and settlement encompassed reinsurance agreements in effect from January 1997 through December 2004. During this period, First American Title Insurance Company had issued more than five million title insurance policies in California. In other words, *less than one percent* of First American Title Insurance Company's customers were victims of the reinsurance scheme and entitled to refunds under the settlement. The press release announcing the settlement issued by the California Department of Insurance identified a list of *builders, realtors and lenders who were implicated in the reinsurance scheme.* Wilmington Finance was not among them.

---

[4] We note that this allegation is directly contradicted by Sjobring's deposition testimony, in which he stated that *the seller's agent* and *the escrow company* (which had been selected by the seller's agent) had recommended First American. Indeed, Sjobring testified that he had decided to have his attorney represent him in the transaction, rather than allowing the seller's agent to represent both parties to the sale. The seller's agent "insisted that if I wasn't going to use him, he said, 'Then you have to use [the escrow company].' And he also insisted on me using the title company that I used." Sjobring has chosen to include his entire deposition as part of the record in this writ proceeding; there is no indication that the deposition was before the trial court at the time it ruled on the challenged discovery motion.

[5] The settlement was not finalized until November 2, 2005.

[6] The California Department of Insurance initially indicated First American Title Insurance Company was involved in 30,544 improper transactions. When First American Title Insurance Company and First American Homebuilders Reinsurance Company subsequently made payments, refunds were made to 38,294 customers in California.

On September 26, 2005, the president and chief executive officer of Wilmington Finance executed a declaration stating that Wilmington Finance had not entered into any reinsurance agreements with any First American entities and that Wilmington Finance had not been paid any compensation by First American entities for the referral of title insurance business. In light of this evidence, on October 24, 2005, Sjobring requested the dismissal of the action against Wilmington Finance, without prejudice.

On November 1, 2005, Sjobring filed his first amended complaint. The only difference between the first amended complaint and Sjobring's original pleading was the omission of the cause of action for breach of fiduciary duty. Despite Sjobring's apparent acknowledgement that Wilmington Finance was not involved, Sjobring still: (1) named Wilmington Finance as a defendant; (2) defined the class in terms of kickbacks to Wilmington Finance and Doe defendants; (3) alleged Wilmington Finance had directed him to use First American Title Company of Los Angeles; and (4) alleged First American Title Company of Los Angeles had paid a kickback to Wilmington Finance.

Concurrent with his first amended complaint, Sjobring filed a case management statement. In pertinent part, the statement read, "Plaintiff's counsel is considering the substitution or addition of a class representative. It is possible that no improper kickbacks were directly connected to . . . Sjobring's purchase of title insurance. However, plaintiff may have suffered a direct injury if his title insurance premium was artificially inflated as a result of defendant's practice of paying improper kickbacks on other title insurance policies. [¶] If it is determined that plaintiff Sjobring cannot represent the class, the court should allow plaintiff the opportunity to amend the complaint to 'redefine the class, or to add new individual plaintiffs, or both, in order to establish a suitable representative.' [Citation.]"

On November 30, 2005, Sjobring filed a Public Records Act (Gov. Code, § 6250 et seq.) request with the California Department of Insurance, seeking all documents relating to its investigation of the improper title insurance practices. Although several of the categories of information sought in Sjobring's request specifically referred to the investigation of the First American entities, it was in no way limited to such entities.[7] Of particular note was Sjobring's request for "[a]ll documents which constitute, evidence, memorialize, relate to, and/or refer to the identity of any individual

---

[7] For example, Sjobring sought, "All documents which constitute, evidence, memorialize, relate and/or refer to the identity of any homebuilder, lender, realtor, and/or reinsurance entity alleged by the [California Department of Insurance] to have engaged in improper or illegal title insurance rebating practices . . . ."

(i.e., consumer, homeowner or policyholder) who was allegedly injured by First American's improper title insurance rebating practices." On January 6, 2006, the Department of Insurance rejected Sjobring's request, indicating that the few public documents which his counsel already possessed were the only documents subject to disclosure.[8]

On March 6, 2006, Sjobring amended his complaint to name five additional First American entities as Doe defendants.[9] On April 21, 2006, Sjobring "served extensive discovery requests on the First American defendants. . . . The discovery requests were specifically designed to obtain information regarding the extensive reinsurance kickback scheme involving [the] First American [entities] that was the subject of the [California] Department of Insurance investigation. The discovery also sought basic information regarding the title insurance practices of [the] First American [entities]." Among other information, Sjobring sought the names and addresses of the 38,000 individuals who had received refunds pursuant to the California Department of Insurance settlement. Sjobring would subsequently argue that the list of all individuals who had received refunds would "help plaintiffs identify a suitable class representative and also lead to potential witnesses to First American's improper rebatings, 'kickback' and/or payment practices. Plaintiffs must also contact these individuals to determine whether they received their refunds and, if so (1) how those refunds were received and (2) whether they adequately compensated for damages." The First American entities did not provide the responses for which Sjobring had hoped.

On June 16, 2006, two of the First American defendants,[10] First American Title Insurance Company and First American Homebuilders Reinsurance Company (hereinafter, collectively defendants) moved for summary adjudication of the issues.[11] The motions were based on the facts that defendants had not paid Wilmington Finance for the referral of Sjobring's business; defendants had not done any improper acts; and defendants were not, in fact, "involved in any aspect of [Sjobring]'s title insurance transaction."

On July 3, 2006, Sjobring filed a motion for precertification discovery to seek class representatives. Sjobring sought an order compelling defendants to

---

[8] Darrel Woo, the senior staff counsel who responded to Sjobring's request, added, "As a matter of clarification regarding your request, in the case of this captive title reinsurance case. First American dealt only with homebuilders and not with lenders and realtors."

[9] Sjobring also, apparently, dismissed First American Title Company of Los Angeles.

[10] It appears that all five First American defendants filed similar motions; only two are par of the record on this writ proceeding.

[11] The motions were, in effect, summary judgment motions. They were directed to all cause of action except the CLRA cause of action, which cannot be attacked by summary judgment and must instead by addressed by a "no merit" motion. (See Civ. Code, § 1781.)

provide to a third party administrator the names and addresses of all California homeowners who were compensated by defendants as part of the settlement with the California Department of Insurance. Sjobring then sought approval for the third party administrator to send a letter to each identified homeowner, informing those individuals of the pendency of this action and asking any individual who would like to serve as a class representative to send an authorization form back to the third party administrator granting permission to be contacted by class counsel. Sjobring's motion explained, "The underlying transaction from which Plaintiff Sjobring brought his claim was based on the payment of an illegal kickback from First American to defendant Wilmington Financ[e]. However, as this case has developed, it appears that First American did not have an illegal kickback scheme with Wilmington Financ[e]. As a result, Wilmington Financ[e] has been dismissed as a defendant. [¶] The dismissal of Wilmington Financ[e] puts plaintiff Sjobring in the position of having his claim subject to unique defenses that other class members may not face, namely that there was not a direct kickback agreement involved in his purchase of title insurance. Defendants have already moved for summary adjudication on this issue. [¶] If there is a potential difference between Sjobring['s] claims and those of the class, he may not be able to serve as an adequate representative for the plaintiff class. [Citation.] [¶] As a result, Sjobring brings the instant motion to allow precertification discovery seeking a new class representative."

Sjobring also filed an ex parte motion to continue the hearing on the summary adjudication motions until after his motion for precertification discovery had been heard. The motion to continue was heard on August 11, 2006. At the hearing, Sjobring conceded that Wilmington Finance did not have a kickback agreement with any First American entity. He argued, however, that he still had two potential theories of liability against the First American entities: first, that perhaps *another* entity had channeled Sjobring into buying his title policy from First American in return for a kickback;[12] and second, that Sjobring was *indirectly* harmed by the reinsurance scheme, in that the reinsurance scheme resulted in elevated premiums for all First American customers "to some extent." The First American entities objected to any continuance, on the basis that "we have a fundamental jurisdictional issue. We don't have a lawsuit here. There is nobody who is in front of the

---

[12] Sjobring's counsel stated, "We don't know that another entity didn't channel Mr. Sjobring into buying his First American policy." Although Sjobring had testified at deposition that he had suspected the seller's agent of receiving a kickback from First American, the record does not indicate any attempt to name that agent as a defendant.

court as a plaintiff other than a bunch of lawyers looking for a client." The trial court granted the motion to continue the summary adjudication motions.

Defendants then opposed the motion for precertification discovery on the basis that Sjobring had no standing and could not seek defendants' assistance in finding a plaintiff to sue them. Defendants argued that the order sought by Sjobring "would be unprecedented, highly prejudicial to defendants, an invasion of the privacy of defendants' customers, an exploitation of the discovery process, and an invitation to litigation abuse by lawyers looking for clients." Defendants argued that while Sjobring might be entitled to such discovery if he was a member of the class who, due to a change in law, could no longer represent the class, Sjobring was *never* a member of the class alleged in his complaint, and therefore lacked standing to obtain discovery to locate a proper class representative.

In his reply, Sjobring conceded that he is not a member of the class he proposed in his complaint, but argued that he still had standing to bring *other* causes of action against defendants. He argued, "Sjobring is seeking to determine whether another individual or individuals would be interested in stepping forward to represent the class that was proposed in his complaint. But Sjobring still has standing to bring other claims against First American and he could serve as a class representative for a class consisting of First American policyholders who have otherwise been harmed by wrongful practices. Sjobring is just not a good class representative for the 'reinsurance' class." As the settlement with the California Department of Insurance demonstrated that defendants had engaged in wrongdoing against the proposed class, Sjobring argued that California law favors allowing him discovery to obtain a new representative for that class.

At the hearing on the motion, the trial court expressed concern that lawyers not be permitted to file a class action with any random individual named as the class representative, and then use precertification discovery to obtain from the defendant a client who could legitimately represent the class. The court concluded, however, that this case did not present that scenario, because Sjobring had in fact purchased a title insurance policy from a First American entity, and may have mistakenly believed that his policy had been subject to an illegal reinsurance kickback scheme. The trial court ultimately granted the motion for precertification discovery, apparently based on its determination of Sjobring's good faith. The court stated, "Well, Mr. Sjobring thought he might have been [a member of the class]. Turns out Mr. Sjobring was mistaken. I think it's appropriate and consistent with California law to give him some discovery now to see if he can find another representative." The court

approved a letter to be sent by the third party administrator to the recipients of refunds pursuant to the Department of Insurance settlement.

Defendants filed a petition for writ of mandate and request for immediate stay. We granted the stay and issued an order to show cause why the requested relief should not be granted. We now grant the writ petition, and direct the trial court to vacate its order and enter a new and different order denying precertification discovery.

## ISSUE PRESENTED

(1)   The sole issue presented is whether the trial court abused its discretion by granting Sjobring precertification discovery to find a new class representative. Sjobring argues that he may have standing to assert a kickback in his purchase of title insurance, or that he may have standing to bring a class action on behalf of all First American customers whose premiums might have been increased as a result of the reinsurance kickback scheme. These issues are not relevant to the resolution of the issue before us.[13] That issue can be framed as follows: Can a plaintiff who purports to bring a cause of action on behalf of a class of which he was *never* a member obtain precertification discovery to find a new class representative? Framed as such, the answer must be "no."

## DISCUSSION

At issue is whether the trial court abused its discretion in granting precertification discovery. Appellate review of discovery rulings is governed by an abuse of discretion standard. (*Experian Information Solutions, Inc. v. Superior Court* (1996) 138 Cal.App.4th 122, 132 [41 Cal.Rptr.3d 219].)

(2)   We first briefly address Sjobring's standing to represent the putative class. "It is elementary that the named plaintiff in a class action must be a member of the class he purports to represent." (*Trotsky v. Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 146 [121 Cal.Rptr. 637].) In the specific context of unfair business practices actions, plaintiffs who were not members of the class were previously permitted, by statute, to bring class actions on behalf of the general public. (Bus. & Prof. Code, former § 17204.)

---

[13] Similarly of no relevance is whether Sjobring is entitled to discovery, under Code of Civil Procedure section 437c, subdivision (h), in order to oppose the summary adjudication motions. Under that subdivision, Sjobring may be entitled to discovery regarding whether *he* has a cause of action against defendants; the discovery at issue in this proceeding relates to whether *anyone else* does.

**1574**          FIRST AMERICAN TITLE INS. CO. *v.* SUPERIOR COURT
                  146 Cal.App.4th 1564; — Cal.Rptr.3d — [Jan. 2007]

In November 2004, the voters approved Proposition 64, which changed this statute.    **(3)**  Now, an individual or entity may bring an unfair business practices class action only if that individual is a member of the class injured by the practice. (Bus. & Prof. Code, § 17204.)    **(4)**  Issues of standing are generally determined by reference to the allegations made in the complaint. (*Shapell Industries, Inc. v. Superior Court* (2005) 132 Cal.App.4th 1101, 1111' [34 Cal.Rptr.3d 149].)

In this case, the operative complaint, as amended, alleges a class consisting of all persons "[w]ho paid in whole or in part for a title insurance policy, from [a First American entity or other Doe defendant] which provided coverage for property located in the State of California; . . . [f]or whom part of the premium paid for the title insurance policy was received by . . . Does 250 through 500." The gravamen of the complaint is that the First American entities paid kickbacks to lenders for the referral of title insurance business. Sjobring originally alleged that he was a part of this class because Wilmington Finance directed him to use First American Title Company of Los Angeles, and received a kickback for this referral. Sjobring now concedes that this is false.[14] Regardless of whether Sjobring may have another, unpleaded, claim against a First American entity, and regardless of whether Sjobring made his initial allegations in good faith, the fact remains that Sjobring is not, and never has been, a member of the class he sought to represent.[15]

**(5)**   When it is determined that a class representative lacks standing to represent the class, the representative may be granted leave to amend to redefine the class or add new individual plaintiffs, or both. (*La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 872 [97 Cal.Rptr. 849, 489 P.2d 1113].) This rule is usually applied in situations where the class representative *originally* had standing, but has since lost it by intervening law or facts. (E.g., *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 243 [46 Cal.Rptr.3d 66, 138 P.3d 214] [plaintiff in pending unfair competition case lost standing by intervening adoption of Prop. 64]; *Foundation for Taxpayer & Consumer Rights v. Nextel Communications, Inc.*

---

[14] We again note that, according to his deposition, Sjobring never suspected Wilmington Finance of receiving a kickback from First American. If anything, he suspected the seller's agent of receiving such a kickback. Sjobring, however, has never attempted to amend his complaint to allege that kickbacks were paid to *real estate agents.*

[15] Sjobring suggests that he sought precertification discovery in response to defendants' motions for summary adjudication, in that defendants' motions first raised a challenge to his standing to represent the class. On the contrary, Sjobring was aware, at the time he filed his first amended complaint and case management statement, that he likely lacked standing to represent the class, and may require leave to amend to name a new class representative.

(2006) 143 Cal.App.4th 131 [48 Cal.Rptr.3d 836] [same]; *La Sala v. American Sav. & Loan Assn., supra,* 5 Cal.3d at p. 868 [class action plaintiff challenged defendant's loan acceleration clause; defendant waived enforcement of the clause against plaintiff].) It has also been applied when the class representative had standing when she sent the defendant a demand letter threatening suit, but lacked standing when the suit was filed because the defendant had granted the plaintiff individual relief in response to her demand letter. (*Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 588–589, 596 [200 Cal.Rptr. 38, 676 P.2d 1060].) We do not have such facts here and each of the foregoing cases is distinguishable on that ground.

Sjobring relies on *Branick v. Downey Savings & Loan Assn., supra,* 39 Cal.4th at page 244, for the proposition that, in California, a plaintiff who has never been a member of the class may amend the complaint to substitute in a plaintiff with standing to represent the class. Whether Sjobring should be granted leave to amend his complaint to name a new class representative, if he so moved, is not at issue in this proceeding. Sjobring is apparently unaware of the identity of any member of the alleged class who seeks to become a representative plaintiff in this action. At issue here is whether defendants must provide Sjobring discovery in order to enable him to find a new plaintiff.

**(6)** Two California cases have addressed the issue of precertification discovery of the identity of class members. Both agreed that, in exercising its discretion, the court must weigh the danger of possible abuses of the class action procedure against the rights of the parties under the circumstances. (*Best Buy Stores, L.P. v. Superior Court* (2006) 137 Cal.App.4th 772, 779 [40 Cal.Rptr.3d 575]; *Parris v. Superior Court* (2003) 109 Cal.App.4th 285, 301 [135 Cal.Rptr.2d 90].) In the *Parris* case, the named plaintiffs sought leave to have precertification communication with the class members, and to compel discovery of the names and addresses of potential class members. Division Seven of the Second Appellate District concluded that no leave was required simply to *communicate* with potential class members, but that the trial court abused its discretion in denying the motion to compel discovery "without expressly weighing the actual or potential abuse of the class action procedure that might be caused by permitting the discovery, on the one hand, against the rights of the parties, on the other hand."[16] (*Parris v. Superior Court, supra,* 109 Cal.App.4th at p. 290.) In *Best Buy Stores,* the representative plaintiff

---

[16] The *Parris* court adopted this standard from *Howard Gunty Profit Sharing Plan v. Superior Court* (2001) 88 Cal.App.4th 572 [105 Cal.Rptr.2d 896], a case in which the court was concerned about the potential for abuse arising from a class action where the representative plaintiff was "a professional plaintiff." (*Id.* at p. 580.)

was an attorney who had also intended to represent the class. Intervening authority held that a lawyer could not be both a class representative and class counsel. (*Best Buy Stores, L.P. v. Superior Court, supra,* 137 Cal.App.4th at p. 774.) As a result, the plaintiff sought precertification discovery to seek additional class representatives. Division Three of the Fourth Appellate District upheld the trial court's order granting such discovery, on the basis that the trial court had properly engaged in the weighing required by *Parris.* (*Id.* at p. 779.)

In this case, while the trial court did not expressly engage in the *Parris* weighing process, it is unnecessary to remand for the trial court to do so. In light of the complete record presented to this court—including documents submitted by Sjobring which were apparently not before the trial court at the time it ruled on the motion[17]—we have no trouble concluding that the potential abuse of the class action procedure greatly outweighs the rights of the parties under the circumstances.

The instant case began with the Colorado investigation into title insurance abuses. The state of Colorado investigated such abuses, concluded First American entities were involved in an illegal scheme using captive reinsurers, and reached a settlement whereby the First American entities agreed to *fully refund* the overcharges to all affected customers nationwide. *Four days later,* Sjobring filed suit in California, seeking to represent, in effect, the California customers who were entitled to refunds under the Colorado settlement. While Sjobring had obtained title insurance from a First American entity, less than one percent of First American customers in California had been directly affected by the reinsurance scheme. Regardless of whether Sjobring initially had a good faith belief that he was, in fact, the victim of such a scheme by means of a kickback to Wilmington Finance, it is apparent that, by the time he moved to dismiss Wilmington Finance seven months later, he knew that he was not.

Sjobring did not, at this point, dismiss his action or seek leave to amend it to allege facts by which he could state a cause of action against a First American entity. Instead, he continued to pursue the claims of a class of which he was *not* a member. First, Sjobring sought documents relating to the reinsurance scheme from the Department of Insurance. When that avenue proved unfruitful, Sjobring then sought all documents relating to that scheme from the First American entities. The scope of Sjobring's fishing expedition is illustrated by Sjobring's claim that he needed the names and addresses of all individuals implicated by the settlement because he "must . . . contact these

---

[17] See footnote 3, *ante.*

individuals to determine whether they received their refunds and, if so
(1) how those refunds were received and (2) whether they adequately
compensated for damages." Sjobring had apparently appointed himself en-
forcement officer for the California Department of Insurance settlement
agreement; the fact that Sjobring was, at this time, *an acknowledged stranger*
to that agreement did not restrain his efforts in any way.

California law is clear that a representative plaintiff must be a member of
the class he seeks to represent. Indeed, Proposition 64 was enacted to prevent
abuses of the class action system by " 'prohibit[ing] private attorneys from
filing lawsuits for unfair competition where they have no client who has been
injured in fact.' " (*Californians for Disability Rights v. Mervyn's, LLC* (2006)
39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207].) We cannot permit
attorneys to make an "end-run" around Proposition 64 by filing class actions
in the name of private individuals who are not members of the classes they
seek to represent and then using precertification discovery to obtain more
appropriate plaintiffs.

Balanced against this potential abuse of the class action procedure are the
rights of the parties under the circumstances. Sjobring's interest in obtaining
a proper plaintiff to represent the class is nonexistent. Sjobring is not a
member of the class and never has been; he has no cognizable interest in
seeing this class action proceed.[18] We acknowledge that the members of the
putative class may have an interest in pursuing the class action. However, we
are not blind to the fact that this is not a case in which Sjobring has
uncovered an apparent wrongdoing that will remain unaddressed without this
class action. Indeed, Sjobring only filed his complaint *after* Colorado had
entered into a settlement with First American Title Insurance Company
providing for full refunds to be made to customers nationwide. The California
Department of Insurance similarly sought to make certain California insureds
were properly compensated. Any further legal action can be pursued by
members of the class, if they so desire. Sjobring makes no argument that any
future action they might pursue would be time-barred, or offer any other
reason why the class members might be denied relief if *this action* is unable
to proceed on their behalf. In short, the potential for abuse of the class action
procedure is overwhelming, while the interests of the real parties in interest
are minimal. Precertification discovery under these circumstances would be
an abuse of discretion.

The case of *Budget Finance Plan v. Superior Court* (1973) 34 Cal.App.3d
794 [110 Cal.Rptr. 302] does not change our result. In that case, the plaintiffs

---

[18] We again note that while Sjobring may have a cognizable claim against the First
American entities, he does not have the claim asserted in this class action.

individuals to determine whether they received their refunds and, if so (1) how those refunds were received and (2) whether they adequately compensated for damages." Sjobring had apparently appointed himself enforcement officer for the California Department of Insurance settlement agreement; the fact that Sjobring was, at this time, *an acknowledged stranger to that agreement* did not restrain his efforts in any way.

California law is clear that a representative plaintiff must be a member of the class he seeks to represent. Indeed, Proposition 64 was enacted to prevent abuses of the class action system by " 'prohibit[ing] private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact.' " (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207].) We cannot permit attorneys to make an "end-run" around Proposition 64 by filing class actions in the name of private individuals who are not members of the classes they seek to represent and then using precertification discovery to obtain more appropriate plaintiffs.

Balanced against this potential abuse of the class action procedure are the rights of the parties under the circumstances. Sjobring's interest in obtaining a proper plaintiff to represent the class is nonexistent. Sjobring is not a member of the class and never has been; he has no cognizable interest in seeing this class action proceed.[18] We acknowledge that the members of the putative class may have an interest in pursuing the class action. However, we are not blind to the fact that this is not a case in which Sjobring has uncovered an apparent wrongdoing that will remain unaddressed without this class action. Indeed, Sjobring only filed his complaint *after* Colorado had entered into a settlement with First American Title Insurance Company providing for full refunds to be made to customers nationwide. The California Department of Insurance similarly sought to make certain California insureds were properly compensated. Any further legal action can be pursued by members of the class, if they so desire. Sjobring makes no argument that any future action they might pursue would be time-barred, or offer any other reason why the class members might be denied relief if *this action* is unable to proceed on their behalf. In short, the potential for abuse of the class action procedure is overwhelming, while the interests of the real parties in interest are minimal. Precertification discovery under these circumstances would be an abuse of discretion.

The case of *Budget Finance Plan v. Superior Court* (1973) 34 Cal.App.3d 794 [110 Cal.Rptr. 302] does not change our result. In that case, the plaintiffs

---

[18] We again note that while Sjobring may have a cognizable claim against the First American entities, he does not have the claim asserted in this class action.

were defrauded by a seller of goods who sold on an installment plan. The seller assigned the installment contracts to three different financing agencies. The plaintiffs brought a class action against the seller as well as each of the financing agencies, even though their contracts had only been assigned to a single financing agency. The seller defaulted and disappeared, leaving the financing agencies as the only defendants. The two financing agencies not involved with the plaintiffs' contract demurred, on the basis that a class action against multiple defendants can only be maintained against defendants as to whom the class representative has a cause of action. The demurrer was sustained with leave to amend, and the plaintiffs subsequently submitted interrogatories to the demurring defendants, seeking to discover the identity of customers whose installment contracts had been assigned to those defendants.

The Court of Appeal held such discovery appropriate. The court noted that a class action plaintiff who does not adequately represent the class should be granted leave to redefine the class or seek additional plaintiffs. With no further analysis, the court concluded, "It follows that if discovery is necessary in order to do this, it should be made available." (*Budget Finance Plan v. Superior Court, supra,* 34 Cal.App.3d at p. 799.) When the demurring finance companies argued that leave to amend is only granted when the representative plaintiff was *originally* part of the class, the court responded, "The argument from the distinction is not persuasive. Plaintiffs in the case at bench were members of a class allegedly defrauded by a common entrepreneur using a common method. The action is against him as one defendant. His splitting of assignment of the contracts among three finance agencies should not protect those contracts against effective rescission by withholding of the identities of the persons dealing with him." (*Id.* at p. 800.)

While we question the current validity of *Budget Finance*'s apparent blanket authorization of precertification discovery given the subsequent balancing test of *Parris,* it is apparent that *Budget Finance* is distinguishable from the instant case. The *Budget Finance* plaintiffs had been defrauded by the seller in a scheme in which the seller had used three additional defendants. The named plaintiffs were proper representatives of the subclass of plaintiffs whose contracts had been assigned to a single finance company as part of the scheme, and simply sought discovery to obtain *similarly situated* plaintiffs with respect to other finance companies. In the instant case, Sjobring is not, and never has been, a member of the class he sought to represent, and he seeks discovery to obtain a representative plaintiff to cure this defect. This is inappropriate.

## DISPOSITION

The petition for writ of mandate is granted. The trial court is directed to vacate its order granting Sjobring's motion for precertification discovery and to enter a new order denying that motion. First American Title Insurance Company and First American Homebuilders Reinsurance Company shall recover their costs in this proceeding. The stay heretofore issued shall be vacated upon issuance of the remittitur in this matter.

Klein, P. J., and Aldrich, J., concurred.

3

# EXHIBIT "3"

LAWLER v. LOMAS & NETTLETON MORTG. INVESTORS   Tex. **593**
Cite as 691 S.W.2d 593 (Tex. 1985)

H. Roger LAWLER, as Trustee for the
Lawler Family Trusts, Petitioner,

v.

LOMAS & NETTLETON MORTGAGE
INVESTORS, et al., Respondents.

No. C–3682.

Supreme Court of Texas.

June 5, 1985.

Rehearing Denied July 10, 1985.

Action was brought alleging that certain loans made by financial corporation and others were usurious. The 101st District Court, Dallas County, Craig T. Enoch, J., concluded that the interest charged on one loan was usurious and awarded maker of that note recovery of usury penalties. Maker and defendants appealed. The Court of Appeals, 679 S.W.2d 671, Claude Williams, Retired C.J., affirmed in part and reversed and remanded in part. On appeal, the Supreme Court, McGee, J., held that: (1) original loan made to noncorporate entity and later loan made to corporation did not constitute single obligation; (2) original loan to noncorporate trust, upon which interest was charged at rate of 10.139 percent per annum, was usurious; and (3) provision of loan permitting interest at 18 percent during default was effective so that loan to corporation was not usurious.

Court of Appeals reversed; trial court affirmed.

Spears, J., concurred and filed an opinion.

**1. Appeal and Error ⊜841**

Appellate court, in reviewing case tried upon agreed statement of facts, is not permitted to draw any inference or find any fact not embraced in agreement unless as matter of law, such further inference or fact is necessarily compelled by agreed upon evidentiary facts.

691 S.W.2d—14

**2. Stipulations ⊜14(10)**

All documents constituting loan transaction, which were mentioned in and attached to agreed statement of facts, had to be interpreted together.

**3. Stipulations ⊜14(10)**

Recitation of agreed fact that promissory note executed by corporation was for sum of money "representing the principal and accrued and unpaid interest" on original loan to trust did not prevent decision that second note began new loan transaction.

**4. Bills and Notes ⊜116**

Original loan made to noncorporate entity and later loan made to corporation did not constitute single obligation where original note provided for interest rate of ten per cent per annum during default while second loan provided for interest at 18 percent during default, original note did not establish method for calculation of interest, but second note set calculation at daily rate of 1/360th of annual percentage, only original note allowed prepayment without penalty, and where language in second note referred to "payment" of original indebtedness.

**5. Usury ⊜11**

One of requisite elements of usury is exaction of greater compensation than allowed by law for use of money by borrower.

**6. Usury ⊜12**

For purpose of determining existence of usury, lending institution's practice of charging per diem rate of interest based on 360–day year cannot be characterized as "accidental or bona fide error." Vernon's Ann.Texas Civ.St. art. 5069–1.06.

**7. Usury ⊜42**

Original loan to noncorporate trust, upon which interest was calculated on per diem rate based on 360–day year and therefore charged at rate of 10.139 percent per annum was usurious, given that maximum legal rate of interest chargeable on loans to noncorporate entities was ten percent per

**594** Tex.    **691 SOUTH WESTERN REPORTER, 2d SERIES**

annum. Vernon's Ann.Texas Civ.St. art. 5069–1.02.

### 8. Bills and Notes ⚖116, 136, 137(1)

Provision of promissory note and subsequent modification and extension agreement controlled any inconsistent provision of letter agreement.

### 9. Stipulations ⚖14(10)

Notwithstanding fact that there was no mention of default in agreed statement of facts, provision of loan permitting interest at 18 percent during default was effective so that loan to corporation was not usurious. Vernon's Ann.Texas Civ.St. art. 1302–2.09.

———

Douglas R. Hudman, Fort Worth, for petitioner.

Locke, Purnell, Boren, Laney and Neely, Larry M. Lesh, Dallas, for respondent.

McGEE, Justice.

This is a usury case. The Lawler Family Trusts and the Lawler Corporation sued Lomas & Nettleton Mortgage Investors and Lomas & Nettleton Financial Corporation, alleging that various loans (607, 1126 and 1667) were usurious. The trial court rendered judgment that Lomas & Nettleton Financial charged the Lawler Family Trusts usurious interest on part of loan 607; however, it was also found that part of loan 607, charged to the Lawler Corporation, and loans 1126 and 1667 were not usurious. The court of appeals reversed the judgment of the trial court regarding loans 607 and 1126. 679 S.W.2d 671. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

### Loan 607

On March 21, 1972 the Lawler Family Trusts d/b/a Lawler Investment Company, William Robert Lawler, Jr., Trustee, executed a promissory note payable to the order of Lomas & Nettleton Financial. The note provided for a principal amount of $400,000.00 with interest at 10 percent per annum and a maturity date of March 1, 1975. On May 1, 1973, the Lawler Corporation was chartered. Thereafter, the Lawler Corporation executed a promissory note dated January 20, 1975 payable to Lomas & Nettleton Financial for the principal amount of $479,500.00. The note provided for a maturity date of January 20, 1976 and for monthly interest payments of 5 percent over the prime rate starting March 1, 1975; however, a subsequent modification agreement reduced the interest rate to 10 percent per annum. The note further permitted an interest rate of 18 percent per annum in the event of default on principal or interest payments.

From April 1972 to March 1976, Lomas & Nettleton Financial submitted monthly interest statements on loan 607 to "Lawler Investment Co." Although the statements recited a 10 percent interest rate, a per diem calculation was assessed on the basis of a 360-day year. In total, $118,711.52 was charged from April 1, 1972 through February 28, 1975; $27,082.21 from March 1, 1975 through September 30, 1975; and $28,262.55 from October 1, 1975 through April 30, 1976.

The issue presented is: Does loan 607 involve two separate obligations, and if so, is the original note usurious? The case was submitted to the trial court on an agreed statement of facts pursuant to Tex. R.Civ.P. 263. The trial court rendered judgment that the original debt, from March 21, 1972 through March 1, 1975, was usurious because interest was charged to a non-corporate entity at a rate higher than 10 percent per annum. The trial court found the remaining obligation on loan 607 from March 1, 1975 through April 30, 1976 was not a usurious loan because it was made to the corporate borrower, the Lawler Corporation, and the interest rate did not exceed one and one-half percent per month. The court of appeals determined that the promissory note executed by the Lawler Corporation was not a new transaction but a continuation of the original indebtedness. The court of appeals cited *Schwab v. Schlumberger Well Surveying*

the Lawler Management Company were one and the same entity and all alter egos of H. Roger Lawler. It is argued, therefore, that only one loan transaction has occurred because the various promissory notes and documents evidencing loan 607 were executed by only "one" borrower. In *RepublicBank Dallas, N.A. v. Shook,* 653 S.W.2d 278, 282 (Tex.1983), a new loan was established after the noncorporate borrower on the original loan incorporated himself and negotiated a renewal loan with corporate interest rates. The loan was not usurious even though all parties agreed and the jury found that Shook was the "true borrower." *Id.* at 279. Similarly, the present loan transaction involves an original loan made to a noncorporate entity and a later loan made to a corporation. The court of appeals erred in treating all the transactions as a single obligation.

The remaining issue pertaining to loan 607 is whether the original loan was usurious. Lomas & Nettleton Financial sent the Lawler Investment Company monthly statements reciting a 10 percent per annum rate of interest but calculated the per diem rate based on a 360-day year.[2] In other words, interest was charged at the rate of 10.139 per cent per annum. The relevant maximum legal rate of interest chargeable on loans to noncorporate entities was 10 percent per annum. Tex.Rev.Civ.Stat.Ann. art. 5069-1.02 (Vernon 1971).

[5–7] One of the requisite elements of usury is "exaction of a greater compensation than allowed by law for the use of the money by the borrower." *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). Furthermore, a lending institution's practice of charging a per diem rate of interest based

on a 360-day year cannot be characterized as an "accidental or bona fide error." Tex. Rev.Civ.Stat.Ann. art. 5069-1.06 (Vernon Supp.1985). Accordingly, we hold that the original 607 loan obligation was usurious.

*Loan 1126*

On May 3, 1973, the Lawler Corporation executed a promissory note payable to Mercantile Safe and Deposit Company of Baltimore, Maryland (Mercantile). The note provided for a principal amount of $2,200,000.00 with interest at 8¼ percent per annum and a maturity date of May 3, 1975. In addition, the note provided for interest at the rate of 18 percent during default. Also, on May 3, 1973, by way of a letter agreement, the Lawler Corporation promised to pay a take-out commitment fee of $125,000.00 to Lomas & Nettleton Financial in consideration of their issuance of a commitment agreement to Mercantile to purchase the $2,200,000.00 loan at maturity. The letter agreement provided for a 10 percent per annum interest rate on unpaid principal once Lomas & Nettleton funded the note. Thereafter, according to take-out commitment, Lomas & Nettleton Financial purchased from Mercantile the note on May 21, 1975. In September of the same year, Lomas & Nettleton Financial and the Lawler Corporation executed a modification and extension agreement wherein the principal amount was increased to $2,230,000.00, the maturity date extended to January 6, 1976 and the interest rate changed to 10 percent per annum. The agreement further provided that, except as then modified, the terms and conditions of the prior note executed by Lawler Corporation payable to Mercantile remained in full force and ef-

---

2. Three methods used in calculating interest have been described:

(1) 365/365: The annual interest rate is divided by 365 and the resulting daily rate is multiplied by the number of days in the payment period.

(2) 360/360: The annual interest rate is divided by 360, and each month is treated as having 30 days. Interest for each month is the same, and for a calendar year the interest is the same as that calculated by using the 365/365 method.

(3) 365/360: The annual interest rate is divided by 360 to get a daily interest rate. This rate is then multiplied by the number of days in the payment period. Thus for a calendar year of 365 days, this method produced 5/360th more interest than the other two methods.

*THC Financial Corp. v. Managed Investment Corp.,* 64 Hawaii 491, 643 P.2d 549, 550 n. 2 (1982).

*Corp.,* 145 Tex. 379, 384, 198 S.W.2d 79, 82 (1946) for the general proposition "that the giving of a new note for a debt evidenced by a former note does not extinguish the original indebtedness unless such is the intention of the parties." It was reasoned that no such intention was apparent because the agreed statement of facts recited that the promissory note executed by the Lawler Corporation was "in the principal amount of $479,550.00, representing the principal and accrued and unpaid interest on the March 21, 1972, promissory note executed by the Lawler Trust."

[1, 2] An appellate court, in reviewing a case tried upon an agreed statement of facts, is not permitted to draw any inference or find any fact not embraced in the agreement unless as a matter of law such further inference or fact is necessarily compelled by the agreed upon evidentiary facts. *Bowman v. Simpson,* 546 S.W.2d 99, 100 (Tex.Civ.App.—Beaumont 1977, writ ref'd). The various documents evidencing loan 607 are mentioned in and attached to the agreed statement of facts. All these documents constituting the loan transaction must be interpreted together. *Nevels v. Harris,* 129 Tex. 190, 195, 102 S.W.2d 1046, 1048 (1937).

[3] Although the agreed facts mention that the promissory note executed by the Lawler Corporation was for a sum of money "representing the principal and accrued and unpaid interest" on the original 607 loan, this recitation does not prevent a decision that the second note began a new loan transaction. In particular, the *Schwab* case also makes it clear that the execution of a renewal note "is generally treated as a new contract." 198 S.W.2d at 82; *see*

*Priest v. First Mortgage Co. of Tex.,* 659 S.W.2d 869, 871 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). The focus of the court of appeals on whether intent to extinguish the original indebtedness was present does not entirely resolve the issue of whether two separate obligations on loan 607 existed.

[4] The promissory note executed by the Lawler Corporation differed from the original note executed by the Lawler Family Trusts. The original note provided for an interest rate of 10 percent per annum during periods of default, whereas the corporation's note provided for interest at 18 percent during default. The original note did not establish the method for calculation of interest; however, the second note sets the calculation at a daily rate of $\frac{1}{360}$ of the annual percentage. Also, the original note, but not the second, allowed for prepayment without penalty.

In addition, language in the second note referring to "payment" of the original indebtedness supports the conclusion that a new contract obligation existed. The deed of trust executed by the Lawler Corporation on the same day as the promissory note stated that the promissory note "is given in renewal" of the original 607 loan, that "the proceeds of the note hereby secured have been advanced ... to renew and pay" the outstanding balance due on loan 607 and further that the original $400,-000.00 "promissory note and all other charges aforementioned thus paid and renewed are secured" by the deed of trust.[1]

Lomas & Nettleton Financial rely on a bankruptcy order declaring the Lawler Family Trusts, the Lawler Corporation and

---

1. The deed of trust specifically provides:
    The Note hereby secured is given in renewal of that certain Promissory Note dated March 21, 1972, in the original principal amount of $400,000.00 executed by The Lawler Family Trust d/b/a Lawler Investment Company, payable to the order of Beneficiary ... Grantors hereby acknowledge that proceeds of the Note hereby secured have been advanced by Beneficiary at Grantors' request to renew and pay (i) the aforementioned $400,000.00 Promissory Note which has an outstanding princi-

    pal balance of $430,616.80, (ii) accrued interest thereon in the amount of $6,479.25 ... and the $400,000.00 aforementioned thus paid and renewed are secured by a valid and subsisting first deed of trust lien against the property described in this Deed of Trust, and the Beneficiary of this Deed of Trust is subrogated to all of the rights, liens, equities and remedies securing the indebtedness evidenced by the aforementioned $400,000.00 Promissory Note.

fect. From May 1975 to April 1976, Lomas & Nettleton submitted to Lawler Investment Company, attention Roger Lawler, monthly statements which recited an interest rate of 10 percent; however, the per diem calculations were based on a 360-day year. In total, Lomas & Nettleton charged $210,187.83 of interest at a rate of 10.139 percent per annum.

Tex.Rev.Civ.Stat.Ann. art. 1302–2.09 (Vernon 1980) provides in pertinent part:
Notwithstanding any other provisions of the law, corporations, domesticate or foreign, may agree to and stipulate for any rate of interest as such corporation may determine, but not to ex-exceed one and one-half percent (1½%) per month, on any bond, note debt, contract or other obligation of such corporation...."

The trial court determined that loan 1126 was not usurious because it was a corporate loan and the interest rate did not exceed 1½ percent per month. The court of appeals reversed the judgment of the trial court reasoning that the Lawler Corporation did not agree to pay interest in excess of 10 percent per annum. The court of appeals refused to give effect to the provision in the note permitting an 18 percent interest rate during default because "there's no mention of default" in the agreed statement of facts. 679 S.W.2d at 678.

[8] We do not agree with this strict reading of the agreed statement of facts. The exhibits attached to the agreed statement, and in particular, the "Modification and Extension Agreement" provides "the note is now in default." The "note" referred to was identified as the promissory note executed by Lawler Corporation in favor of Mercantile dated May 3, 1975 and the modifications were directed to the terms of that prior note. The modification and extension agreement further provided that, except as then modified, Lawler Corporation renewed the note and agreed to "comply with and perform each and every of the obligations, terms, agreements, covenants and conditions specified or contained in the note...." The provisions of the

promissory note and the subsequent modification and extension agreement control any inconsistent provision of the letter agreement. *Peavy-Moore Lumber Co. v. First National Bank of Beaumont,* 133 Tex. 467, 128 S.W.2d 1158, 1163 (Tex. Comm'n App.1939, opinion adopted).

[9] Lawler Corporation admits that loan 1126 would not be usurious if the provision permitting interest at 18 percent during default is effective. Accordingly, we hold that the court of appeals erred in finding loan 1126 to be usurious.

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

SPEARS, J., files a concurring opinion.

SPEARS, Justice, concurring.

I concur with the majority's holding that usury was charged on Loan 607 to the Lawler Trusts. I disagree, however, to the extent this Court is once again approving of a clever device to evade usury laws. A lending institution's practice of encouraging non-corporate entities to incorporate so a higher rate of interest can be charged is a subterfuge to avoid usury penalties. *RepublicBank Dallas N.A. v. Shook,* 653 S.W.2d 278, 283 (Tex.1983) (Spears, J., dissenting); *see also Texas Commerce Bank—Arlington v. Goldring,* 665 S.W.2d 103, 104 (Tex.1984) (Spears, J., concurring). I suppose the next step will be for this Court to approve the current pernicious practice of many lenders to demand 50% of the equity or ownership of the business or project from the borrower before the loan will be made. I see little difference in this practice and extorting "protection" money.



# EXHIBIT "4"

LONE STAR STEEL
COMPANY, Appellant,

v.

John SCOTT, Appellee.

No. 9577.

Court of Appeals of Texas,
Texarkana.

June 28, 1988.

Rehearing Denied Sept. 20, 1988.

Employee sued his employer because of its failure to pay him for suggestion he made which improved slag removal efficiency and increased operating time in the company's steel soaking pits. The 76th Judicial District Court, Morris County, B.D. Moye, J., entered judgment on jury verdict in favor of the employee, and employer appealed. The Court of Appeals, Cornelius, C.J., held that: (1) employer breached its contract with employee by failing to pay him for a suggestion he made which improved slag removal efficiency and increased operating time and company's steel soaking pits; (2) evidence was sufficient to support award of over $3 million in actual damages; and (3) punitive damages could not be recovered for breach of contract where there was no proof of a separate and independent tort or a finding of actual damages resulting from such a tort.

Affirmed as reformed.

Grant, J., filed a concurring opinion.

Bleil, J., filed a dissenting opinion.

**1. Venue** ⟜68

Rule requiring that motion to transfer venue should be granted when it is duly made unless credibility of those making application, or their means of knowledge or truth of facts set out in application are attacked by affidavit of a credible person is mandatorily operative, and if motion for transfer is duly filed and is not challenged as provided in the rule, trial judge is required to transfer the case. Vernon's Ann. Texas Rules Civ.Proc., Rule 258.

**2. Appeal and Error** ⟜1026

Harmless error rule applies to all errors, even those involving violation of procedural rules couched in mandatory language. Rules App.Proc., Rule 81.

**3. Appeal and Error** ⟜1043(8)

Error in failing to transfer case was not calculated to cause and did not cause rendition of an improper judgment and therefore constituted harmless error. Vernon's Ann.Texas Rules Civ.Proc., Rules 257, 258; Rules App.Proc., Rule 81.

**4. Master and Servant** ⟜72

Suggestion plans or other employee benefit plans which expressly make performance optional on part of employer, express an intent not to be bound, or which amount to mere gratuities do not constitute binding contracts.

**5. Master and Servant** ⟜9.5

Where performance under a suggestion plan is left to discretion of employer, there is no cause of action for failure to perform absent proof that employer's discretion was exercised in bad faith; however, suggestion plans which provide or represent that an award will be paid for suggestions adopted and used may constitute valid unilateral contracts which become binding when accepted and performed by promisee.

**6. Master and Servant** ⟜80(10)

Although employer's basic suggestion plan was couched in purely optional or discretionary terms, there was sufficient evidence that later modifications of the plan in the form of company newspaper announcements and agreements by company's officers constituted an agreement to pay some award if an idea was actually adopted and used.

**7. Master and Servant** ⟜72

It was not necessary that employee know of all of terms or modifications of employer's suggestion plan in order to accept the offer by his performance where employee was aware of general nature of suggestion plan and its scheme of awards.

**LONE STAR STEEL CO. v. SCOTT**    Tex. **145**
Cite as 759 S.W.2d 144 (Tex.App.—Texarkana 1988)

**8. Master and Servant ⬦9.5**

Employer breached its contract with employee by failing to pay him for a suggestion he made which improved slag removal efficiency and increased operating time and company's steel soaking pits.

**9. Master and Servant ⬦72**

Fact that amount of any award was left by suggestion plan solely to discretion of employer's awards committee did not render the promised award too indefinite to constitute a contract.

**10. Master and Servant ⬦72**

Fact that employee chose to conceive, design, develop and implement a slag removal scheme in order to increase employer's production quantity and efficiency constituted a benefit to employer and constituted a sufficient consideration for its agreement to pay for employee's suggestion pursuant to employer's suggestion plan.

**11. Contracts ⬦238(1, 2)**

Unless contract is one which by statute is required to be in writing, written provision against alteration or waiver may themselves be waived, modified or changed by subsequent oral or written agreements.

**12. Limitation of Actions ⬦95(1)**

Action for breach of contract accrues when contract is breached or when claimant has notice of facts sufficient to place him on notice of the breach.

**13. Limitation of Actions ⬦28(1)**

Breach of contract claim based on employer's failure to pay employee for his suggestion was timely. V.T.C.A., Civil Practice & Remedies Code § 16.004.

**14. Implied and Constructive Contracts ⬦55**

Recovery on either unjust enrichment or quantum meruit is recovery on a quasi-contract or a contract implied in law, and there can be no recovery on either if the same subject is covered by an express contract.

**15. Implied and Constructive Contracts ⬦55**

Employee could not recover on either quantum meruit or unjust enrichment theories for employer's failure to pay him pursuant to suggested plan since there was an express contract to pay for his idea.

**16. Estoppel ⬦52(7)**

Estoppel cannot create a contract where none existed but estoppel can operate to prevent a party to an existing contract from exercising or insisting upon one of the contractual terms or limitations.

**17. Master and Servant ⬦80(11)**

Evidence, which tended to show that employee's plan was responsible for approximately $60 million in increased profits during the first year and that five percent of first year's savings produced by a suggestion was a general starting point or "rule of thumb" to guide suggestion committee in determining value of an idea and resulting award, was sufficient to support an award of over $3 million for employer's breach of contract by failing to pay employee for his suggestion.

**18. Damages ⬦89(2)**

Punitive damages could not be recovered for breach of contract where there was no proof of a separate and independent tort or a finding of actual damages resulting from such a tort.

**19. Contracts ⬦353(2)**

In breach of contract action, it was not improper to ask jury if parties made an agreement.

**20. Interest ⬦39(2.30)**

Prejudgment interest could be awarded on employee's recovery of actual damages for breach of contract for employer's failure to pay him for his suggestion which improved slag removal efficiency and increased operating time in company's steel soaking pits.

**21. Costs ⬦194.32**

Evidence that employee had repeatedly requested payment for his suggestion was sufficient proof of presentment under applicable statute and therefore employee,

who recovered on his breach of contract claim for employer's failure to pay for his suggestion, was entitled to an award of attorney fees. V.T.C.A., Civil Practice & Remedies Code § 38.002.

———

Stephen F. Fink, Thompson & Knight, Dallas, for appellant.

Rick Harrison, Jones, Day, Reavis & Pogue, Austin, for appellee.

CORNELIUS, Chief Justice.

John Scott sued his employer, Lone Star Steel Company, because of its failure to pay him for a suggestion he made which improved slag removal efficiency and increased operating time in the company's steel soaking pits. The jury found for Scott on theories of contract breach, unjust enrichment, fraud, and estoppel. Scott was awarded $3,016,699.00 actual damages, $3,016,699.00 exemplary damages, and $2,315,851.26 prejudgment interest and attorney's fees, for a total of $8,349,249.26. Lone Star brings fifty-two points of error attacking the judgment and various rulings of the trial court. We find that the judgment for actual damages should be sustained on the breach of contract findings, but that the award of exemplary damages must be eliminated from the judgment because there is no proof of an independent tort accompanying the breach of contract or actual damages resulting from tort.

## VENUE

At the threshold, we will discuss Lone Star's first point by which it contends that the judgment should be reversed because the trial court failed to transfer the case in response to Lone Star's uncontested motion for change of venue.

**[1–3]** At docket call on January 5, 1987, Lone Star announced ready for trial. The case was set for trial at 9:00 a.m. on January 12, one week later. On that day at 8:55 a.m., Lone Star filed a written motion to transfer venue pursuant to Tex.R.Civ.P. 257, on the ground that there existed in Morris County and surrounding counties so great a prejudice against it that it could not

obtain a fair trial. The motion was supported by the affidavits required by Rule 257. Scott did not file any affidavit opposing the motion. The trial then apparently proceeded as scheduled, with no separate hearing on the motion to transfer. The trial court orally denied the motion on January 15 and issued a written order to that effect the next day. A corrected order was filed on May 18, 1987. In its order the trial court found that the motion to transfer was not timely filed, that it was filed for the purpose of delay, that the events creating the alleged prejudice occurred several weeks before Lone Star's announcement of ready, and that at least one attorney for Lone Star had been aware of the alleged prejudicial events since they occurred.

Tex.R.Civ.P. 257 provides in part that:

A change of venue may be granted in civil causes upon motion of either party, supported by his own affidavit and the affidavit of at least three credible persons, residents of the county in which the suit is pending, for any following cause:

(a) That there exists in the county where the suit is pending so great a prejudice against him that he cannot obtain a fair and impartial trial.

Tex.R.Civ.P. 258 provides in part:

Where such motion to transfer venue is duly made, it shall be granted, unless the credibility of those making such application, or their means of knowledge or the truth of the facts set out in the said application are attacked by the affidavit of a credible person; when thus attacked, the issue thus formed shall be tried by the judge; and the application either granted or refused.

Rule 258 is mandatorily operative, and if the motion for transfer is duly filed and is not challenged as provided in the rule, the trial judge is required to transfer the case. *City of Abilene v. Downs,* 367 S.W.2d 153 (Tex.1963); *Freeman v. Ortiz,* 136 S.W. 113 (Tex.Civ.App.1911), *aff'd,* 106 Tex. 1, 153 S.W. 304 (1913). Rule 258 presupposes that, if the motion stands unchallenged, a change of venue is necessary in the interest of justice, and the failure to transfer the case in those circumstances is undoubt-

edly error. It is equally well settled, however, that a judgment is not to be reversed for an error of law, unless the error amounts to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment, or probably prevented the appellant from making a proper presentation of the case on appeal. Tex.R. App.P. 81.[1] The harmless error rule, as expressed in Rule 81, applies to all errors, even those involving the violation of procedural rules couched in mandatory language. *Lorusso v. Members Mutual Insurance Co.,* 603 S.W.2d 818 (Tex.1980); *C.E. Duke's Wrecker Service, Inc. v. Oakley,* 526 S.W.2d 228 (Tex.Civ.App.–Houston [1st Dist.] 1975, writ ref'd n.r.e.). While the harmless error rule has not, to our knowledge, been applied to violations of Rule 258, the courts have held that the mandatory provisions of that rule may be waived by one in whose favor it would operate. *See Grozier v. L–B Sprinkler & Plumbing Repair,* 744 S.W.2d 306 (Tex. App.–Fort Worth, 1987, writ denied). This fact, together with the well-recognized principle that all of the Rules of Civil Procedure stand on equal footing unless they provide otherwise, leads us to conclude that the provisions of Rule 81 apply to violations of Rule 258 the same as to other errors. Having accepted that proposition and having carefully examined the jury selection process as reflected in the record, we conclude that the error in failing to transfer the case was not calculated to cause and did not cause the rendition of an improper judgment.

Forty-five panel members were examined during voir dire. They were all examined about any prejudice they may have had against Lone Star because of the company's lay-offs, disputes over its retirement policies, or for any other reason. All denied that they had any bias or prejudice. Only seven of the forty-five panel members

had ever worked for Lone Star, and only three had heard about the lawsuit. Lone Star challenged none of the panel members for cause. We think these facts clearly indicate that Lone Star was not prejudiced by the jury's composition, and that the error in failing to grant its motion to transfer was harmless under the provisions of Rule 81.

## THE FACTS

Lone Star began operating a suggestion plan in 1962, whereby its employees could receive monetary awards for suggestions which resulted in increased production or savings. Scott was employed in 1966 as a brick mason. In 1975, he submitted a suggestion concerning the operation of the soaking pits where steel ingots must be heated to a uniform temperature before they can be rolled into slabs and coils. The soaking pits are large masonry pits with movable covers. The steel ingots stand on the floor of the pit and are brought to the proper temperature ("soaked") by circulating hot gases around them. The gases come from a natural gas burner set in the wall of the pits and escape through a vent, an arched opening in the bottom of the back wall of the pit, and into tunnels leading to smokestacks. Heating the ingots produces slag, a molten material that runs off the ingots while in a semi-liquid state and onto the floor of the pit. The slag hardens and accumulates in the pits until it eventually must be removed.

When Scott made his suggestion, the procedure Lone Star used for slag removal required workers to enter the cooled pits and use jackhammers to loosen the solidified slag, which was then either dropped into the pit basement through doors in the floor of the pit or taken out through the top of the pit. While they were being cleaned the pits could not be used, and the production of marketable steel was delayed

---

1. *Improper* venue cannot be harmless error. Tex.Civ.Prac. & Rem.Code Ann. § 15.064(b) (Vernon 1986). The error here, however, was not improper venue. Venue was proper in Morris County. Tex.Civ.Prac. & Rem.Code Ann. § 15.036 (Vernon Supp.1988). The error here was failure to order a change of venue because

of local prejudice. *See* 3. R. McDonald, *Texas Civil Practice in District and County Courts* § 10.19 (rev. 1983). Lone Star did not file a statutory motion for transfer at the time of or before answering. Tex.Civ.Prac. & Rem.Code Ann. § 15.063 (Vernon 1986).

until the pits were again operational. The intense heat in the pits during operation and the process of removing the solidified slag by jackhammers damaged the brickwork of the pits. From time to time Scott, as a brick mason, helped repair the damaged brickwork. While performing that work, he conceived his idea for slag removal.

In summary, Scott's suggestion was that the floor of each soaking pit be inclined toward the downtakes and that a "slag runner," which was a grooved tile funnel, be placed in the floor to allow molten slag to run into the funnel and out into the downtakes. His design also called for a gas burner or "lance" to be mounted in the downtake, directed toward a notch cut in the bridge wall, to keep the slag fluid as it exited the bridge wall so that it would continue to flow out of the pit and into the downtake. Scott further proposed that part of an ingot mold be placed in the bottom of the downtake to catch the molten slag as it ran into the downtake. The ingot mold was to function as a kind of wastebasket which could be removed and replaced with another ingot mold after it had filled with slag.

Before Scott submitted his suggestion, he was warned by one of his supervisors that he could not be paid for his suggestion under the company's suggestion plan, because the idea had been discussed previously by others at the company. Nevertheless, he was told to take his suggestion to Robert Hurtte, who administered the suggestion plan for Lone Star. After his visit with Hurtte, Scott submitted his plan in writing on forms furnished by Lone Star. By a notice dated January 26, 1977, Scott was told that his suggestion had been rejected by the suggestion review committee. The reason for the rejection stated on the form was: "This has been considered previously by Management and/or another suggester."

Since he had been told that his suggestion could not be adopted, Scott wrote to Lone Star in May of 1977 asking it to release any rights it had in his suggestion so that he could develop it on his own. The

company refused, and so advised him by a letter in which Lone Star's plant attorney observed that it was the company's policy not to release its rights to inventions or ideas discovered by its employees during and in relation to their employment. He also pointed out that the suggestion form itself, which was signed by Scott when he submitted his suggestion in writing, contains the statement that all suggestions become the property of Lone Star.

Additional evidence, viewed most favorably to Scott's case, revealed the following: Scott continued to believe in and further develop his idea. He asked Albert Bridwell, who was acting foreman in the masonry department, to set up a meeting with Jerry Sheehan, who was manager of the rolling mill. In early 1979, Scott met with Sheehan, Charles Coleman, and Jim Jennings, who was then general foreman of the masonry department. Scott explained his design and told Sheehan that he could remove slag from the soaking pits while the pits were still operating. Jennings gave his opinion that the idea would not work, but Sheehan told Jennings and Coleman to let Scott install his design in the next pit that had to be shut down and cleaned out because of slag build-up. Scott's suggestion was not implemented at that time, but Sheehan was instrumental in later obtaining final approval to have the idea tried.

In December 1979, Scott was approached by Bridwell. He said, "John, these soaking pits are eating us up." Scott described his idea once again for Bridwell and assured him that his idea would remove the slag better than the jackhammer method. Following this conversation, Lone Star authorized and instructed Scott to install his design in one pit.

Scott again went to see Robert Hurtte, the administrator of the suggestion plan, because he wanted his suggestion to be considered for an award. Scott explained that he had met with some of Lone Star's officials and they had decided to let him install his slag runner design. Hurtte responded, "Well, John, looks like you are

going to get to put your project in after all."

Scott's meeting with Bridwell occurred on Christmas Day of 1979. On the day after Christmas, Scott worked seventeen hours beginning to redesign and rebrick Pit No. 1 in accordance with his idea. The next day he spent five hours in the pit downtake putting in his "catch box" to catch the slag as it ran out of the pit. The box was a revision of his earlier idea to use an ingot mold to catch the slag. After Scott completed his redesign of Pit No. 1, he was asked to keep watch over the pit in addition to performing his regular duties. He testified, "We watched it from time to time for two or three days and the slag started running down in this little box just like you open a faucet of water, just a solid stream, and when this thing got a pretty big piece [formed inside], we would go under there and take it out...." The operation of the newly modified soaking pit was also observed by several senior employees and officials of Lone Star, including Ernest Stebbins, L.K. Doty, Jerry Sheehan and Bob Scott. Stebbins, who was then works manager and the second highest ranking plant official, remarked that the idea was "fantastic." Doty, who supervised Scott's work at the soaking pits, concluded that the idea "had an awful lot of merit, because it did—it did the job of removing the slag...."

After the successful trial of Scott's idea in Pit No. 1, Doty instructed him to convert the remaining fifteen pits in accordance with his suggestion. As each pit had to be shut down for slag clean-out, Scott complied. He also made improvements in his design. Instead of replacing loose bricks in the walls at the bottom of the downtakes each time a load of slag was removed, he installed doors specially made with kayo wool through which the workers used fork-lifts to efficiently remove the slag that had flowed over the pit bridge wall and then hardened on top of sand placed in the bottom of the downtakes. Scott worked all hours at the plant while he modified the pits and afterward while he oversaw the pits' continuous slag removal system. He continued to work his assigned shift, but

also regularly returned from home to the plant to check the pits. Sheehan arranged for Scott to have a car pass so that he could freely come and go to observe the modified pits. His reason for doing this was, "Since it was Mr. Scott's idea I wanted Mr. Scott to be there to see what was happening."

According to Scott's evidence, the conversion of all sixteen soaking pits to the new design proved highly successful. In 1980, the pits were able to process all the ingots that had been stacked up in the ingot bank and to keep a steady supply of steel for processing through the rolling mill and the pipe mills. Mr. Stebbins observed that the sixteen pits with Scott's slag runner design were the equivalent of twenty-two pits without the design. Although the number of soaking pits had increased from twelve to sixteen between the years 1979 and 1980, the number of pit clean-outs fell from 212 in 1979 to 62 in 1980. Lone Star, by a conservative estimate, calculated that the reduced down-time for slag clean-outs added 180 more days of pit availability per year. Three hundred thousand more tons of ingots were processed through the soaking pits in 1980 than in 1979. As a result, in 1980 the company set eleven new performance records, including records from the operation of the soaking pits.

Scott produced expert testimony that the adoption of his suggestion produced approximately $60,000,000.00 in extra profits to Lone Star during the first year.

When Lone Star's company magazine, *Starlight*, published an article saying that another employee had received the top award for suggestions in the year 1980, Scott became concerned that his award had been overlooked. He went to L.K. Doty, the supervisor of the soaking pit area, to discuss the amount of his award. After doing some preliminary figuring, Doty told Scott that his award would be "phenomenal."

In April of 1981, Scott visited Jerry Sheehan about payment for his idea. Sheehan told him that he would evaluate the savings from the pits' performance with the new

slag removal design in place through June of 1981 and pay Scott based on that evaluation, and then would reevaluate the project again at a later date and pay Scott again later. Two months later, Scott went to see Sheehan again, and this time Sheehan told him that he would not pay Scott for the new slag removal design, although the plant was going to continue to use it. After Sheehan's statement, Scott left the soaking pits and returned to his job in the masonry department. He then told Hurtte about Sheehan's statement. Hurtte responded that Sheehan had no business telling Scott that he would not be paid for his design. He further stated that Lone Star would have to pay him for his idea or shut down the entire suggestion plan. At some point in their discussions Hurtte had told Scott that an award under the suggestion plan would be five percent of the savings it produced the first year.

During 1981 and 1982, although Lone Star's officers considered that Scott's idea did not meet the established eligibility criteria under the suggestion plan, they discussed the fact that he had pushed an idea others lacked faith in, and it had apparently succeeded. There were discussions about putting his picture in *Starlight* and paying him something outside of the suggestion plan to recognize his efforts. J.B. Jennings, then vice-president of the plant, and Jerry Chapman, an industrial engineer, met with Scott on December 2, 1981. During that meeting, Jennings told Scott that he was going to reconsider whether the steel company would pay for the idea. Scott, who had refused to return to work in the soaking pits unless he was paid for his suggestion, said he was ready to return. A few days later, however, Jennings suffered an incapacitating stroke. He never returned to the plant, and died several months later. Stebbins took his place as vice-president.

Scott next talked with Hurtte, who told him that Stebbins had decided to pay him the top award ever given under the plan and then rewrite the plan to make the maximum cash award $50,000.00. At trial Hurtte testified that Stebbins said he wanted to pay Scott $10,000.00 and write an

article in *Starlight* giving him credit for working diligently in the installation of his suggestion, but he was afraid Scott would be embarrassed or insulted by the $10,-000.00 payment and file suit against the company. Stebbins died in April of 1982.

In October of 1982, the suggestion plan committee reconsidered Scott's suggestion, apparently at his request. The committee was told that because there had been changes made at the soaking pits since 1977 and Scott claimed that those changes had involved his idea, his suggestion should be reconsidered. The committee heard no new information that refuted its 1977 decision that the idea was not original, and it heard from several technical people involved with the soaking pits who said that the experiment with this method of slag removal had failed because it was causing too much damage to the facilities, and that it was going to be discontinued. The committee thus let stand its original decision rejecting Scott's suggestion.

### THE JURY FINDINGS

In answer to special issues, the jury found that Scott submitted an idea which Lone Star adopted and which resulted in increased production or cash savings; that Lone Star made an agreement with Scott to pay him for the idea; that Scott complied with the agreement, but Lone Star did not; and that $3,016,699.00 was the amount Lone Star would have paid had it complied with the agreement. The jury also found that Lone Star falsely represented to Scott that it would pay for his suggestion; that it acted with malice in making such representation; that Lone Star was unjustly enriched by using Scott's idea; that Lone Star was estopped to contend that Scott's suggestion was not eligible under the suggestion plan; and that by finding his suggestion ineligible, Lone Star failed to administer its suggestion plan in good faith. Damages for false representation, unjust enrichment, and for punishment were each found to be the same as for breach of contract—$3,016,699.00. The date the contract was breached was found to be January 1, 1982.

### BREACH OF CONTRACT

Lone Star contends in several of its points of error that Scott's recovery on a breach of contract theory cannot be sustained because as a matter of law there was no contract, and in any event there is insufficient evidence to establish the essential elements of a contract. These contentions are based on the terms of the suggestion plan which Lone Star contends conclusively demonstrates that there was no intent to be bound, no definite promise, no consideration, and that performance by Lone Star was entirely optional.

The suggestion plan is described in a document titled "Lone Star Steel Company's Suggestion Plan." The document was not distributed to employees, but a brief description of it is contained in a manual for new employees. It was also described in the November 1962 issue of *Starlight*, the company newspaper, when the suggestion plan was initiated. Successive issues of *Starlight* elaborated on the provisions and operation of the plan.

In arguing that there was no binding contract, Lone Star relies particularly on the following provisions of the suggestion plan as it is contained in the basic document.

A suggestion will not be awardable if it is received after general company action has started on the same subject.

. . . .

AWARD AMOUNT.

1. Tangible Suggestions

A tangible suggestion is one which will result in actual cash savings during the first year after implementation.

. . . .

. . . No action which the company might take shall be deemed to constitute an agreement to pay for an ineligible suggestion.

. . . .

By submitting a suggestion, an employee waives any right to compensation for use of the suggestion except under the terms of the Suggestion Plan,. . . .
The processing of a suggestion . . . under the Suggestion Plan shall not be deemed a waiver of any rights which Lone Star

Steel Company may have to the subject matter of the suggestion.

Lone Star Steel Company reserves the right to change the Suggestion Plan at its discretion. Any decision of the company concerning the terms or administration of the plan, including the eligibility of suggestions and the amount of any awards made, is final.

Additional features of the plan were discussed in *Starlight*. For example, in the November issue:

Cash awards will be paid for all suggestions adopted. Awards for suggestions which result in savings to the Company, or in greater production or better quality, will be based on a percentage of the savings during the first year the suggested change is in operation. The minimum award will be $5. The maximum is governed only by the value of the employee's suggestion, but could amount to thousands of dollars for a valuable idea. No award is to be granted unless the suggestion is adopted and installation has been initiated.

. . . .

Suggestions will be processed as rapidly as possible, and necessary investigations conducted as quickly as they can effectively be carried out. Employees will be notified of the status of their suggestion when such studies require more time than normal. In some cases, it may be necessary to put a suggestion into practice and operate it for several months before a determination of its value and the savings it accomplishes is possible. Awards will be made as soon as such experimentation is completed.

. . . .

A suggestion and all ideas embodied therein become the absolute and exclusive property of the Company upon submission.

. . . .

All decisions of the Company with respect to eligibility, the adoption of suggestions, the making of awards, or the interpretation of the Suggestion Plan shall be final and binding on all parties.

[4,5] Lone Star correctly points out that suggestion plans or other employee benefit plans which expressly make performance optional on the part of the employer, express an intent not to be bound, or which amount to mere gratuities do not constitute binding contracts. *Long v. Southwestern Bell Telephone Company*, 442 S.W.2d 462 (Tex.Civ.App.–San Antonio 1969, writ ref'd n.r.e.); *Parrott v. Brotherhood of Railroad Trainmen*, 85 S.W.2d 306 (Tex.Civ.App.–Texarkana 1935, writ ref'd); *Rieden v. Brotherhood of Railroad Trainmen*, 184 S.W. 689 (Tex.Civ.App.–San Antonio 1916, writ ref'd); *Calkins v. Boeing Company*, 8 Wash.App. 347, 506 P.2d 329 (1973). Where performance under a suggestion plan is left to the discretion of the employer, there is no cause of action for failure to perform absent proof that the employer's discretion was exercised in bad faith. *Moore v. General Motors Corp.*, 558 S.W.2d 720 (Mo.Ct.App.1977); *Schott v. Westinghouse Electric Corporation*, 436 Pa. 279, 259 A.2d 443 (1969). However, suggestion plans which provide or represent that an award will be paid for suggestions adopted and used may constitute valid unilateral contracts which become binding when accepted and performed by the promisee. *Carlini v. United States Rubber Company*, 8 Mich.App. 501, 154 N.W.2d 595 (1967).

[6] Although Lone Star's basic suggestion plan is couched in purely optional or discretionary terms, there is sufficient evidence that later modifications of the plan in the form of *Starlight* newspaper announcements and agreements by Lone Star's officers constituted an agreement to pay some award if an idea was actually adopted and used. The November 1962 issue of *Starlight* is especially convincing: "Cash awards *will be paid* for all suggestions *adopted*." (Emphasis added.) *See Douglass v. Panama, Inc.*, 504 S.W.2d 776 (Tex. 1974); *Danaho Refining Company v. Dietz*, 398 S.W.2d 307 (Tex.Civ.App.–Corpus Christi 1965, writ ref'd n.r.e.); *Signs v. Bankers Life & Casualty Company*, 340 S.W.2d 67 (Tex.Civ.App.–Dallas 1960, no writ); *see also*, Annot., 40 A.L.R.3d 1416 (1971).

Lone Star argues that no contract existed because (1) Scott did not read the November 1962 *Starlight* article until after he filed the lawsuit, so he could not have accepted the offer; (2) Scott's idea was not eligible because it was not original; (3) the promise is too indefinite, especially as to the amount of an award; (4) there was no consideration; and (5) later modifications of the plan were not effective because the plan expressly prohibited them.

[7] The fact that Scott did not know of the November 1962 *Starlight* article until after the lawsuit was filed does not defeat his right of contract. He was aware of the general nature of the suggestion plan and its scheme of awards. It was not necessary that he know all of its terms or modifications in order to accept the offer by his performance. *Restatement (Second) of Contracts* § 23 comment e (1981).

[8] As for the argument that Scott's idea was ineligible because it was not original, we find no requirement in the plan for originality. The plan speaks of eligibility, which was apparently left to the decision of the awards committee. This requirement too, however, was subject to the subsequent modifications that all ideas adopted would be paid for. It is undisputed in this record that Lone Star did adopt Scott's suggestion. Moreover, there is evidence that even if an idea was not original, if the earlier suggestion had not been adopted within two years of the other's submission the latter idea would become eligible.

[9] Lone Star argues that the promise was too indefinite to constitute a contract. The basis of that contention is that the suggestion plan left the amount of any award solely in the discretion of the awards committee. It is recognized, however, that the failure of a contract to specify the amount of payment does not render it ineffective. In such a case the law will imply that a reasonable amount was intended. *Bendalin v. Delgado*, 406 S.W.2d 897 (Tex. 1966). And although the determination of what is reasonable was placed in the discretion of Lone Star's suggestion committee, the committee cannot void the contract by

**LONE STAR STEEL CO. v. SCOTT**    Tex. **153**

Cite as 759 S.W.2d 144 (Tex.App.—Texarkana 1988)

refusing to exercise that discretion. If the committee refuses to set the amount, it is deemed to have waived that right, and to have left the matter to determination by the court. *Aycock v. Vantage Management Co.*, 554 S.W.2d 235 (Tex.Civ.App.–Dallas 1977, writ ref'd n.r.e.); *see also, Young v. Warren*, 444 S.W.2d 777 (Tex.Civ.App.–Beaumont 1969, writ ref'd n.r.e.).

[10] There is evidence of consideration for the agreement. Although when he was employed Scott signed an agreement assigning to the company all inventions and ideas he conceived while employed there, he was not obligated to conceive or develop any such idea. He was a brick mason who had no duty to seek a solution to the slag build-up in the soaking pits, and it is conceded that his efforts in doing so were beyond the scope of his original duties. The fact that he chose to conceive, design, develop and implement the slag removal scheme in order to increase Lone Star's production quantity and efficiency constituted a benefit to Lone Star and constitutes sufficient consideration for its agreement to pay. As Lone Star concedes in its brief before this Court, although the company had title to all of its employees' ideas, it "evidently saw a need to encourage employees to share their ideas with the company," and thus designed and announced the suggestion plan with its scheme of awards. If a performance includes something that is not within the promisee's pre-existing duty, the requirement of consideration is satisfied. *Restatement (Second) of Contracts* § 73 (1981); 1A *Corbin on Contracts* § 192 (1963).

[11] Lone Star also argues that subsequent modifications of the suggestion plan or subsequent agreements by its officers could not be effective because the plan itself provided that no action taken by the company could constitute an agreement to pay for an ineligible suggestion. A provision of that nature, however, like similar nonwaiver provisions, is itself subject to modification or waiver by subsequent agreements. For example, unless the contract is one which by statute is required to be in writing, written provisions against

alteration or waiver may themselves be waived, modified or changed by subsequent oral or written agreements. A written agreement is of no higher legal degree than an oral one, and either may vary or discharge the other. *Morrison v. Insurance Co. of North America*, 69 Tex. 353, 6 S.W. 605 (1887); *Group Hospital Services, Inc. v. One & Two Brookriver Center*, 704 S.W.2d 886 (Tex.App.–Dallas 1986, no writ); *Hyatt Cheek Builders v. Board of Regents*, 607 S.W.2d 258 (Tex.Civ.App.–Texarkana 1980, writ dism'd).

In another point Lone Star argues that there can be no recovery because Scott failed to secure a jury finding that Lone Star acted in bad faith in declaring his suggestion ineligible. We believe this point is immaterial in view of the jury finding that Lone Star agreed to pay Scott for his suggestion and failed to do so. Bad faith becomes an essential element of a breach of contract action only when the contract places performance solely and absolutely in the discretion of one party. In that case, recovery can only be had if the party exercised its discretion in bad faith. As noted previously, however, in this case there is evidence of subsequent agreements or modifications to the effect that an award would be paid for any idea adopted, and the jury so found. The question of a bad faith exercise of discretion was thus not material.

## LIMITATIONS

[12] Lone Star contends that Scott's action is barred as a matter of law by the four-year statute of limitations, Tex.Civ. Prac. & Rem.Code Ann. § 16.004 (Vernon 1986), because he knew no later than February of 1977 that the company had declared his suggestion ineligible. Aside from the eligibility argument, however, the jury found that Lone Star agreed to pay Scott for his idea and failed to do so. An action for breach of contract accrues when the contract is breached, *Jackson v. J.R. Neatherlin Corp.*, 557 S.W.2d 327 (Tex.Civ.App.–Houston [1st Dist.] 1977, writ ref'd n.r.e.), or when the claimant has notice of facts sufficient to place him on notice of

the breach. *Maddox v. Oldham Little Church Foundation,* 411 S.W.2d 375 (Tex. Civ.App.–Tyler 1967, writ ref'd n.r.e.). The jury here found that the breach occurred on January 1, 1982.

[13] There is evidence that Lone Star agreed to pay for suggestions which were adopted. The implementation of Scott's suggestion in all of the soaking pits was completed in April of 1980. Scott testified that he was told by Lone Star's officers that he would not be paid until the design had been in place for some time and the savings had been evaluated. There is also evidence that the payment would be based on a percentage of savings experienced during the first year of operation. There is, therefore, evidence that the breach of the obligation to pay did not occur until mid- or late–1981 at the earliest. This action was filed in January of 1983, less than four years after that time.

## UNJUST ENRICHMENT

[14, 15] We agree with Lone Star that a recovery by Scott on findings of unjust enrichment cannot be upheld. Although Scott characterized his theory as unjust enrichment, it actually stated a right to recover in quantum meruit. *See Black Lake Pipe Line Co. v. Union Construction Co.,* 538 S.W.2d 80 (Tex. 1976). Recovery on either unjust enrichment or quantum meruit is recovery on a quasi-contract or a contract implied in law, and there can be no recovery on either if the same subject is covered by an express contract. *Truly v. Austin,* 744 S.W.2d 934 (Tex. 1988); *Black Lake Pipe Line Co. v. Union Construction Co.,* supra; *Davidson v. Clearman,* 391 S.W.2d 48 (Tex. 1965); *Woodard v. Southwest States, Inc.,* 384 S.W.2d 674 (Tex. 1964). Scott could not recover on either quantum meruit or unjust enrichment, because if there was an express contract to pay for his idea, as the jury found, that governs the transaction; if there was not such an express agreement, Lone Star owned Scott's idea under another express contract, the invention assignment, and there was no unjust receipt by Lone Star of any benefit.

## ESTOPPEL

We also find the evidence legally insufficient to support a recovery on the basis of estoppel, because there is no evidence of any detrimental reliance by Scott which resulted in damages to him.

[16] We disagree with Lone Star that there could be no estoppel in any event. It is true that estoppel cannot create a contract where none existed, *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726 (Tex. 1981), but estoppel can operate to prevent a party to an existing contract from exercising or insisting upon one of the contractual terms or limitations. *Wheeler v. White,* 398 S.W.2d 93 (Tex. 1965). In this case, had there been the requisite reliance and resulting damage, Lone Star could have been estopped from claiming that Scott's idea was ineligible under the suggestion plan. But there is no evidence of detrimental reliance by Scott on any representation or conduct on Lone Star's part. Scott owed his idea to Lone Star and had assigned it to Lone Star. The only detrimental reliance he could have had because of a representation was the extra time and effort he spent in developing and implementing his idea. There is no evidence of damages resulting from those activities, and there was no jury finding requested or made as to any damage resulting from them. The only evidence of damages was the suggestion's value to Lone Star.

## CONTRACT DAMAGES

[17] Lone Star levels an attack on the breach of contract damage award. It argues that the jury's finding of $3,016,-699.00 actual damages cannot be sustained because it rests on two bases, neither of which is competent or sufficient evidence of damages in the context of this case. These two bases are that the use of Scott's suggestion was responsible for approximately $60,000,000.00 in increased profits to Lone Star in the first year, and that the reasonable value of Scott's design was five percent of the first year's savings or increased profits.

There was testimony from Scott's expert witness, Mr. Ludwig, based in part on Lone Star's admitted increase in profits and decrease in pit down-time, that Scott's plan was responsible for approximately $60,000,-000.00 increased profits during the first year. The evidence was contested and disputed, of course, but it is sufficient, if believed, to support such a conclusion. Lone Star's more significant problem with the $60,000,000.00 figure is that it represents increased *profits* rather than *savings.* It contends that the provisions of its suggestion plan, which speaks of awards based on cash savings rather than profits, require that any award be limited to a percentage of *savings.* Scott correctly points out, however, that several of the plan's descriptions and the eligibility forms used in connection with the plan spoke in terms of suggestions which would "increase production," and there was testimony that increased profits resulting from increased production in Lone Star's situation was the equivalent of cash savings as contemplated by the suggestion plan.

Likewise, there was testimony supporting a conclusion that five percent of the first year's savings produced by a suggestion was a general starting point or "rule of thumb" to guide the suggestion committee in determining the value of an idea and the resulting award. Several awards of that percentage had been made under Lone Star's suggestion plan. Since the suggestion committee in this case refused to make any award to Scott, the jury was authorized to determine the reasonable award under the direction of the circumstances, and the evidence relating to five percent of first-year savings was sufficient to justify a finding of that amount.

## FRAUD

In several points, Lone Star challenges the jury findings of fraud and damages suffered by Scott in relying on Lone Star's alleged false representation. We sustain this challenge, and find that there is no evidence that Lone Star made a representation, false when made, that it would pay for his suggestion. We also find that, under the direction of the court's charge,

Scott could not recover the value of his suggestion as fraud damages.

For a promise to do an act in the future to be fraudulent, the promisor must have intended at the time the promise was made not to perform it. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432 (Tex. 1986); *Stanfield v. O'Boyle,* 462 S.W.2d 270 (Tex. 1971). There is no evidence in this record that at the time Lone Star promised to pay Scott for his suggestion, as found by the jury, it intended not to honor that promise. Scott argues correctly that a denial by the promisor that he ever made the promise constitutes some evidence of an intention, when made, not to honor it. *Spoljaric v. Percival Tours, Inc.,* supra. But Lone Star has not denied making the statements which we have held constitute an agreement to pay Scott. They have simply contended, and still contend, that the statements do not constitute a legal agreement to pay. That is a perfectly legitimate defense to a contract dispute, and does not constitute any evidence of fraud. This dispute is essentially one over whether Lone Star's suggestion plan, as modified by its *Starlight* announcements and agreements of its officers, constituted a binding contract. It is not a case of fraudulent promises made to induce Scott to develop and implement his idea.

Moreover, the award of $3,016,699.00 for fraudulent representations was unauthorized under the court's charge and the evidence. The charge instructed the jury that:

> [I]n connection with this issue, ... the word "damages" means that sum of money necessary to put a party in the position he would have been in had he not acted in reliance on a false, material representation. You *should not include any amount of money for what the party might have gained or profited had the representation been true.* (Emphasis added.)

The sum of $3,016,699.00 was the value of Scott's suggestion, according to his evidence. It was the "amount of money the party might have gained or profited had

the representation been true," the very thing which the instruction said was not allowed. There is no evidence of any amount of money necessary to put Scott in the position he would have been in had he not submitted and developed his idea. There is no evidence that he would have been better off financially had he not submitted his idea. The idea belonged to Lone Star under the assignment of inventions agreement. The only dispositive question was whether Lone Star agreed to pay Scott for the suggestion.

### EXEMPLARY DAMAGES

[18] Lone Star contends that exemplary damages were improperly awarded. We agree that such damages are not recoverable in this case, and we will modify the judgment to delete them.

Exemplary or punitive damages may not be recovered for breach of contract unless there is also proof of a separate and independent tort and a finding of actual damages resulting from that tort. *Texas Oil & Gas Corporation v. Hagen,* 31 Tex.Sup. Ct.J. 140 (Dec. 16, 1987); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex. 1986); *Bellefonte Underwriters Insurance Co. v. Brown,* 704 S.W.2d 742 (Tex. 1986). Loss of the benefit of the bargain is not sufficient as a finding for a recovery of damages in such a case. *Jim Walter Homes, Inc. v. Reed,* supra.

As Scott did not prove an independent tort or secure a finding of actual damages resulting from such a tort, a recovery of exemplary damages is not authorized.

### EVIDENTIARY RULINGS

Lone Star attacks the rulings of the trial court in allowing evidence of increased profits resulting from Scott's suggestion, and in excluding from evidence Lone Star's Exhibit 21, which was a summary of awards made under suggestion plans operated by companies throughout the nation.

We have previously noted that evidence of increased profits was proper, since there was evidence that Lone Star's suggestion plan was designed to increase production, and that increased production and profits resulting therefrom were the equivalent of cash savings.

Exhibit 21 purported to show an average of the amounts of money paid for suggestions at companies throughout the country operating suggestion plans. The trial court excluded the exhibit, primarily because it covered a different time period from that involved in this suit. We believe the exclusion was harmless in any event. The average suggestion award in the nation was not the issue here. The issue was what would be reasonable under Lone Star's suggestion plan. Thus, evidence of the suggestion committee's rule of thumb and other awards made under Lone Star's plan would be the most appropriate evidence. While we believe Exhibit 21 was admissible for whatever weight the jury desired to give it, we do not believe its exclusion was calculated to or probably did result in an improper judgment, and it was therefore not reversible error. Tex.R.App. P. 81.

### THE COURT'S CHARGE

Lone Star complains of alleged errors in the court's charge to the jury. Points of Error 32 and 36 attack the use of "increased production" rather than "actual cash savings" in the issues inquiring about the effect of implementing Scott's suggestion. We have already passed on this general issue in other portions of the opinion, and find no error in this aspect of the court's charge.

Numerous points of error are leveled at the submission of the issue inquiring if Lone Star made an agreement with Scott to pay for his suggestion. The basic arguments under these points are that the issue was a legal rather than a factual one, the issue was not a controlling one, and the issue was not limited as to time.

[19] Whether or not parties have made a contract is an issue of fact, unless the undisputed documentary or other evidence shows that they intended to enter into a binding agreement. *Scott v. Ingle Bros. Pacific, Inc.,* 489 S.W.2d 554 (Tex. 1972); *Hervey v. Passero,* 648 S.W.2d 344 (Tex.

App.–El Paso), *rev'd on other grounds*, 658 S.W.2d 148 (Tex. 1983); *Henry C. Beck Company v. Arcrete, Inc.*, 515 S.W.2d 712 (Tex.Civ.App.–Dallas 1974, writ dism'd). Once a determination has been made as to what passed between the parties, decisions as to whether their agreement meets the legal requirements of a contract and its interpretation are questions of law. *Hervey v. Passero*, supra; *Enos v. Leediker*, 214 S.W.2d 694 (Tex.Civ.App.–Galveston 1948, no writ). Under our broad submission practice, it was not improper to ask the jury if the parties made an agreement. *Haas Drilling Co. v. First National Bank in Dallas*, 456 S.W.2d 886 (Tex. 1970). And certainly, whether or not Lone Star made a contract to pay for Scott's suggestion was an ultimate issue in the case. Since the question of limitations was covered in another special issue, the failure to limit the issue concerning the agreement to a specific time was not error.

The complaints concerning the special issues on fraud, unjust enrichment, estoppel and bad faith have become immaterial in view of our previous rulings on those subjects.

### PREJUDGMENT INTEREST AND ATTORNEY'S FEES

[20] The trial court allowed Scott prejudgment interest on his recovery of actual damages, and also awarded attorney's fees. Lone Star challenges these awards, contending that prejudgment interest was not proper and that attorney's fees should not have been allowed because there was no evidence that Scott presented his demand for payment to Lone Star as required by Tex.Civ.Prac. & Rem.Code Ann. § 38.002 (Vernon 1986).

Our Supreme Court has ruled that prejudgment interest is now recoverable in a breach of contract case, where the contract itself does not fix the amount of damages.

*Perry Roofing Company v. Olcott*, 744 S.W.2d 929 (Tex.1988). The decision applies to all cases now in the judicial process.

[21] As for attorney's fees, Lone Star's Admission No. 50 admitted that Scott had repeatedly requested payment for his suggestion.. This is sufficient proof of presentment under Section 38.002. *Welch v. Gammage*, 545 S.W.2d 223 (Tex.Civ.App.–Austin 1976, writ ref'd n.r.e.).

### DISPOSITION

For the reasons heretofore stated, the judgment is reformed to eliminate the recovery of exemplary damages. As reformed, the judgment is affirmed.

GRANT, Justice, concurring.

I concur with the majority opinion, except I would also uphold the trial court's ruling that the Motion to Transfer Venue was not timely made.

The docket notice on which this case appeared contained the following statement: Both civil and criminal dockets will be called on the first day of each term of court. Civil at 9:00 A.M. and criminal at 10:00 A.M. *All pre-trial motions must be presented on that day.* Civil juries will be selected on the second Monday of the term and criminal juries on the third Monday. (Emphasis added.)

On the day of the docket call, Lone Star Steel Company announced ready for trial. On the day set for the jury trial, Lone Star Steel Company filed a Motion to Transfer Venue.[1] Lone Star Steel Company did not ask leave of the trial court to file the additional pretrial motion, and it did not seek to withdraw its announcement of ready.

As stipulated by Lone Star Steel Company during the trial, the trial court observed in its order [2] that the in-house attorney for

---

1. Lone Star Steel Company also filed a Motion for Continuance at the same time.

2. The language of the Corrected Order Overruling the Motion to Transfer Venue is as follows:
   On this, the 12th day of January, 1987, came on to be considered the Defendant's

Motion to Transfer Venue and after hearing evidence and the argument of counsel thereon, the Court finds as follows:
   That this case was filed on the 18th day of January, 1983; that since that time several motions for continuance have been granted

Lone Star Steel Company had been aware of the basis for the Motion to Transfer Venue long before the deadline for pretrial motions and long before announcing ready for trial. The court denied the motion on the basis that it was not timely filed, that Lone Star Steel Company was not diligent, and that the motion was filed for the purpose of delaying the trial. Tex.Civ.Prac. & Rem.Code Ann. § 15.063 (Vernon 1986) requires that a motion to transfer a case to another county of proper venue on the basis that an impartial trial cannot be had in the county in which the action is pending shall be "filed and served concurrently with or before the filing of the answer,...."

Tex.R.Civ.P. 258 does not state a specific time for filing a Motion for Change of Venue, but does require that such motions be "duly made." To determine the meaning of "duly made," we must consider Rule 258 in conjunction with other applicable rules. Tex.R.Civ.P. 248 directs that when a jury has been demanded, motions, as far as practicable, shall be heard and determined by the court before the day designated for the trial. Tex.R.Civ.P. 166 permits the trial court to establish a pretrial calendar and to take up at pretrial conference such matters as may aid in the disposition of the case.

We should not diminish the authority granted to the trial court by this rule. If parties are allowed to ignore these rules and the trial court's pretrial orders authorized by the rules, delay and judicial inefficiency is sure to result. Allowing consideration of a Motion to Transfer Venue filed on the day of jury selection is in effect allowing that party an automatic postponement of the trial, so that the opposing party can have an opportunity to file an answer with supporting affidavits and so that evidence can be heard on this pretrial motion.

Only in the case of an abuse of discretion, which has not been shown in the present case, should a judge be reversed on such a ruling. Upon the filing of the Motion to Transfer Venue, Lone Star Steel Company had the burden of showing good cause as to why this motion could not have been filed in accordance with the trial court's pretrial calendar, and this burden has not been met. A trial court can properly refuse to delay a jury trial in order to consider matters presented out of time or order when no good reason is shown to warrant the delayed presentation. *Dyche v. Simmons,* 264 S.W.2d 208 (Tex.Civ. App.–Fort Worth 1954, writ ref'd n.r.e.).

The case of the *City of Abilene v. Downs,* 367 S.W.2d 153 (Tex.1963), is very similar in many respects to the present case on the change of venue issue. I find, however, that in the *Downs* case it was not shown that the trial court directed all pretrial motions to be presented at the docket call, as in the present case. Furthermore, there had not been an announcement of

---

by the Court, which motions were filed by one or both of the parties; that in December of 1986, a copy of the 76th Judical (sic) District Court docket was mailed to all parties, a copy of which is attached hereto and incorporated herein; the local rule for hte (sic) 76th Judicial District Court which is also contained in the docket sheet provides that all pre-trial motions be presented on the first day of each term; that on the 5th day of January, 1987, at 9:00 A.M., and a jury panel was duly summoned; that Jerry Jones, one of the outside counsel for the defendant, was involved in a protracted trial in the last part of 1986, and started interviewing witnesses the week of January 5, 1987; that at 8:55 A.M. on January 12, 1987, at a time at which the members of the panel were already seated or on their way to the courthouse, the defendant filed its Motion to Transfer Venue; that the events which the defendant alleges created the purported

prejudice occurred several weeks prior to January 5, 1987; that William Osborn is an attorney who is employed as in-house counsel for the defendant at its plant in Lone Star, Morris County, Texas; that Mr. Osborn is one of the attorneys in this case and has been involved in its preparation and trial since its inception; that Mr. Osborn has been aware of the events which were the subject of defendant's Motion to Transfer Venue since the time they occurred and should have known, suspicioned, or with diligence could have discovered, that prejudice, if any, existed in Morris County against the defendant; that the defendant was not diligent, its Motion to Transfer Venue was not timely filed, and was filed for the purpose of delaying the trial of this case.

It is, therefore, ORDERED by the Court that the defendant's Motion to Transfer Venue be and it is hereby denied.

## LONE STAR STEEL CO. v. SCOTT      Tex. **159**
Cite as 759 S.W.2d 144 (Tex.App.—Texarkana 1988)

ready by the defendant at a docket call a week prior to the trial in the *Downs* case; rather in *Downs*, the defendant filed its motion for change of venue prior to announcing ready for trial.

For the reasons set forth, I would hold that the trial court did not err in ruling that the Motion to Transfer Venue was not timely filed.

BLEIL, Justice, dissenting.

I disagree with the majority's legal conclusion that we are free to apply the harmless error rule to this venue error. Therefore, I dissent.

*Does the harmless error rule apply to this venue error?*

Not according to the law of this state. While I agree with the majority that the harmless error rule has not previously been applied to a denial of a mandatory right to a change of venue, I am not willing to join the majority in deciding for the first time that the harmless error rule applies to appellate review of the trial court's failure to grant a motion for change of venue which is unopposed by affidavit.

Our Supreme Court has spoken on this subject. In *City of Abilene v. Downs*, 367 S.W.2d 153 (Tex.1963), the Court held that when a motion for a change of venue is filed—and not attacked with a supporting affidavit pursuant to Tex.R.Civ.P. 258—the trial court is required to grant the motion. The Court held that: "Rule 258 presupposes, and we think properly, that a change of venue is necessary in the interests of justice if the application therefor stands unchallenged in the manner prescribed." 367 S.W.2d at 156. The facts in *Downs* are strikingly similar to those now before us. These similarities exist: (1) before trial the defendant moved for a change of venue; (2) no affidavit opposing the motion pursuant to Tex.R.Civ.P. 258 was filed; (3) the motion was overruled, apparently without a hearing; and (4) the trial court found that the motion was untimely filed and would cause a delay.

Today's majority concedes that the *Downs* decision makes the trial court's action mandatory when a properly filed motion for change of venue is not opposed. The trial court was required to change venue. It did not. The majority acknowledges that this trial court action, denying the motion for change of venue, was clear error. Without any judicial authority or precedent, the majority first determines that the harmless error rule applies in this setting, then promptly determines the error to be harmless. I would look to *Downs* for more guidance on the subject.

The Court in *Downs* had a perfect opportunity to apply the harmless error rule, but did not. However, the Court did address the meaning of the error, saying: "The trial judge was therefore under the duty of removing the cases pursuant to Petitioner's application for change of venue and this cause must be reversed and remanded for this purpose,...." The *Downs* decision, as precedent binding on this Court, requires that this case be reversed and remanded.

Our Legislature has also spoken quite specifically on whether a venue error requires reversal, in enacting Tex.Civ.Prac. & Rem.Code Ann. § 15.064 (Vernon 1986),[1] which provides:

(a) In all venue hearings, no factual proof concerning the merits of the case shall be required to establish venue. The court shall determine venue questions from the pleadings and affidavits. No interlocutory appeal shall lie from the determination.

(b) On appeal from the trial on the merits, if venue was improper *it shall in no event be harmless error and shall be reversible error.* In determining whether venue was or was not proper, the appellate court shall consider the entire record, including the trial on the merits. (Emphasis added).

Applying this statutory provision, I conclude that once the motion to change venue was not attacked pursuant to Tex.R.Civ.P.

1. While the Texas Civil Practice & Remedies Code was enacted in 1985, the historical note in the annotation following Tex.Civ.Prac. & Rem.

Code Ann. § 15.064 (Vernon 1986) dates the prior law to 1863.

258, venue in Morris County became improper. And, pursuant to Tex.Civ.Prac. & Rem.Code § 15.064(b), the trial court's error in no event is harmless; it is reversible error.[2]

Because of my conclusion that the venue error requires a reversal of the trial court's judgment, I would not reach the other issues addressed by the majority of this Court.



Lou W. BURTON and Galleria
Diplomat Association, Inc.,
Appellants,

v.

Jeffrey M. CRAVEY, et al., Appellees.

No. 01-88-00270-CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 18, 1988.

Rehearing Denied Sept. 8, 1988.

Condominium association appealed an order of the 269th District Court of Harris County, David West, J., which granted condominium owners a writ of mandamus to inspect the association's books and records. The Court of Appeals, Duggan, J., held that: (1) writ of mandamus was proper method by which to enforce owners' statutory inspection rights, and (2) absent proof by association of improper purpose for inspecting records, owners were entitled to inspect all pertinent records including those of association's attorney.

Affirmed.

2. Interestingly, this does not appear to represent any change in our law. *See, e.g., City of Abilene v. Downs,* 367 S.W.2d 153 (Tex.1963); *see also, Sneed v. Box,* 166 S.W.2d 951 (Tex.Civ.App.–Fort

**1. Mandamus ⟸129**

Writ of mandamus was proper method to enforce condominium owners' statutory rights to view condominium's records; owners were not required to establish a cause of action against the condominium or a probable right and probable injury. V.T.C.A., Property Code § 81.209; Vernon's Ann.Texas Civ.St. art. 1396–2.23.

**2. Condominium ⟸8**

Absent proof by condominium association that inspection of records was for improper purpose, condominium owners were entitled to inspect "all books and records" of condominium including records and files of attorney for association. Vernon's Ann. Texas Civ.St. art. 1396–2.23.

**3. Condominium ⟸8**

In the event that condominium association's attorney's records, sought by condominium owners, were subject to attorney-client privilege, court would weigh association's interest in nondisclosure of communications against inspection rights of condominium owners. V.T.C.A., Property Code § 81.209; Vernon's Ann.Texas Civ.St. art. 1396–2.23.

Wade B. Reese, Houston, for appellants.

Lou W. Burton, Houston, pro se.

John K. Grubb, Houston, for appellees.

Before SAM BASS, DUGGAN and LEVY, JJ.

OPINION

DUGGAN, Justice.

This appeal involves the right to inspect records and books of a condominium association. Appellees, a group of dissident owners, filed a petition for writs of mandamus and injunction because of the appellant Galleria Diplomat Association's board of directors' refusal to allow the inspection of records. In a corrected order dated March 2, 1988, the trial court granted the writ of

Worth 1942, no writ); *Wilson v. Ryan,* 163 S.W.2d 448 (Tex.Civ.App.–San Antonio 1942, no writ).